# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA;<br>STATE OF CALIFORNIA;<br>STATE OF DELAWARE;<br>STATE OF FLORIDA;<br>STATE OF GEORGIA;<br>STATE OF HAWAII;<br>STATE OF ILLINOIS;<br>STATE OF INDIANA;<br>STATE OF LOUISIANA;<br>COMMONWEALTH OF MASSACHUSETTS;<br>STATE OF MICHIGAN;<br>STATE OF MONTANA;<br>STATE OF NEVADA;<br>STATE OF NEW HAMPSHIRE;<br>STATE OF NEW MEXICO;<br>STATE OF NEW YORK;<br>STATE OF OKLAHOMA;<br>STATE OF RHODE ISLAND;<br>STATE OF TENNESSEE;<br>COMMONWEALTH OF VIRGINIA;<br>STATE OF WISCONSIN; and<br>DISTRICT OF COLUMBIA,<br><br>*Ex rel.* LAURIE SIMPSON,<br><br>PLAINTIFF/RELATOR,<br><br>v.<br><br>BAYER CORPORATION;<br>BAYER HEALTHCARE<br>PHARMACEUTICALS, INC.;<br>BAYER HEALTHCARE LLC; and<br>BAYER AG,<br><br>DEFENDANTS. | **JURY TRIAL DEMANDED**<br><br>Civ. No. 05-3895 (JLL) (JAD)<br><br><br>TENTH AMENDED COMPLAINT<br><br><br>Attorney of Record:<br><br>David A. Bocian<br>KESSLER TOPAZ MELTZER & CHECK LLP<br>280 King of Prussia Road<br>Radnor, PA 19087<br>Tel. (484) 270-1418<br>Fax. (610) 667-7056<br>dbocian@ktmc.com<br><br>Counsel for Relator Simpson |

Table of Contents

Page

I.    INTRODUCTION ...................................................................................................1

      A.    Federal False Claims Act ................................................................................2

      B.    State False Claims Acts ..................................................................................2

II.   SUMMARY OF THE ALLEGATIONS .................................................................4

      A.    Bayer's Unlawful Actions and Marketing Schemes ......................................4

      B.    The Damages Caused by Bayer's Unlawful Marketing Schemes ...................6

III.  JURISDICTION, VENUE, AND STATUTORY REQUIREMENTS..............................7

IV.   THE PARTIES........................................................................................................8

      A.    Relator ............................................................................................................8

      B.    Bayer Defendants ..........................................................................................8

V.    GOVERNING LAWS, REGULATIONS, AND CODES OF CONDUCT .....................10

      A.    The False Claims Act ...................................................................................10

      B.    The FCA's Relationship to the Anti-Kickback Statute.........................................11

      C.    FDA Regulation of Prescription Drugs.........................................................12

            1.    FDA Approval of New Drugs.................................................................12

            2.    Prohibition Against Off-Label Promotion of Drugs .................................12

            3.    Prohibition Against Misbranding of Drugs.............................................13

            4.    The Materiality of Misbranding to the Federal Government....................15

      D.    Government-Funded Health Assistance Programs' Laws and Rules
            Relating to Prescription Drugs....................................................................19

            1.    Medicare ...........................................................................................19

            2.    The Prospective Payment System.............................................................22

            3.    Medicare Cost Reporting ....................................................................23

            4.    The Materiality of Fraud Within the Medicare Payment System ..............25

Table of Contents
(continued)

Page

       5.    Medicaid ...........................................................................................26

  E.   Drug Purchases by and Through Federal Health Insurance Plans and Other Federal Agencies...................................................................................28

VI.   BAYER'S GROWTH AND MARKETING STRATEGIES ............................................32

VII.   RELATOR LAURIE SIMPSON .....................................................................................36

VIII.   TRASYLOL.......................................................................................................................38

  A.   Nature and Usage of Trasylol ...............................................................38

       1.    Trasylol Competition and Profitability ....................................40

  B.   Bayer Consistently Overstated the Effectiveness of Trasylol and Concealed, Obfuscated, and Downplayed Its Safety Risks ................................41

       1.    Bayer Downplayed Trasylol's Renal Risks ..............................42

       2.    Bayer Downplayed the Risks of Heart Attack and Death from Trasylol ....................................................................................42

       3.    Bayer Downplayed the Risk of Adverse Graft Patency with Trasylol ....................................................................................44

       4.    Bayer Knew That Valve-Surgery Patients Were at Higher Risk for Adverse Events with Trasylol ...................................................44

       5.    Bayer Concealed the Results of Other Trasylol Clinical Studies and Safety Findings............................................................46

  C.   Bayer's Illegal Trasylol Marketing Schemes..........................................47

       1.    Post-1998 Trasylol Marketing ..................................................47

       2.    Conflicts of Interest and Biased Trasylol Research ....................48

       3.    Off-Label Trasylol Marketing for Cardiac Procedures............................49

           a.    Trasylol Promotion for Valve and CABG/Valve Procedures........49

           b.    Trasylol Promotion for Off-Pump Procedures..............................50

           c.    Trasylol Promotion for Pediatric Patients.....................................51

Table of Contents
(continued)

Page

4.  Trasylol and Antiplatelets ................................................................52

5.  Off-Label Trasylol Marketing for Non-Cardiac Procedures ...................52

   a.   Orthopedic-Surgery...............................................................52

      i.   Bayer's Off-Label Promotion of Trasylol for
           Orthopedic-Surgery.............................................................53

      ii.  Off-Label Marketing Results in Increased Adverse
           Events........................................................................55

   b.   Liver Transplant Surgery ................................................55

6.  Misbranding Trasylol by Promoting Unsubstantiated Outcomes ..............56

7.  Listing of Off-Label Uses in the Major Compendia ...............................57

D.  Bayer's Kickbacks and Off-Label Marketing of Trasylol ...................................59

   1.  Cardiac Team Meetings ................................................................60

      a.   Cardiac Team Meetings and Return on Investment Analysis.........60

      b.   Disguise of the Meetings' Promotional Nature ............................62

   2.  Improper Grants to Influence Prescribing Trasylol .............................64

      a.   Dr. Peter Smith and Duke University Medical Center ................64

      b.   United Way of Forsyth County, North Carolina...........................64

      c.   Cardiovascular Surgical Clinic of Northwest Arkansas ...............64

      d.   CABG-consult.com.........................................................65

   3.  Bayer's Funding of Off-Label Continuing Medical Education ................65

   4.  Gifts and Other Kickbacks ................................................................66

   5.  Key Opinion Leader Programs/ Peer-to-Peer Selling...............................67

   6.  Contract Discounts ................................................................67

E.  Claims for Reimbursement of the Costs of Trasylol ...........................................68

iv

Table of Contents
(continued)

Page

1.      The Costs of Bayer's Misconduct.................................................68

2.      Government Direct and Indirect Payments for Trasylol............................69

       a.      Medicare ..............................................................70

       b.      Medicaid ..............................................................70

       c.      Trasylol Purchases for Veterans Administration,
               Department of Defense, and Other Direct Purchasers.................71

               i.      Bayer's Misleading Promotion Affects Veterans
                       Administration and Department of Defense
                       Prescribers.......................................................71

               ii.     VA and Department of Defense Purchases of
                       Trasylol .........................................................72

IX.     AVELOX ...............................................................................73

A.      Overview of Avelox and Its Sales Volume, and Bayer's Kickback
        Schemes ..............................................................................73

B.      Bayer's Kickback Schemes to Market Avelox ...................................75

        1.      Cash Honoraria Paid to Avelox Key Opinion Leaders...........................75

        2.      Honoraria Paid to Doctors as Avelox "Consultants" to Bayer ................77

               a.      Clinical Advisory Panels.........................................77

               b.      Avelox Clinical Experience Study ("ACES 2000") ...................77

               c.      Managed Care Advisory Board ....................................78

               d.      Avelox Consultant Exchange Newsletter ...........................78

               e.      Avelox Velocity Challenge........................................79

               f.      Avelox Advisory Board Meetings .................................79

               g.      Testing of New Detailing Approach ..............................80

               h.      Roundtable Meetings ...........................................80

               i.      Signature Series Programs .......................................80

Table of Contents
(continued)

Page

          3.     Bayer Paid Honoraria for Attendance at Avelox Promotions....................81

          4.     Other Kickbacks.......................................................................................83

    C.     Bayer Funded and Sponsored Biased Continuing Medical Education and Other Programs with Kickbacks to Promote Avelox...............................84

    D.     Bayer Paid Kaiser Permanente to Influence Physicians to Increase Prescriptions of Avelox....................................................................................86

    E.     False Claims for Reimbursement and the Costs of Avelox ..................86

X.     DEFENDANTS' UNLAWFUL RETALIATION AND OUTRAGEOUS MISCONDUCT ....................................................................................................88

    A.     Bayer's Outrageous Misconduct with Respect to Baycol......................88

    B.     Bayer's Outrageous Misconduct and Retaliation with Respect to Trasylol ..........91

XI.    CLAIMS FOR RELIEF ......................................................................................96

XII.   PRAYER FOR RELIEF .....................................................................................136

On behalf of the United States of America, and the States of California, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Montana, Nevada, New Hampshire, New Mexico, New York, Oklahoma, Rhode Island, Tennessee, Virginia, Wisconsin, and the District of Columbia, (collectively "the States") Relator Laurie Simpson files this Tenth Amended Complaint against Defendants Bayer Corporation, Bayer Healthcare Pharmaceuticals, Inc., Bayer HealthCare LLC, and Bayer AG (collectively "Bayer" or "Defendants").  Relator alleges as follows:

## I.      <u>INTRODUCTION</u>

1.      This Complaint arises from Bayer's concealment of safety risks, unlawful marketing, and kickbacks associated with its illegal on and off-label promotion of the prescription drug Trasylol and the kickbacks associated with its illegal on and off-label promotion of Avelox.

2.      Trasylol is Bayer's U.S. trade name for aprotinin, a drug approved for intravenous administration during cardiac surgery to prevent excess bleeding.  The United States Food and Drug Administration ("FDA") approved Trasylol for the limited purpose of reducing blood loss in the course of coronary artery bypass graft ("CABG") surgeries.  Bayer illegally promoted Trasylol and downplayed its substantial risks.  Bayer engaged in illegal marketing practices and kickbacks designed to expand its use, including uses beyond the limits of the FDA's approval, or "off-label" uses, which lacked sufficient medical support.  As a result of this misconduct, Trasylol was rendered a misbranded drug and all marketing, sales, and distributions of Trasylol were illegal.  This in turn caused physicians and hospitals to improperly prescribe and administer Trasylol in violation of federal and state laws.  In addition thousands of patients received Trasylol unnecessarily.  A number of Trasylol patients suffered injuries and even death.  Because

of its misconduct, Bayer should not have received federal or state funds for Trasylol.  After the risks finally were revealed publicly, Bayer withdrew Trasylol from the market in 2008.

3.     Avelox is Bayer's trade name for moxifloxacin hydrochloride, an extremely powerful antibiotic.  Bayer illegally provided kickbacks to providers to induce them to use Avelox.

### A.     Federal False Claims Act

4.     This action seeks to recover treble damages and civil penalties on behalf of the United States of America arising from the conduct of Bayer, which (a) made, used, or presented, or caused to be made, used or presented, certain false or fraudulent statements, records and/or claims for payment, and/or (b) made, used, or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the United States, all in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA").

5.     The false claims and statements at issue involve, in substantial part, payments for prescription drugs and related medical services made by (a) federally-funded health assistance programs, including Medicaid and Medicare; (b) federally-funded health insurance programs, including the Federal Employees Health Benefits Program ("FEHBP") and TRICARE; and (c) federal departments and agencies, including the Department of Defense ("DoD"), the Department of Veterans Affairs ("VA"), and other federal entities.

6.     Relator also asserts claims pursuant to 31 U.S.C. § 3730(h) for unlawful retaliation and seeks appropriate statutory penalties and common-law relief.

### B.     State False Claims Acts

7.     This action seeks to recover damages and civil penalties on behalf of the named states arising from the conduct of Bayer which:

a.   made, used, or presented, or caused to be made, used or presented, certain false or fraudulent statements, records and/or claims for payment or approval to the states; and/or

b.   made, used, or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the states,

all in violation of each state's respective False Claims Act or similar statute.  The false claims and statements at issue involve payments made by state-funded health assistance and insurance programs, including Medicaid, and payments made by other state-funded agencies or entities, such as hospitals.

8.   The statutes of the states under which Relator brings these related actions are the:

a.   California False Claims Act, Cal. Govt. Code §§ 12650, *et seq.*;

b.   Delaware False Claims and Reporting Act, 6 Del. C. §§ 1201, *et seq.*;

c.   Florida False Claims Act, Fla. Stat. §§ 68.081, *et seq.*;

d.   Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168, *et seq.*;

e.   Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21, *et seq.*;

f.   Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §§ 175/1, *et seq.*;

g.   Indiana False Claims and Whistleblower Protection Act, In. Code §§ 5-11-5.5, *et seq.*;

h.   Louisiana False Claims Act/Medical Assistance Programs Integrity Law, 46 La. Rev. Stat. Ch. 3 §§ 437.1, *et seq.*;

i.   Massachusetts False Claims Law, Mass. Gen. Laws ch. 12 §§ 5A, *et seq.*;

j.   Michigan Medicaid False Claims Act, MCLS §§ 400.601, *et seq.*;

k.   Montana False Claims Act, Mont. Code §§ 17-8-401, *et seq.*;

l.   Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010, *et seq.*;

m.   New Hampshire Medicaid Fraud and False Claims Law, N.H. Rev. Stat. Ann. §§ 167:61, *et seq.*;

3

n.      New Mexico Fraud Against Taxpayers Act, N.M.S. §§ 44-9-1, *et seq.*;

o.      New York False Claims Act, N.Y. Fin. Law §§ 187, *et seq.*;

p.      Oklahoma Medicaid False Claims Act, Okla. Stat. Ann. §§ 5053, *et seq.*;

q.      Rhode Island False Claims Act, R. I. St. §§ 9-1.1-1, *et seq.*;

r.      Tennessee Medicaid False Claims Act, Tenn. Code §§ 71-5-181, *et seq.*;

s.      Virginia Fraud Against Taxpayers Act, Va. Code §§ 8.01-216.1, *et seq.*;

t.      Wisconsin False Claims Act, Wis. Stat. Ann. §§ 20.931(1), *et seq.*;
        and

u.      District of Columbia False Claims Act, D.C. Code §§ 2-308.03, *et seq.*

## II.    SUMMARY OF THE ALLEGATIONS

### A.    Bayer's Unlawful Actions and Marketing Schemes

9.      Bayer engaged in unlawful marketing, including off-label marketing and payment of kickbacks, in order to increase the market shares of its prescription drugs Trasylol and Avelox.  Bayer also engaged in a campaign of concealment and disinformation concerning Trasylol's safety and efficacy that continued at least until May 2008, when Bayer recalled Trasylol from the market.  Bayer's conduct rendered Trasylol a misbranded drug under federal and state law.

10.     Bayer knew that its false and fraudulent practices would cause the submission of millions of dollars of false claims to federal and state health assistance and insurance plans and cause the federal and state governments to make substantial direct purchases of the misbranded drug, many for medically unnecessary and potentially harmful uses.

11.     Following Bayer's 1994 Trasylol launch, Trasylol sales increased and its market share expanded, particularly after 1998, when Bayer fraudulently succeeded in allaying

4

physicians' safety concerns.  Trasylol's growth continued until early 2006, when adverse research findings and increasing "adverse event reports," *i.e.*, reports of harmful side effects, including death, prompted FDA scrutiny.  In November 2007, the FDA and Bayer announced that Bayer had suspended its marketing of Trasylol.  The suspension of marketing was based on preliminary results from a large clinical trial that showed increased mortality risk with Trasylol.  In May 2008, the New England Journal of Medicine published that trial's final results, including the researchers' conclusion that Trasylol was only modestly more efficacious than far less expensive competing drugs but posed far greater risks.

12.     Avelox is a potent synthetic antibiotic.  Avelox is approved only for treating certain conditions caused by particular bacteria.  By 2004, Avelox had reached annual sales in excess of $270 million.

13.     As part of its unlawful marketing strategy, Bayer engaged in an off-label marketing campaign for Trasylol by promoting the drug for uses that were not approved by the FDA and lacked sufficient medical support, and in manners that were inconsistent with the drugs' labeling.  Although aware of the FDA's prohibition against off-label marketing and that such activity rendered the drugs "misbranded" under the law, Bayer chose aggressively to promote off-label prescriptions.  As a result, Bayer earned substantial profits from government-funded healthcare programs that it otherwise would not have received.  Bayer's off-label marketing schemes caused the submission and payment of false claims within the meaning of federal and state False Claims Acts.

14.     In part because Trasylol was associated with a risk of allergic reactions, the FDA initially approved it only for specific purposes.  By promoting Trasylol without fully disclosing potential harms, Bayer exposed tens of thousands of patients to undisclosed risks.  In fact, the

majority of the reported Trasylol adverse events, including deaths, were attributable to off-label use.

15.     In order to increase its prescription drug market share, Bayer routinely paid kickbacks to physicians and hospitals in order to increase Trasylol and Avelox sales.  The kickbacks that Bayer paid to prescribing physicians and hospitals took many forms, including free trips, "consulting" honoraria, grants, and drug-price discounts.

16.     Bayer's kickbacks and other illegal conduct led to violations of federal and state False Claims Acts because they rendered false numerous certifications that Bayer and providers complied with federal and state laws and regulations.  By paying kickbacks, Bayer caused healthcare providers to file false claims, including cost reports, in violation of federal and state False Claims Acts.

17.     Undisclosed to the federal and state governments, Bayer offered incentives and benefits to physicians, pharmacists, institutions, and other healthcare providers to induce prescriptions for Avelox.

18.     Finally, Bayer retaliated against employees, including Relator, for objecting to, resisting, and reporting its unlawful and fraudulent behavior and, among other things, terminated Relator from her position.

**B.      The Damages Caused by Bayer's Misconduct**

19.     Through its unlawful kickback schemes, Bayer caused false claims to be submitted to Medicare, Medicaid, and other federally and state funded healthcare programs. These government entities paid large sums for claims that they would have refused to pay had they been aware that Bayer had paid kickbacks, either directly or through third parties, to hospital officials, healthcare providers, and others to increase Trasylol and Avelox sales.

6

20.     For example, by promoting drugs for purposes other than those approved by the FDA, by misbranding, by concealing safety risks for both the FDA-approved and off-label uses, and by paying kickbacks, Bayer caused the submission of claims to federal and state government-funded healthcare programs that were not "reasonable and necessary," not "medically necessary," not for a "medically accepted indication," and not for a "safe and effective" drug or otherwise ineligible for payment.  These claims were thus "false or fraudulent" in violation of federal and state laws.

21.     As a consequence of Bayer's unlawful promotion schemes, patients who received Trasylol and Avelox had no assurance that their doctors were exercising independent and fully informed medical judgment or were instead responding to Bayer's inducements and to false and misleading statements by Bayer or its Key Opinion Leaders ("KOLs") in the medical community.[1]  As a natural and proximate result of Bayer's misrepresentations, many patients suffered adverse events that they would not have suffered but for Bayer's unlawful conduct. Those adverse events added additional costs to the patients' care, both immediately and for follow-up care.  In fact, Trasylol usage in the United States has resulted in many patients requiring expensive dialysis frequently paid for by Medicare or Medicaid.

**III.    JURISDICTION, VENUE, AND STATUTORY REQUIREMENTS**

22.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States, in particular, the FCA.  In addition, the FCA specifically confers jurisdiction upon the United States District Court.  31 U.S.C. § 3732(b).

--------

[1]     In the pharmaceutical industry, the term "KOL" means a well-regarded physician who has the ability to influence his or her peers' prescribing decisions.

23.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the subject matter of the claims brought pursuant to the States' False Claims Acts because those claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the Constitution.  Under 31 U.S.C. § 3732(b), the False Claims Act itself provides jurisdiction over the States' claims, since they arise from the same transaction or occurrence as the claims brought under 31 U.S.C. § 3730.

24.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and the Defendants have sufficient minimum contacts with the United States.

25.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), because acts complained of herein occurred in the State of New Jersey within this judicial district.

26.     The Relator has knowledge of the allegations, which is both independent of and materially adds to any publicly disclosed allegations, as defined in 31 U.S.C. § 3730(e)(4)(B). Relator acquired her knowledge through her employment at Bayer.  Relator voluntarily disclosed information in her possession to the government before filing this lawsuit.

## IV.     **THE PARTIES**

### A.     **Relator**

27.     Relator brings this action for violations of the False Claims Act on behalf of herself, the United States of America pursuant to 31 U.S.C. § 3730(b)(1), and the States pursuant to their respective statutes.  Relator worked at Bayer from 1998 through 2004.

### B.     **Bayer Defendants**

28.     Prior to 2003, Bayer Pharmaceuticals Corporation, located in West Haven, Connecticut, was a subsidiary of Bayer Corporation, a multi-billion-dollar company with headquarters in Pittsburgh, Pennsylvania.  Bayer Corporation was in turn a wholly owned

subsidiary of Bayer AG, the management holding company for the Bayer Group.  Bayer AG, a

publicly traded German corporation, is a multi-billion-dollar international conglomerate

headquartered in Leverkusen, Germany, with more than 140,000 employees working in

approximately 150 countries.

29.     In 2003, Bayer created a new entity, Bayer HealthCare LLC, to operate five

divisions, including its pharmaceutical operations.  The U.S. pharmaceutical division was

renamed Bayer HealthCare Pharmaceuticals, Inc.  In about 2006, Bayer and Schering Berlin, Inc.

entered into a merger resulting in Bayer HealthCare Pharmaceuticals, Inc. being wholly owned

by Schering Berlin, Inc., which is in turn wholly owned by Bayer GmbH, a wholly owned

subsidiary of Bayer AG.  American Depository shares of Bayer AG were publicly traded on the

New York Stock Exchange from 2002 through 2007.  Effective January 1, 2008, Bayer

Pharmaceuticals Corporation was merged into Bayer HealthCare Pharmaceuticals, Inc. and

eventually did business through Bayer HealthCare LLC's headquarters in Wayne, New Jersey.

Bayer Schering Pharma AG became a wholly owned subsidiary of Bayer AG on September 25,

2008.  For ease of reference, unless otherwise noted, the term "Bayer" shall refer to and include

Miles Laboratories, Bayer Corporation, Bayer AG, Bayer Pharmaceuticals Corporation, and its

successor Bayer HealthCare LLC, d/b/a Bayer HealthCare Pharmaceuticals, Inc.

30.     Bayer is in the business of manufacturing, researching, developing, marketing,

and selling prescription drugs throughout the United States and worldwide.  The federal and state

governments, through Medicare, Medicaid, and other healthcare programs, were major

purchasers of Trasylol and Avelox.

## V.  GOVERNING LAWS, REGULATIONS, AND CODES OF CONDUCT

### A.  The False Claims Act

31.     The FCA, specifically 31 U.S.C. § 3729(a)(1) and (2),[2] as amended, 31 U.S.C. § 3729(a)(1)(A), (B) & (G), imposes liability upon any person who  "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval;" or "knowingly makes, uses or causes to be made or used, a false record or statement to get false or fraudulent claims paid or approved;" or "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government."  Any person found to have violated these provisions is liable for a civil penalty of up to $10,000 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government.

32.     The FCA imposes liability where the conduct is "in reckless disregard of the truth or falsity of the information" and "no proof of specific intent to defraud is required."  31 U.S.C. § 3729(b), as amended, 31 U.S.C. §3729(b)(1)(A) & (B).  The FCA defines a "claim" as including "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(c).

---

[2]     This Complaint employs the numbering used in the version of the FCA in effect during the relevant time period, which was prior to its amendment by the Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. No. 111-21, 123 Stat. 1617 (2009).

**B.** **The FCA's Relationship to the Anti-Kickback Statute**

33.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), reflects Congress's concern that payments to those who influence healthcare decisions will result in providing goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  In order to protect the integrity of government-funded healthcare programs from these difficult to detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.

34.    The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for federally funded medical services, including services provided under Medicare, Medicaid, and TRICARE.  42 U.S.C. § 1320a-7b(b).

35.    The Anti-Kickback Statute makes it a crime to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce a person

> (1)    to refer an individual to a person for the furnishing of any item or service for which payment may be made in whole or in part under a federal healthcare program; or
>
> (2)    to purchase, lease, order, arrange for or recommend any good, facility, service, or item for which payment may be made in whole or in part under a federal healthcare program.

36.    The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind.  42 U.S.C. § 1320a-7b(b)(1).

37.    Parties who contract or subcontract with the federal government are subject to the Anti-Kickback Statute, which makes it unlawful "to provide, attempt to provide, or offer to provide any kickback."  The Statute defines "kickback" as:

11

> any money, fee, commission, credit, gift, gratuity, thing of value,
> or compensation of any kind which is provided, directly or
> indirectly, to any prime contractor, prime contractor employee,
> subcontractor, or subcontractor employee for the purpose of
> improperly obtaining or rewarding favorable treatment in
> connection with a prime contract or in connection with a
> subcontract relating to a prime contract.

41 U.S.C. §§ 52.

38.    By paying kickbacks to healthcare providers and pharmacists who prescribed,

purchased, recommended, administered, or dispensed Trasylol and Avelox, Bayer caused them

to falsely certify compliance with the Anti-Kickback Statute and thus rendered false their claims

for reimbursement from Medicare, Medicaid, and other government programs.

## C.    FDA Regulation of Prescription Drugs

### 1.    FDA Approval of New Drugs

39.    Pursuant to the Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301-397, a new

pharmaceutical drug cannot be distributed in interstate commerce unless it is safe and effective

for each of its intended uses.  21 U.S.C. § 331(d) (prohibiting distribution in violation of section

355); § 355(a) & (d) (prohibiting distribution unless approved as safe and effective for approved

use).  FDA approval of a drug is a multi-year process that begins when the manufacturer files an

Initial New Drug application.  Once the manufacturer completes required clinical trials, it

submits a New Drug application to obtain FDA approval for marketing.

40.    The FDA approves a drug only for treatment of a specific condition or for a

particular use for which the drug has been shown to be safe and effective.  The specific approved

use is referred to as the "indication" in the drug's labeling and in medical literature.

### 2.    Prohibition Against Off-Label Promotion of Drugs

41.    The FDA prohibits drug manufacturers from promoting a drug for any use that is

not FDA-approved.  All uses outside the approved indications are deemed "off-label," including

treating conditions different from those indicated in the label, utilizing a different dose or frequency than indicated in the label, and treating a different patient population than indicated in the label.  21 U.S.C. §§ 331(d), 355.

42.      The Food and Drug Administration Modernization Act of 1997 ("FDAMA") provided, among other things, a means by which a drug manufacturer could lawfully go beyond merely responding to inquiries about off-label usage and initiate dissemination of information about off-label uses of a drug by distributing peer-reviewed journal articles.[3]  FDAMA required a manufacturer to agree to (a) conduct clinical trials required for FDA approval of an additional indication; (b) submit an application seeking such approval; and (c) submit to the FDA for approval any peer-reviewed journal articles to be distributed to the medical community.

43.      Only after receiving FDA approval can a manufacturer proactively distribute peer-reviewed articles that address off-label usage.  The manufacturer must maintain distribution records.  Manufacturers that distribute unapproved journal articles about off-label use, absent a prescriber's unsolicited request, illegally promote that drug for off-label use.

### 3.      Federal Prohibition Against Misbranding of Drugs

44.      Because the FDA considers all of a manufacturer's external communications about a drug (whether written, audible, or visual) as part of the drug's labeling, misleading communications are a form of misbranding.  42 U.S.C. § 352(n).  The Food Drug & Cosmetic Act ("FDCA") requires that all communications by a manufacturer about a drug shall be

---

[3]      21 U.S.C. § 360aaa.  That provision expired on September 30, 2006.  In response, the FDA issued for comment draft industry guidance entitled "Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of New Drugs and Approved or Cleared Medical Devices."  The FDA issued updated guidelines in January 2009.

consistent with its approved indication and labeling, and not misleading in any manner.  A

prescription drug is misbranded when the manufacturer's labeling is "false, lacking in fair

balance or otherwise misleading."  21 U.S.C. § 352.  For example, cost-benefit information

provided to formulary committees of hospitals, managed-care providers, or similar organizations

must be limited to competent and reliable scientific evidence concerning the drug's approved

uses.[4]  Information in drug labeling must be placed in a manner so "as to render it likely to be

read," and drug labeling must provide adequate warnings if a drug may be dangerous to the

patient's health.  21 U.S.C. § 352(c).

      45.     The FDCA deems omission of information relevant to approved uses, or to known

intended uses to be misbranding:

> If an article is alleged to be misbranded because the labeling or
> advertising is misleading, then in determining whether the labeling
> or advertising is misleading there shall be taken into account
> (among other things) not only representations made or suggested
> by statement, word, design, device, or any combination thereof, but
> also the extent to which the labeling or advertising fails to reveal
> facts material in the light of such representations or material with
> respect to consequences which may result from the use of the
> article to which the labeling or advertising relates under the
> conditions of use prescribed in the labeling or advertising thereof
> or under such conditions of use as are customary or usual.

21 U.S.C. § 321(n).

---

[4]     A formulary is a list of prescription drugs that a hospital, governmental agency, managed-care provider, or insurer approves or prefers, based on the drugs' efficacy, safety, and cost effectiveness.  A formulary tends to direct drug purchases to the most cost-effective drug in any particular class of drugs and also tends to preclude purchases of drugs that are not on the formulary.  Each drug manufacturer thus has a strong incentive to ensure that the people who maintain formularies place the manufacturer's drugs in the most favorable positions on the formularies.

46.     A drug is misbranded if its manufacturer has knowledge or notice that the drug "is to be used for conditions, purposes, or uses other than the ones for which [the manufacturer] offers it" yet fails "to provide adequate labeling for such a drug which accords with such other uses to which the article is to be put."  21 C.F.R. § 201.128.  Accordingly, when a drug manufacturer illegally promotes a drug for off-label uses, it misbrands the drug by failing to modify the label for a known intended use.

### 4.     The Materiality of Misbranding to the Federal Government

47.     Federal law makes it illegal to introduce a misbranded drug into interstate commerce.  Specifically, 21 U.S.C. § 331(a) prohibits "[t]he introduction or delivery for introduction into interstate commerce of any . . . drug . . . that is . . . misbranded."  Federal law also makes it illegal to receive and distribute misbranded drugs in interstate commerce. Specifically, 21 U.S.C. § 331(c) prohibits "[t]he receipt in interstate commerce of any . . . drug . . . that is . . . misbranded and the delivery or proffered delivery thereof for pay or otherwise."

48.     The FDCA's prohibition of misbranding and the delivery or receipt of misbranded products is integral to the purpose and mission of the federal government's regulation of pharmaceuticals.  The United States Supreme Court recognized this fact in interpreting the misbranding provisions of the FDCA, stating  that the statute's "overriding purpose" is to "protect the public health" and ensure that marketed drug products "serve the public with 'efficacy and 'safety.'"  United States v. Article of Drug . . . Bacto-Unidisk . . ., 394 U.S. 784, 798 (1969).

49.     In recent years the Department of Justice ("DOJ") has battled misbranding and has succeeded in obtaining settlements of criminal and civil claims for violations of the above-cited misbranding statutes and the federal and state False Claims Acts.  The misbranding cases the DOJ has pursued have included FCA actions brought by whistleblowers.  These settlements,

15

involving some of the largest pharmaceutical companies, have recouped billions of dollars for the federal and state fiscs.  The DOJ's pursuit of these cases, and the resulting settlements, are evidence that the federal government deems misbranding to be a material ground for recovering federal funds expended on pharmaceuticals.  For example:

a.  Warner-Lambert agreed to pay $430 million to the federal and various state governments to resolve criminal and FCA claims arising from Warner-Lambert's misbranding of Neurontin by marketing the anti-seizure drug for off-label uses and making "false or misleading statements . . . regarding Neurotin's efficacy," and its introduction of misbranded Neurotin into interstate commerce.  Press Release, U.S. Department of Justice (May 13, 2004), available at http://www.justice.gov/opa /pr/2004/May/04_civ_322.htm.

b.  Pfizer agreed to pay $2.3 billion to the federal and various state governments to resolve criminal and FCA claims arising from its misbranding of Bextra by promoting the anti-inflammatory drug for off-label uses and doses, paying kickbacks to health-care providers, and the off-label promotion of Geodon, Zyvox, and Lyrica. Press Release, U.S. Department of Justice (Sept. 2, 2009), available at http://www.justice.gov/opa/pr/2009/September/09-civ-900.html.

c.  Scios agreed to pay $85 million to the federal government to resolve criminal charges relating to its misbranding of Natrecor and its introduction of the drug into interstate commerce.  Tony West, Assistant Attorney General for the Justice Department's Civil Division, said that this significant fine "demonstrate[s] the Justice Department's commitment to fighting health care fraud wherever we find it."  The United States had also initiated a parallel FCA action, which is still pending at this time.  Press Release, U.S. Department of Justice (Oct. 5, 2011), available at http://www.justice.gov/opa/pr/2011/October/11-civ-1323.html.

d.  Stryker Biotech agreed to pay $15 million to the federal government to resolve criminal charges relating to its misbranding of its medical device Calstrux.  In a side letter agreement, the government reserved the right to file a FCA suit "to pursue overpayment or recoupment actions." Tom Moylan, Stryker Biotech Pleads Guilty, Will Pay $15 Million for Promoting Bone Repair Products, LexisNexis Legal Newsroom Litigation (Jan. 18, 2012, 4:03 PM), http://www.lexisnexis.com/ legalnewsroom/litigation/b/litigation-blog/archive/2012/01/18/stryker-biotech-pleads-guilty-will-pay-15-million-for-promoting-bone-repair-products.aspx.

e.  Abbott Laboratories was ordered to pay $700 million to the federal and Virginia governments to resolve criminal charges arising from its misbranding of Depakote by marketing the anti-seizure drug for off-label uses and its illegal remuneration practices.  Abbott agreed to pay an additional $800 million to settle FCA claims. Stuart F. Delery, Acting Assistant Attorney General for the Justice Department's Civil Division said that the criminal sentencing "emphasizes the importance of the

16

U.S. government's coordinated efforts to combat health care fraud." Press Release, U.S. Department of Justice (Oct. 2, 2012), available at http://www.justice.gov/opa/pr/2012/October/12-civ-1195.html.

f.   Amgen agreed to pay $762 million to the federal and various state governments to resolve criminal and FCA claims arising from its misbranding, and introduction into interstate commerce, of the drug Aranesp, as well as its promotion of the drugs Enbrel and Neulesta for off-label uses, illegal kickbacks, and false price reporting practices. Civil Division Principal Deputy Assistant Attorney General Delery described the settlement as "reinforc[ing] the Department of Justice's commitment to cracking down on unlawful conduct by pharmaceutical companies. When drug companies improperly misbrand their products, they not only could put individual patients at risk, but they also undermine the federal health care system that protects all of us." Press Release, U.S. Department of Justice (Dec. 19, 2012), available at http://www.justice.gov/opa/pr/2012/December/12-civ-1523.html.

g.   Par Pharmaceuticals agreed to pay $45 million to the federal and various state governments to resolve criminal and FCA claims relating to its misbranding, and introduction into interstate commerce, of the drug Megace ES. Civil Division Principal Deputy Assistant Attorney General Delery stated: "[W]e expect companies to make honest, lawful claims about the drugs they sell. We will be vigorous in our enforcement efforts when they break the law, to ensure that they are held accountable." Press Release, U.S. Department of Justice (March 5, 2013), available at http://www.justice.gov/opa/pr/2013/March/13-civ-270.html.

h.   ISTA Pharmaceuticals agreed to pay $33.5 million to the federal and various state governments to resolve criminal and FCA claims relating to its misbranding and introduction into interstate commerce of the drug Xibrom, and for violations of the Anti-Kickback Statute. ISTA had promoted the drug, which had been approved to treat pain and inflammation specifically following cataract surgery, for the off-label uses of treating pain and inflammation after Lasik and glaucoma surgeries and the treatment and prevention of cystoid macular edema. Press Release, U.S. Department of Justice (May 24, 2013), available at http://www.justice.gov/opa/pr /2013/May/13-civ-606.html.

i.   Wyeth Pharmaceuticals agreed to pay $490.9 million to the federal and various state governments to resolve criminal and FCA claims relating to its misbranding and introduction into interstate commerce of the drug Rapamune. Wyeth had promoted the drug, which had been approved for kidney transplant patients, for off-label use in other types of transplant patients. Press Release, U.S. Department of Justice (July 30, 2013), available at http://www.justice.gov/opa/pr/2013/July/13-civ-860.html.

50.   That the federal government considers misbranding to be material to its decisions

to pay or to seek reimbursement of payments for pharmaceuticals is also evidenced by the

Statement of Interest ("SOI") filed by the DOJ in <u>United States ex rel. Krahling v. Merck & Co.</u>, No. 10-CV-4374 (E.D. Pa.).  In that case the relator brought an FCA claim against Merck, alleging that Merck misrepresented the efficacy of its mumps vaccine in violation of federal statutes and agency regulations that required Merck to ensure that the vaccine's label was not false or misleading, including the prohibition on misbranding in 21 U.S.C. § 352(a).  The SOI supported the relators' theories of recovery, specifically citing the paragraph of the relators' complaint (117) that stated the relator's misbranding theory.

51.     That the federal government considers whether a drug can be legally sold to be material to its decisions to pay or seek reimbursement of payments is evidenced by the SOI filed by the DOJ in <u>United States ex rel. Provuncher v. Angioscore, Inc.</u>,  No. 09-12176-RGS (D. Mass).  In that case, the relator alleged that Angioscore failed to report adverse events relating to its catheter device, leading to a delay in the removal of the device from the market. The United States filed its SOI in support of relator's theory of liability.  The United States argued (at 6-8) that the failure to report adverse events can be material because reporting adverse events affects "whether a device can be legally sold."

52.     Any misbranded drug that has been introduced into interstate commerce can be condemned and seized by the government, and upon ruling of a court, be disposed of without payment to the owner.  21 U.S.C. § 334 (a)(1), (d)(1).  Additionally, wholesale drug distributors are required to quarantine misbranded drugs until the drugs can be destroyed or returned to the manufacturer.  21 C.F.R. § 205.50(e)(1).  Had the government known that Trasylol was a misbranded drug, the government could have seized and destroyed the drug, and, <u>a fortiori</u>, the government could have refused to make payments for it.

### 5.   State Prohibitions Against Misbranding

53.     Nearly every state in the Union and the District of Columbia prohibit the manufacture, sale, or distribution of a misbranded drug and many states prohibit the mere possession, for the purpose of distribution, of a misbranded drug.[5]

### D.   Government-Funded Health Assistance Programs' Laws and Rules Relating to Prescription Drugs

### 1.   Medicare

54.     Medicare is a federal government-funded medical-assistance program that provides benefits primarily to elderly individuals.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), which is a part of the U.S. Department of Health and Human Services ("HHS").  Medicare Part A covers inpatient hospital care (including covered drugs.)  Medicare Part B covers inpatient and outpatient physician services and certain physician-administered outpatient drugs.  Medicare did not cover outpatient drugs such as Avelox tablets until January 1, 2006, when Medicare Part D became effective.

-------------------

[5]     See Ala. Code § 20-1-27; Alaska Stat. § 17.20.290; Ark. Code Ann. § 20-56-215; Cal. Health & Safety Code § 111440; Colo. Rev. Stat. § 25-5-403; Del. Code Ann. tit. 16, § 3302; D.C. Code § 48-702; Fla. Stat. § 499.005; Ga. Code Ann. § 26-3-3; Haw. Rev. Stat. § 328-6; Idaho Code Ann. § 37-115; 225 Ill Comp. Stat. 120/58; Ind. Code § 16-42-1-16; Iowa Code § 126.3; Kan. Stat. Ann. § 65-657; Ky. Rev. Stat. Ann. § 217.175; La. Rev. Stat. Ann. § 40:636; Me. Rev. Stat. tit. 7, § 482 (2006) (amended Aug. 2006); Md. Code Ann., Health-Gen. § 21-256; Mich. Comp. Laws. § 333.17764; Minn. Stat. § 151.34; Mo. Rev. Stat. § 196.015; Mont. Code Ann. § 50-31-501; Neb. Rev. Stat. § 71.2405; Nev. Rev. Stat. Ann. § 585.520; N.H. Rev. Stat. Ann. § 146:1; N.J. Stat. Ann. § 24:5-1; N.M. Stat. Ann. § 26-1-3; N.Y. Educ. Law § 6811 (McKinney); N.C. Gen. Stat. § 106-122; N.D. Cent. Code § 19-02.1-02; Ohio Rev. Code Ann. § 3715.52; Okla. Stat. tit. 63, § 1-1402; Or. Rev. Stat. § 689.135; 35 Pa. Stat. Ann. § 780-113 (West); R.I. Gen. Laws § 21-31-3; S.C. Code Ann. § 39-23-80; S.D. Codified Laws § 39-15-10; Tenn. Code Ann. § 53-1-103; Tex. Health & Safety Code Ann. § 431.021; Utah Code Ann. § 58-17b-502; Vt. Stat. Ann. tit. 18, § 4052; Va. Code Ann. § 54.1-3457; Wash. Rev. Code § 69.04.040; Wis. Stat. § 450.074; Wyo. Stat. § 35-7-111.

55.     Medicare enters into agreements with healthcare providers and suppliers, such as physicians and hospitals, to establish their eligibility for payment.  To enroll in Medicare, healthcare providers and suppliers must fill out and sign an application form.  Institutional providers, such as hospitals, use the CMS-855A form (attached as Exhibit E), physicians and non-physician practitioners use the CMS-855I form, and all other healthcare providers use the CMS-855B form.  All CMS-855 forms contain a "Certification Statement" where, among other certifications, the healthcare provider certifies:

> I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.[6]

56.     Federal regulations require, as a condition of participation in Medicare, that hospitals be "in compliance with applicable Federal laws related to the health and safety of patients." 42 C.F.R. § 482.11(a) (emphasis added).  More specifically, federal regulations require hospitals to distribute drugs "in accordance with applicable standards of practice, consistent with Federal and State law." 42 C.F.R. § 482.25(b).  The distribution of Trasylol, a misbranded drug, is inconsistent with federal law and state law and therefore a violation of a condition of participation in Medicare.

57.     Medicare Part A paid hospitals for inpatient care provided to Medicare patients for on-label Trasylol uses such as coronary artery bypass graft ("CABG") surgery.  Medicare paid hospitals for other procedures where Trasylol was used off-label, such as heart-valve-surgery, combination CABG/valve-surgery, and orthopedic-surgery.  Medicare covered the costs

---

[6]     In CMS-855I and CMS-855B "provider's" is replaced with "supplier's."

of Trasylol administered during such procedures and the cost of Avelox administered during inpatient hospitalizations.  Hospitals submitted claims for government reimbursement of hospital care on CMS-1450 (formerly UB-92) or its electronic equivalent.  Because payments of all Medicare claims are conditioned on the compliance of the claim and the underlying transaction with applicable laws and regulations (including the federal Anti-Kickback Statute), a claim submitted on CMS-1450, or its equivalent, impliedly certifies compliance with the law.

58.    The cost of a drug is not reimbursable by Medicare unless the drug is "reasonable and necessary for the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member."  42 U.S.C. § 1395y(a)(1)(A).  Medicare reimburses the cost of a drug only if its use is safe and effective or otherwise reasonable and necessary.  However, the FDA rejected Bayer's requests to approve Trasylol for pediatric use, off-pump CABG surgery, heart-valve-surgery, and orthopedic-surgery.

59.    An unapproved use may by covered under Medicare, according to the CMS Medicare Benefit Policy Manual Chapter 15 § 50.4.2, only if the use is determined to be "medically accepted, taking into consideration the major drug compendia,[7] authoritative medical literature and/or accepted standards of medical practice," unless the FDA has specified that the use is "nonapproved."  Medicare Benefit Policy Manual Chapter 1 § 30.  Despite Bayer's best efforts to influence these sources, most of the off-label uses of Trasylol never reached this level of medical acceptance.

---

[7]    A "drug compendium" is a compilation or database of information about particular drugs, including approved uses, unapproved uses, side effects, etc.  The Medicare Benefit Policy Manual does not specify which compendia should be consulted, but the Medicaid statute lists three major compendia: (i) American Hospital Formulary Service Drug Information; (ii) United States Pharmacopeia-Drug Information; and (iii) the DRUGDEX Information System.

60.     Medicare reimburses physicians for professional services for inpatients and outpatients under Part B according to a Physician Fee Schedule ("PFS").  42 C.F.R. § 414.58(a). Physicians submitted claims for their professional services for Trasylol and Avelox patients on Form CMS-1500.  Because payments of all Medicare claims are conditioned on the compliance of the claim and the underlying transaction with applicable laws and regulations (including the federal Anti-Kickback Statute), a claim submitted on CMS-1500 or its equivalent impliedly certifies compliance with the law.  In addition, the submitting physician certifies that "the services listed above were medically indicated and necessary for the health of the patient," that the information therein is "true, accurate, and complete," that payment will be "from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

## 2.     The Prospective Payment System

61.     Most hospitals that contract with Medicare agree to accept payment through the Inpatient Prospective Payment System ("IPPS").  For inpatient stays under Medicare Part A, hospitals receive payments under the IPPS, on a per discharge or per case basis, that encompass all covered charges related to the patient's care provided by the admitting hospital or any entity that is wholly owned or operated by the admitting hospital.  These payments do not encompass physician services which are billed under Medicare Part B.

62.     Payments under the IPPS are calculated using a formula that takes into account many factors.  Every payment includes two standardized amounts, one that provides for operating expenses and the other that provides for capital expenses.  The payments are then adjusted based on: (i) the market conditions in the hospital's location relative to national conditions, and (ii) the diagnosis-related group ("DRG"), or groups, that the patient is assigned.

63.     Each DRG has a different "weight," which is multiplied by the base standard amount.  These weights reflect the average relative cost of patients within the assigned group.  In 2006, for example, there were 559 different DRGs, more than one of which applied to patients who were routinely administered Trasylol.[8]

64.     DRG classifications and weights are adjusted annually "to reflect changes in treatment patterns technology, and other factors that may change the relative use of hospital resources."  42 C.F.R. § 412.60.  As use of Trasylol increased, its high cost was incorporated into the weights assigned to procedures in which Trasylol was commonly used, thereby increasing the government's payments for those procedures.

### 3.     Medicare Cost Reporting

65.     In the administration of Medicare Part A, CMS contracts with private non-governmental organizations known as "fiscal intermediaries" to review and process claims for reimbursement submitted by healthcare providers.  42 U.S.C. § 1395h.  These intermediaries, typically insurance companies, process and pay claims and audit cost reports.

66.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays.  42 C.F.R. §§ 413.1, 413.60, 413.64.

67.     In addition, 42 C.F.R. § 413.24(f)(4)(iv) requires a certificate of compliance with federal health care law with the filing of a cost report as a prerequisite to final payment under Medicare.  Therefore, as a prerequisite for reconciliation of Medicare payments, CMS requires each hospital to submit an annual Medicare cost report on Form CMS-2552 (formerly HCFA-

---

[8]     Discharges that occurred on or after October 1, 2007 are subject to a new, more complex DRG system utilizing different codes.

2552), the relevant page of which is attached as Exhibit H.  This form contains the following language:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under Federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

The form also requires a certification signed by an officer or administrator of the provider. Included in the certification is the following language:  "I further certify that I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations."  CMS thus conditions payment of claims on a healthcare provider's compliance with federal law, including the Anti-Kickback Statute.

68.     The cost report is the final claim that a hospital files to identify its costs for services rendered to Medicare beneficiaries and to request additional reimbursement for the year if its records support such reimbursement.  42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; see also 42 C.F.R. § 405.1081(b)(1).  In its cost report, a hospital must separate non-covered charges from covered charges.  Non-covered charges include those for drugs or services that were not "reasonable and necessary."  Medicare Claims Processing Manual Chapter 3 § 40.2C.  Hospitals that included the cost of Trasylol as a covered charge, misrepresented that Trasylol was a covered drug when it was not and thereby submitted false claims.

69.     42 U.S.C. § 1395ww(d)(5)(A) requires the government to make additional payments, beyond standard DRG payments, for unusually costly cases of patient treatment. These cases are called "outliers."  A case is an outlier if the cost to the hospital exceeded the

DRG payment for the case plus a fixed dollar amount, which is adjusted on a year-by-year basis. 42 C.F.R. § 412.80(a). During the relevant time period, this fixed dollar amount was established at the level that would result in estimated outlier payments equaling 5.1 percent of total payments by the government for the year. Dep't of Health and Human Services, Office of Inspector General, A-07-10-02764, The Centers for Medicare & Medicaid Services Did Not Reconcile Medicare Outlier Payments in Accordance with Federal Regulations and Guidance (2012). The government is not required, however, to consider non-covered charges in the calculation or reimbursement of outliers. Therefore, cost reports that falsely labeled Trasylol, an unreasonable and unnecessary charge, as "covered" caused the government to make payments for Trasylol, which was not eligible for Medicare reimbursement, in outlier cases.

### 4. The Materiality of Fraud Within the Medicare Payment System

70. The United States has stated time and again that when a defendant has engaged in fraud related to a drug or medical device, the fact that Medicare payments for treatments involving the drug or device are made under the DRG system does not obviate the materiality of the defendant's fraud to the government's payment decisions. For example:

a.  In United States ex rel. Colquitt v. Abbott Labs., No. 3-06-CV-1769-M (ECF) (N.D. Tex.), the relator alleged that Abbott Laboratories had fraudulently obtained regulatory approval to market a vascular stent and marketed the stent for unapproved uses. Abbott argued that its off-label marketing scheme could not be material to the government's payment decision because CMS uses a prospective payment system which pays claims at a bundled rate. The DOJ filed an SOI clearly stating (at 15-16) that "unallowable charges, even when encompassed by a fixed rate under CMS' prospective payment system, render a claim false" and "[t]he mechanics of reimbursement, therefore, cannot be used to insulate a defendant from liability."

b.  In United States ex rel. Paulos v. Stryker Corp., No. 11-0041-CV-W-ODS (W.D. Mo.), the relator alleged that Stryker failed to report adverse events related to the placing of its infusion devices in patients' shoulders. Stryker argued that the use of its device in a medical procedure could not be material to the government's payment decision because the cost of the device is not separately reimbursed. The DOJ filed an SOI clearly stating that Stryker's argument was "incorrect." "The

mechanics of reimbursement, therefore, cannot be used to insulate a defendant from liability."

c.  In <u>United States ex rel. George v. Boston Scientific Corp.</u>, No. H-07-2467 (S.D. Tex.), the relator alleged that Boston Scientific promoted its surgical ablation device for off-label uses.  Boston Scientific argued that because the government made payments based upon a DRG code representing the procedure and not based upon the particular medical device, there could not be FCA liability.  The DOJ filed an SOI stating that "[t]he mechanics of reimbursement, however, do not insulate Boston Scientific from liability . . . it does not matter how the government sets the reimbursement amount – whether by DRG or otherwise – the claim is false regardless."

d.  In <u>United States ex rel. Hutcheson v. Blackstone Medical, Inc.</u>, No. 06-11771-WGY (D. Mass), the relators alleged that Blackstone Medical ("BMI") paid kickbacks to induce surgeons to perform surgery using BMI's devices.  BMI argued that because the government made payments based upon a DRG code representing the procedure and not based upon the particular medical device, there could not be FCA liability.  The DOJ filed an SOI stating that "[t]he form of reimbursement . . . does not insulate BMI from liability for the payment of kickbacks that cause the submission of false claim . . . The existence of falsity in any portion of the claim renders the claim false, and the entity who knowingly caused the false claim to be submitted is liable under the FCA."

e.  In <u>United States ex rel. Nowak v. Medtronic, Inc.</u>, Nos. 1:08-cv-10368 and 09-cv-11625 (DPW) (D. Mass.), the relators alleged that Medtronic promoted its biliary stents for off-label uses.  Medtronic argued that the IPPS precluded FCA liability because the claims would be reimbursed regardless.  The DOJ filed an SOI to inform the court that this was "incorrect" because "the inclusion of unallowable charges could render the entire claim false."

71.     In this case as well, the DOJ has filed an SOI that addresses the DRG system and affirms that "[t]he mechanics of reimbursement cannot and should not be used to insulate a defendant from liability."

## 5.     Medicaid

72.     Medicaid is a program that provides medical coverage to the needy, the blind, the disabled, and needy families with dependent children.  42 U.S.C. §§ 1396-1396v.  At the federal level, CMS administers Medicaid.  Each of the 49 states with Medicaid programs has a state Medicaid agency to administer its respective program.

73.     Payments for goods and services covered by Medicaid come from both federal and state funds (collectively referred to as "Medicaid Funds"), with the federal contribution computed separately for each state.  42 U.S.C. §§ 1396b; 1396d(b).  Each state's obligation varies depending upon various factors, but generally ranges from 40-60% of the total payments within each State.

74.     Federal law authorizes the states to expend Medicaid funds on behalf of eligible beneficiaries to pay for, among other things (a) drugs, including Avelox; (b) hospital services, which included surgical procedures involving Trasylol and medical care involving Avelox or Avelox IV; and (c) physicians' services, including those related to diagnosis and treatment of Avelox patients and to Trasylol use in surgery.  42 U.S.C. § 1396a(10)(A), 1396d(a)(xvii)(1), (2), (5)(A), (6), (9), (12), and (13).

75.     Medicaid relies upon certified provider agreements, hospital cost reports, and claim forms.  Many state Medicaid Programs require health care providers to certify compliance with federal and state law, including the federal Anti-Kickback Statute.  For example the New York State Medicaid Enrollment Form states that by signing the form the provider is agreeing to "abide by all applicable Federal and State laws."  Many States require similar certifications for enrollment into their Medicaid programs.  See Exhibit A.

76.     The use of federal funds for Medicaid reimbursement is conditioned on those funds not being used in a manner, or for items, that are prohibited under state or local laws or regulations.  2 C.F.R. § 225, Appx. A(C)(1)(c) (effective 2005 to 2013); Office of Mgmt. & Budget, OMB Circular A-87, Cost Principles for State, Local, and Indian Tribal Governments (1997) (amended 2004).  Because Trasylol was a misbranded drug and prohibited from sale or

distribution under state law, Trasylol was not eligible for reimbursement under state Medicaid programs.

**E.     Drug Purchases by and Through Federal Health Insurance Plans and Other Federal Agencies**

**1.     TRICARE**

77.     In addition to Medicare and Medicaid, Bayer caused submission of false claims to other government-funded healthcare programs.  One program was the DoD's healthcare system, TRICARE, formerly known as the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), which provides care for approximately eight million people.  TRICARE provides healthcare to active duty service personnel and to non-active duty beneficiaries, including dependents of active duty personnel and military retirees and their dependents.

78.     TRICARE operates through military hospitals and clinics worldwide and is supplemented through contracts with civilian healthcare providers.  TRICARE is a triple-option benefit program designed to give beneficiaries a choice among health maintenance organizations, preferred provider organizations, and fee-for-service benefits.  Five managed-care contractors create networks of civilian healthcare providers.  Military prescription drug benefits are provided through three programs:  military treatment facility outpatient pharmacies, TRICARE contractor retail pharmacies, and a national contractor's mail-order service.

79.     TRICARE conditions payment for medical services and supplies on the requirement that the services or supplies "are medically necessary."  32 C.F.R §§ 199.4(a)(1)(i), (b)(1), (g)(1).  Medical services and supplies are deemed medically necessary under the controlling regulations if the frequency, extent, and type of medical services are "generally accepted . . . to be reasonable and adequate for . . . treatment."  32 C.F.R § 199.2.  Also excluded from TRICARE coverage are "unproven drugs" and "all services directly related to the unproved

28

drug, device, or medical treatment or procedure." 32 C.F.R §§ 199.4(g)(15)(i), (iii). TRICARE

only covers off-label uses if there is a review for medical necessity and a demonstration from

"medical literature, national organizations, or technology assessment bodies that the off-label use

of the drug is a safe, effective, and in accordance with nationally accepted standards of practice

in the medical community." 32 C.F.R. § 199.4(g)(15)(i)(A).

### 2.    CHAMPVA

80.     CHAMPVA, administered by the Department of Veterans Affairs (the "VA"),

provides healthcare coverage, including payment for certain prescription drugs, to qualified

families of deceased or disabled veterans.

81.     CHAMPVA conditions payment for medical services and supplies on the

requirement that they "are medically necessary and appropriate for the treatment," and

specifically excludes services and supplies that "are not medically necessary and appropriate . . .

for the diagnosis or treatment of a covered condition." 38 CFR § 17.272(a); see also §

17.272(a)(1) (excluding from coverage "[s]ervices, procedures or supplies for which the

beneficiary has no legal obligation to pay).

### 3.    Direct Purchases by the VA and Other Federal Agencies

82.   The VA purchased Trasylol. Certain beneficiaries received Trasylol as part of

inpatient care provided at VA facilities. The VA also reimbursed non-federal hospitals for

inpatient treatments of VA beneficiaries that involved the use of Trasylol.

83.     The VA can purchase drugs under a contract known as a Federal Supply Schedule

("FSS"). A sample FSS solicitation contract is attached as Exhibit F. FSS drug prices are based

on prices that the manufacturers charge their most-favored commercial customers. Under the

Veterans Healthcare Act of 1992, as a condition of payment, drug manufacturers must list their

29

drugs on the FSS to receive payment for drugs purchased by certain federal agencies.  38 U.S.C. § 8126(a)(4).

84.     Once the VA has negotiated the prices of drugs under the FSS, those prices become available to all direct federal purchasers.  Those agencies include the VA, DoD, Public Health Service, U.S. Coast Guard, and Bureau of Prisons.  Those agencies can negotiate contracts separately with the manufacturers to obtain additional price discounts.

85.     Under the FSS contract, Bayer agreed to "comply with all applicable Federal, State, and local laws, executive orders, rules, and regulations applicable to its performance under this contract."  See Exhibit F at 10.  Additionally, Bayer was required to warrant in the FSS contract that the Trasylol delivered under the FSS was "merchantable and fit for use for the particular purpose described in this contract."  See Exhibit F at 12.  Had the VA known before entering into the FSS contract that Trasylol was a misbranded drug, and therefore that it was out of compliance with the standard requirements for an FSS contract, the VA never would have contracted with Bayer to purchase Trasylol.  Furthemore, by selling Trasylol, a misbranded drug, to the VA and other government agencies, Bayer submitted false claims for payment by implying that the sale was in compliance with the FSS when it was not.  Had the VA learned after entering into the FSS contract for Trasylol that it was misbranded, the VA could have refused to pay for Trasylol under the contract.

**F.      Conditions of Payment under Medicare**

86.     Federal regulations empowered CMS or fiscal intermediaries to suspend payment to Medicare providers and suppliers in cases of fraud or willful misrepresentation.  See 42 C.F.R § 405.371(a)(1) (2002) (amended March 25, 2011); see also 42 C.F.R. § 411.4 ("Medicare does not pay for a service if [t]he beneficiary has no legal obligation to pay for the service . . . and [n]o other person or organization . . . has a legal obligation to provide or pay for that service.").

30

Therefore, Bayer's willful misrepresentation of Trasylol's safety and efficacy for on-label and off-label uses, which caused hospitals' false statements of compliance with federal and state laws despite the use of a misbranded drug, violated a condition of payment for Medicare.  Had CMS or fiscal intermediaries been aware that Trasylol was misbranded they could have halted payments for the drug.

87.     Similarly, federal statutes and regulations require the filing of an "acceptable" hospital cost report as a condition of payment under Medicare.  42 C.F.R § 405.371(c) (2002) (amended March 25, 2011); see 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20.  Because cost reports require a certification that hospital services were provided in compliance with health care laws and regulations, and because hospitals falsely certified such compliance despite their receipt and distribution of a misbranded drug in violation of the FDCA and similar State laws, such hospitals were in violation of a condition of payment under Medicare.

88.     Furthermore, payments for claims under Medicare are conditioned on hospitals' compliance with "conditions of participation in Medicare."  See Exhibit E; see also CMS State Operations Manual, CMS Pub. 100-7, Appendix A (2009) ("Hospitals are required to be in compliance with the Federal requirements set forth in the Medicare Conditions of Participation (CoP) in order to receive Medicare/Medicaid payment.").  Compliance with "Federal laws related to the health and safety of patients" and the distribution of drugs "in accordance with applicable standards of practice, consistent with Federal and State law" are conditions of participation under Medicare.  42 C.F.R. §§ 482.11, 482.25.  By receiving and dispensing Trasylol, a misbranded drug under the FDCA, hospitals violated federal law related to the health and safety of patients and distributed a drug in violation of federal and state law.

31

## VI.   <u>BAYER'S GROWTH AND MARKETING STRATEGIES</u>

89.    Beginning about 1998, Bayer implemented plans to increase its U.S. business. Over the next several years, however, Bayer faced a number of setbacks.

90.    Bayer had pinned substantial hopes on the success of Baycol, a cholesterol-lowering drug that it launched in the U.S. in January 1998.  Starting later in 1998, however, a number of adverse events were reported, including kidney damage, kidney failure, and death. Bayer concealed the frequency and severity of Baycol's side effects.  In August 2001, Bayer withdrew Baycol from the market.

91.    In 2001, Bayer downsized and reorganized.  Bayer reassigned certain personnel from the Baycol Marketing Team to the Trasylol and Avelox teams.  Donna Conder-Flanery, previously Vice President of Sales, became Vice President of Business Operations and Analysis, with responsibility for the Scientific Affairs Department, whose role in the organization was deemed non-promotional.  As a result of her directives, Bayer's Scientific Affairs Department focused improperly on increasing Bayer's profit.  Members of Scientific Affairs supported Bayer's marketing and sales departments and even assumed sales responsibilities.  Bayer's Scientific Affairs Liaisons ("SALs"), for example, became responsible for delivering key messages developed by the marketing department to particular KOLs.  Bayer's SALs developed and implemented physician-specific "KOL developmental action plans" to increase product advocacy and use.

92.    Beginning in about 2001, Bayer relied increasingly on Trasylol sales in the U.S. to drive company profits.  In 2003, an internal management presentation noted the "need to optimize sales in 2004 through untapped opportunities existing within the current portfolio."  As part of this effort, Bayer identified 35,000 orthopedic surgeons as potential prescribers, a market far greater than Trasylol's existing market.

32

93.     From 2002-2004, Bayer's overall drug sales continued to fall short of its management's expectations.  In September 2004, Bayer sold the U.S. marketing rights to most of its high-revenue drugs, such as Levitra, Cipro, and Avelox, to Schering-Plough, leaving Trasylol and another drug, Kogenate, as the only major drugs that Bayer marketed in the U.S.

94.     Bayer was well aware of its duty to act lawfully in the development, production, and marketing of drugs and that its drugs were often paid for with, or reimbursed by, government funds.  Despite that duty, members of Bayer's top management concluded that the benefits from increased sales of Bayer products outweighed the potential consequences of violating the laws and regulations that governed their conduct.  Relator attended a corporate meeting in 1998 during which Bayer Pharmaceutical President Dr. David Ebsworth urged the attendees to be more aggressive in marketing another Bayer product.  He stated that Bayer would adopt its competitors' attitude of pushing marketing material aggressively by following their competitors' philosophy that "we do not know where the legal boundary is until we hit it."  He later recommended marketing strategies that directly contradicted Bayer's compliance policies.

95.     On January 21, 2001, Bayer signed a Corporate Integrity Agreement (the "2001 CIA") with HHS in connection with Bayer's $14 million settlement of a an FCA action arising out of its manipulation of Average Wholesale Prices and its failure to report the Best Price for certain prescription drugs.

96.     In the 2001 CIA, Bayer agreed to establish a Code of Conduct for its "Covered

Persons" that would set forth, among other things, the compliance "with all Federal health care

program requirements."[9]

97.     Bayer also agreed to train its "Covered Persons" in, among other things, the

following subjects:  the proper methods of marketing and selling government reimbursed

products in accordance with applicable requirements of federal health-care programs; the

personal obligation of each individual involved in marketing and sales of Government

Reimbursed Products to ensure that those products are marketed and sold in accordance with all

applicable requirements of the federal health care programs; and applicable legal rules (including

the sanctions for violations) relating to Government Reimbursed Products (including, but not

limited to, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(l) and (2); the Civil Monetary

Penalties Law, 42 U.S.C.§ 1320a-7a; the FCA; and the Medicaid Rebate Statute, 42 U.S.C. §

1396r-8)).

98.     Bayer was aware of the potential consequences of the failure to comply with

lawful restrictions on its marketing practices.  Yet Bayer did not abide by the 2001 CIA or

applicable law.  On April 15, 2003, Bayer was forced to sign an Addendum to the 2001 CIA (the

"2003 CIA Addendum") that further tightened Bayer's reporting requirements as a consequence

of Bayer's settlement of another action surrounding its failure to report the Best Price of private-

---

[9]     The 2001 CIA defined "Covered Persons" as Bayer's "officers, directors, employees,
contractors (subject to Bayer's control) and agents of the Bayer Pharmaceutical Division who are
involved in the contracting for, or marketing, selling or reporting the price of products that are
reimbursed by Medicare, Medicaid and all other Federal health care programs (as defined in 42
U.S.C. § 1320a7b(f))."

label sales of Cipro and Adalat and its $100,000 cash payment to Kaiser Permanente in connection with Adalat sales.

99.    The compliance training set forth in the 2001 CIA, plus two hours of refresher training annually, was mandatory for all Covered Persons.  The 2001 CIA further required that "[e]ach individual who is required to attend training shall certify, in writing . . . that he or she has received the required training."  Bayer brand managers, including Stan Horton (Director of Marketing for Trasylol and at certain times, Avelox IV), Val Pascale (Trasylol), and Paul Bedard (Avelox), all completed this training and certification.  They therefore knew that kickbacks and other illegal conduct, which the training covered, would lead to the filing of false claims.[10]

100.    Messrs. Horton and Pascale certified falsely and knowingly in internal contracting documents, which Bayer required for its approval of promotional programs, unrestricted educational grants, and fee-for-service arrangements, that such activities conformed to Bayer's compliance policies.  Messrs. Horton and Pascale received e-mails describing how Bayer's activities in promoting Trasylol had affected beneficiaries of government-funded healthcare programs and healthcare providers who made claims for payment under those programs.  They therefore knew that those providers, and wholesalers who supplied Bayer drugs to those programs, were submitting Trasylol-related claims for payment and that those claims were false.  Upon information and belief, Mr. Horton and Mr. Bedard, among others, knew from reading similar e-mails that the same was true for Avelox-related claims.

## VII.   RELATOR LAURIE SIMPSON

101.    Relator Laurie Simpson was employed by Bayer from April 27, 1998, until her

employment was unlawfully terminated effective on or about January 1, 2005.  Relator's

educational background includes an undergraduate degree in Biology and a Master's degree in

Business Administration.  Prior to Bayer, Relator worked in the healthcare industry as a

consultant and senior analyst.  At Bayer, Relator held various marketing and analytical positions,

such as Senior Market Research Analyst in the Marketing Department on Baycol and Project

Manager for Baycol and later for Trasylol in the Strategic Analysis Department.  She was a

member of the Bayer Anti-Infectives Market Research team under Carol D'Eugenio.  Many

alleged kickbacks and off-label marketing schemes originated in, and were implemented by,

Bayer's Marketing Department during this time.

102.    Relator was formally assigned full-time to Trasylol as a Project Manager for

Strategic Analysis in mid-2002, after working on several Trasylol projects on an ad hoc basis.

She evaluated the existing and potential markets for Trasylol.  She helped prepare Bayer's

annual Trasylol Business Plan.  She participated in Trasylol Therapeutic Team meetings, and

discussed Trasylol strategy and tactics with Product Management and Medical Affairs personnel

and others at Bayer.  She discussed Trasylol clinical trial plans and results with other Bayer

employees.

---

[10]    Bayer also distributed written compliance materials for trainees' reference.  In 2004, for
example, Bayer gave each trainee a copy of the Bayer Healthcare Fraud and Abuse Compliance
Code of Conduct and a Healthcare Fraud and Abuse Compliance Policies and Procedures
Manual.  The trainees read those materials, which covered the code and training subjects
mandated in the CIA, and signed certifications that they understood them and agreed to abide by
them.

103.    Relator assisted with evaluating the market potential of Trasylol successor compounds, including participating in multi-disciplinary and international Trasylol meetings.

104.    Relator analyzed Trasylol usage by dose over time, analyzed Trasylol usage by procedures, including on and off-label uses, designed studies to help quantify blood loss in various procedures, and evaluated a variety of potential data sources.

105.    Relator conducted Trasylol market research with surgeons, anesthesiologists, and others for both off-label and approved uses, including assessing Trasylol awareness, drug utilization, physician perceptions, and sales-representative messaging.

106.    Relator periodically compiled data from Bayer Cardiac Team Meetings where the attendees listened to Bayer-paid speakers present information about Trasylol.  Relator also attended several Cardiac Team Meetings in person.  At the request of Bayer personnel who were responsible for those meetings, Relator reviewed and commented on questions that Bayer wanted its paid speakers to present to attendees.  Such requests diminished over time as Trasylol managers became aware of her objections to those meetings' fraudulent and promotional nature.

107.    As part of her Bayer employment, Relator participated in discussions regarding Bayer's efforts to conceal illegal and off-label Avelox promotion.  She participated in anti-infective market research related to a licensing opportunity.  She was involved with the Clinical Advisory Panel programs used to promote Bayer products such as Baycol and Avelox through the use of sham consulting arrangements.  Many Bayer sales representatives and other Bayer personnel worked on both Avelox and Trasylol.  Stanley Horton, the marketing director for Trasylol, was also the marketing director for Avelox IV.  Relator participated in meetings that concerned both products.

37

108.    Relator was privy to Avelox-related Strategic Brand Plans, tactical plans, and market-research results.  She shared concerns related to the legality of Avelox promotion with Avelox team members and discussed questionable Avelox promotional practices with Bayer Regulatory personnel.

## VIII.   <u>TRASYLOL</u>

### A.    <u>Nature and Usage of Trasylol</u>

109.    Trasylol (aprotinin) is an intravenous drug that was indicated for administration during surgery and until the patient left the operating room.  Trasylol reduced excess surgical and post-surgical bleeding, decreased or eliminated the need for blood transfusions, and thus decreased risks associated with blood transfusions, including transmission of HIV/AIDS and hepatitis.

110.    The FDA approved Trasylol on December 29, 1993, but only for patients undergoing repeat coronary artery bypass graft ("CABG") surgery using a cardiopulmonary bypass pump ("CPB"), known as "on-pump" CABG surgery, and for patients undergoing such surgery for the first time, that is, "primary" CABG patients, who were at high risk of bleeding.[11]

111.    In or about October 1996, Bayer began an effort to persuade the FDA to extend Trasylol's indication to include low-risk CABG patients.  The FDA concluded that Trasylol clinical trials did not demonstrate efficacy in that patient population.

_____

[11]    A cardiopulmonary bypass pump is also known as a heart-lung machine.  Cardiac surgery conducted without using cardiopulmonary bypass (CPB) is known as "off-pump" surgery.  Off-pump cardiac surgery did not come into common use until at least the late 1990s and represented a small fraction of cardiac procedures.  Thereafter, it became increasingly common.  As off-pump cardiac surgery increased, Bayer placed more emphasis on having Trasylol prescribed for that procedure.

112.    By August 8, 1997, Bayer had modified Trasylol's label to add information on blood anticoagulation monitoring, anaphylaxis, and graft patency.

113.    Bayer succeeded in convincing the FDA to broaden Trasylol's indication.  On August 28, 1998, after almost two years of negotiations and re-analysis of clinical trials, the FDA broadened Trasylol's indication to include low-risk primary on-pump CABG patients.  At the same time, Bayer agreed to add a Black Box warning of the risk of allergic reaction, particularly upon re-exposure, which was the FDA's condition for extending the indication to low-risk patients. [12] Bayer also received approval to add a description of Trasylol's Mechanism of Action referencing Trasylol's effect on inflammatory response.  The addition of that description to the label was critical for Bayer.  Bayer used the addition to the label to differentiate Trasylol from its competitors, improperly promote higher doses, and falsely claim that Trasylol improved patient outcomes.

114.    From the time of its launch a substantial portion of Trasylol's use was off-label. By 2002, the majority of Trasylol use was off-label.  That included off-pump CABG surgery, heart-valve repair or replacement, combination CABG/valve-surgery, heart transplants, pediatric surgery (primarily cardiac), orthopedic-surgery, and liver transplants.[13]

---

[12]    A Black Box warning appears prominently on a prescription drug's label and is designed to call attention to serious or life-threatening risks.

[13]    In 2002, CABG procedures accounted for only 54% of Trasylol patients, including off-label CABG patients such as combined CABG/valve patients and off-pump CABG patients.  The remaining 46% of Trasylol patients received it off-label including:  valve repair and/or replacement (31%); other cardiac procedures such as pediatric surgeries, left-ventricular assist device ("LVAD"), and heart transplants (collectively 12%); and liver transplants, orthopedics, and "other" uses (collectively 3%).  By 2002, off-label use was thus estimated conservatively at 60% of total Trasylol use.

115.     In response to reports that associated Trasylol with kidney (renal) damage and allergic reactions, and under pressure from the FDA, on December 15, 2006, Bayer changed the label to again limit the approved indication to on-pump CABG patients at increased risk of blood loss and transfusion.  Bayer added a warning that Trasylol increased the risk of renal damage. Bayer added a Black Box warning that Trasylol should be administered only in situations where cardiopulmonary bypass was available to reduce the risk from severe allergic reactions.

116.     Trasylol use carried significant risks, including the risk of death.  By early 2006, before widespread awareness of Trasylol safety concerns, the FDA had received reports of 235 Trasylol-associated deaths.  These reports significantly underestimated actual serious adverse events and represented adverse events occurring primarily in the U.S.  Adverse events and deaths associated with Trasylol use were attributed to hypersensitivity, anaphylactic reactions, heart attack and other cardiovascular causes, cerebrovascular causes such as strokes, and renal failure, among others.  Many adverse events and deaths were associated with off-label uses of Trasylol.

117.     In November 2007, the FDA stated that there was no patient type that the FDA could identify for which the benefit of Trasylol outweighed the potential risk of Trasylol. The FDA requested a complete marketing suspension of Trasylol and announced that Trasylol would be phased out of the market due to safety concerns.

### 1.     <u>Trasylol Competition and Profitability</u>

118.     Despite the availability of cheaper generic drugs, Trasylol eventually became the preferred therapy for CABG patients at high risk of bleeding.  For patients with a lower risk of bleeding, blood-sparing drugs remained optional, although use steadily increased.

119.     Trasylol became extremely profitable.  In 2004, Bayer internally reported a cost of $204 for 600ml of Trasylol, a standard dose for a single patient.  Bayer's list price for that same amount was $1,293, representing a 500% or $1,089 gross profit for each patient who

received that dose.  During a 2004 Trasylol meeting with Bayer marketing, Scientific Affairs,

Clinical Communications, and other personnel, Bayer Pharmaceuticals North America's

President Colin Foster urged attendees to expand Trasylol use, exclaiming that "[t]he profit on

this drug is unbelievable!"

120.    Bayer marketed Trasylol primarily to a targeted group of about 2500

cardiothoracic surgeons and to anesthesiologists and non-physician members of cardiac surgery

teams and surgical practices.  The targeted cardiac team physicians later increased to about 5,000

or more.  Later, Bayer marketed Trasylol to hospital administrators by making unsupported

claims of improved patient outcomes.  By about 2004, Bayer targeted orthopedic surgeons for

off-label marketing efforts.

**B.     Bayer Consistently Overstated the Effectiveness of Trasylol and Concealed, Obfuscated, and Downplayed Its Safety Risks**

121.    From well before Trasylol's 1994 launch in the United States, Bayer knew of the

dangers Trasylol posed to the kidneys and the heart.

122.    Despite Bayer's awareness that total doses administered per patient were

increasing and that there were dose-related safety concerns, Bayer did not communicate this

information to prescribers.

123.    Bayer caused clinical trials to neither collect nor investigate information relating

to known or potential safety risks, especially adverse renal effects, to avoid safety concerns.

124.    Bayer's practice of avoiding potentially damaging clinical information was

verbalized during a 2004 internal meeting concerning recombinant Trasylol (a potential

successor compound of the drug).  When one attendee stated that the FDA would want to see a

certain safety trial conducted, Paul MacCarthy, M.D., Bayer's Vice President for Medical

Affairs, asked rhetorically why Bayer should confuse the situation with data.  In effect, Dr.

41

MacCarthy was recommending against conducting the proposed trial because he was concerned that it might reveal safety concerns that Bayer would have to disclose.  Based on Dr. MacCarthy's recommendation, Bayer decided not to conduct the trial.

### 1.     Bayer Downplayed Trasylol's Renal Risks

125.    Trasylol had the potential to accumulate in the kidneys, thereby causing poisoning of and damage to the kidneys (nephrotoxicity).  As early as 1972 Bayer had a study reporting the dangers Trasylol posed to kidney function in animals and further reports based on that study highlighted the safety concerns.  Bayer's clinical trials also showed that certain subpopulations were at a higher risk for renal dysfunction but Bayer failed to disclose these added risks on the label until 2006.

126.    From 1995 into 1998, the Trasylol label included information concerning Kidney dysfunction and failure, but Bayer obtained FDA approval to delete the information.  Despite knowing that Trasylol was used off-label in valve replacement procedures, Bayer contended to the FDA that renal dysfunction should be removed from the label because a disproportionate amount of the renal dysfunction in studies was related to such valve replacement procedures. After succeeding in getting renal dysfunction removed from the label Bayer asserted to healthcare providers that there was no evidence of renal dysfunction caused by Trasylol.

### 2.     Bayer Downplayed the Risks of Heart Attack and Death from Trasylol

127.    Many physicians were concerned that a drug that reduced bleeding would also promote clotting, which could result in heart attack, thereby increasing the risk of death. Although several clinical trials showed a trend towards increased incidence of heart attack in Trasylol patients, Bayer consistently downplayed those concerns.

128.     When clinical trials demonstrated increased incidence of heart-attacks in CABG patients, especially repeat and high dose patients, Bayer blamed problems with the studies or masked the incidence down to placebo level by increasing the data pool to include both lower and higher risk patients.  Because Bayer knew that most Trasylol use was in high-risk patients, it was aware that the patients in the Trasylol safety database were not representative of the patients who received Trasylol.

129.     Through data-pooling and data manipulation, Bayer was able to contend misleadingly that the heart-attack incidence with Trasylol was equal to placebo, without revealing that this contention was not true for all patients, doses, and procedures involving Trasylol.  The data, in fact, showed that the heart-attack risk with Trasylol was <u>greater</u> than placebo for patient sub-populations with certain risk factors and for certain procedures, including repeat CABG and CABG/valve replacement.

130.     Bayer's knowledge of heart-attack risks was demonstrated in an internal 2003 draft business-plan presentation developed in part by Relator with input from Trasylol Product Management staff.  The plan noted "Trasylol Weaknesses:  Lingering safety concerns — Stroke is lower; however, [heart attack] is higher."  Bayer Product Management directed removal of the information regarding heart-attack risk and thus the language "[heart attack] is higher" was omitted from the final 2003 business plan.

131.     Shockingly, from at least 2000, Bayer falsely proclaimed that Trasylol produced "Better Patient Outcomes" and <u>reduced</u> heart attack and stroke.  Bayer used these claims to persuade physicians and hospital administrators to use Trasylol.  As of 2004, Bayer used a biased

economic study that Bayer personnel had co-authored with KOL Dr. Peter Smith to bolster such false claims of cardio-protective effects.[14]

### 3. Bayer Downplayed the Risk of Adverse Graft Patency with Trasylol

132.     In addition to heart attack, clot formation (thrombosis) can also result in blockage of heart bypass arterial grafts ("adverse graft patency").  Graft patency (keeping arterial grafts open and flowing freely) is the major factor in the survival of heart-bypass patients and in avoiding the need for repeat bypass surgery.

133.     Despite at least two studies, the 1992 Cosgrove study, which Bayer submitted to the FDA as part of its original application for approval of Trasylol, and the 1992 TRA-B05 study,  finding that adverse graft patency increased with aprotinin use in repeat CABG patients, Bayer downplayed and discounted these concerns and did not undertake additional studies.

134.     Furthermore, Bayer marketed Trasylol with the unqualified and, therefore, false and misleading statement that in Trasylol-treated patients, "graft patency was comparable to placebo," including use in a 2004 promotional piece specific to repeat CABG surgery entitled "The Clinical Plan That Delivers -- for Repeat CABG Surgery."

### 4. Bayer Knew That Valve-Surgery Patients Were at Higher Risk for Adverse Events with Trasylol

135.     Bayer's trial in-valve-surgery patients (D'Ambra et al.) submitted to the FDA with its New Drug Application, showed an increased risk of renal dysfunction in Trasylol

---

[14]     P. K. Smith M.D. et al., Cost analysis of aprotinin for coronary artery bypass patients' analysis of the randomized trials, Annals of Thoracic Surgery 2004; 77:635-642.

patients, but did not show Trasylol was effective for those patients.[15]  Those results helped form

the basis for the FDA limitation of Trasylol's approval to certain on-pump CABG procedures.

136.    Another Bayer trial, D91-007 (Levy et al.), with 76% valve-surgery patients and

24% CABG patients, showed that valve-surgery patients who received the high dose regimen of

Trasylol had nearly twice the incidence of heart attack as compared to valve-surgery patients

who received placebo.  Bayer never published this clinical trial, which was completed in 1994,

shortly after Trasylol's launch.

137.    Bayer's TRA-B05 study found a significantly higher incidence of death, heart

attack and adverse graft patency in Trasylol-treated repeat valve surgery and repeat CABG

patients versus placebo.  Bayer never disclosed the TRA-B05 study results to prescribers who

inquired about using Trasylol in valve-surgery.  Instead, Bayer's form letter response discussed

only efficacy results from clinical trials and omitted reference to known safety risks.  In its form

letter response, Bayer referred prescribers to an article by Dr. Jamieson.[16]  In that article, Dr.

Jamieson reported data from only a subset of patients in the TRA-B05 study and combined them

with results from another study.  The article did not discuss safety, omitted mention of the nine

Trasylol deaths in the full study, and did not include all of the valve-surgery patients in the study.

Bayer relied on Dr. Jamieson's article despite its awareness that it was misleading.

138.    Bayer avoided sponsoring more clinical trials involving valve patients because it

knew that the negative results would adversely impact Trasylol sales.  Bayer therefore knew that

---

[15]    M.N. D'Ambra, et al., Aprotinin in Primary Valve Replacement and Reconstruction: A
Multicenter, Double-Blind, Placebo-Controlled Trial, Journal of Thoracic Cardiovascular
Surgery, Oct. 1, 1996; 112(4): 1081-1089.

Trasylol had a worse safety profile with valve-surgery patients as compared to CABG-surgery patients.

         **5.**      **Bayer Concealed the Results of Other Trasylol Clinical Studies and Safety Findings**

     139.    By the mid-1990s, Bayer knew that storing cardiac bypass grafts in Trasylol-infused blood could result in severe clotting (antifibrinolytic shut-down), but the Trasylol label failed to warn about storing grafts in Trasylol-infused blood.

     140.    In 1999, Bayer employees identified a study that described a high risk of blood clotting when Trasylol was used with Amicar in the same patient.  In 2001, Bayer posed a question on its Cardiac Team Meeting surveys asking if respondents used the two products in combination.  Approximately 10% of respondents in the next five Cardiac Team Meetings responded that they sometimes used the products in combination.  At least 1-2% responded that they routinely used Amicar and Trasylol in combination.  Trasylol Director of Marketing Stanley Horton told Relator that there was a potentially serious safety concern when both products were used in the same patient.  Bayer knew that physicians were not aware of the serious risk of administering Amicar to patients who received Trasylol, but Bayer failed to warn prescribers of that risk.

     141.    On February 8, 2006, as a result of the publications of two studies concerning Trasylol safety risks and the increasing incidence of reported injuries and deaths involving Trasylol, the FDA issued a Public Health Advisory and Q&A sheet for patients, issued an Alert

---

[16]    Jamieson et al., Beneficial Effect of Both Tranexamic Acid and Aprotinin on Blood Loss Reduction in Reoperative Valve Replacement Surgery, Circulation 1997 Nov. 4; 96 (9 Suppl.): II-96-100; discussion II-100-1.

to healthcare professionals, and began a Trasylol "safety review."   The FDA's response

culminated in an FDA Advisory Committee meeting held in September 2006

142.    In preparation for the 2006 FDA Advisory Committee meeting, Bayer compiled a

false briefing document for the Committee containing data of U.S. Trasylol patient exposures for

1994 through 2005 that were 30% to 70% higher than the patient-count figures that Bayer had

used internally in 2004.  Inflating patient exposure numbers improved the safety profile because

a much larger population of patients diluted the percentages of adverse events.

    **C.**      **Bayer's Illegal Trasylol Marketing Schemes**

        **1.**      **Post-1998 Trasylol Marketing**

143.    While it was easier to convince physicians to use expensive medication for

patients with high risk of bleeding, expanding Trasylol use required persuading physicians that it

was a relatively safe drug with minimal risks.  Not only would this lead more physicians to

prescribe Trasylol for greater numbers of high risk patients, it would also increase use in lower-

risk patients as well.

144.    Shortly after obtaining the 1998 indication and labeling changes, Bayer

misbranded Trasylol by falsely and misleadingly marketing Trasylol as having a "clean safety

profile" with "no evidence of increased risk of renal dysfunction," and that "graft patency, MI,

renal and hepatic dysfunction, and mortality were comparable to placebo," and any differences

seen were "not statistically significant."  Those characterizations implied falsely that the

incidence of adverse events with Trasylol was the same regardless of the procedure, dose, or

patient type.

145.    In about 2001, Bayer categorized its Trasylol hospital accounts as either "Grow"

or "Protect" accounts.  The "Grow" accounts were hospitals where Trasylol was used in a

relatively low percentage of CABG procedures.  The "Protect" accounts were hospitals where

Trasylol was used in a relatively high percentage of CABG procedures.  A "clean safety profile"
was the key message for the "Grow" accounts.  Bayer targeted the "Protect" accounts with
unsubstantiated claims of "Better Outcomes" to justify Trasylol's high cost.

**2.     Conflicts of Interest and Biased Trasylol Research**

146.    Bayer used extensive peer-to-peer marketing programs to influence prescribers
under the guise of "scientific communication and advocacy."  Bayer paid physicians to endorse
Trasylol use, offered educational programs aimed at increasing off-label prescribing, conducted a
program called "Ask the Professor" to promote on-label and off-label use, and provided grants
for off-label research.

147.    Bayer cultivated and supported biased and misleading messages through
publications and Continuing Medical Education ("CME") programs by vendors and physicians
with extensive ties to Bayer.  Bayer used those studies and programs to bolster particular
marketing tactics, such as promoting the administration of the high-dose regimen rather than the
low-dose regimen, promoting various off-label uses, and presenting unsubstantiated and
misleading information about outcomes and safety risks.

148.    Bayer's customary practice was to ghostwrite, review, and influence published
studies and programs concerning Trasylol.  Bayer and the authors, however, purposefully
downplayed or hid their relationship in order to avoid revealing this conflict of interest.  Bayer
purchased article reprints and distributed them to decision-makers to create a false impression
that the studies were independent and reliable.

149.    Bayer controlled and influenced studies by limiting access to its own clinical trials
database.  Thus, the only published studies based on Bayer's clinical trials safety database were
by Bayer KOLs, although frequently the author's relationship with Bayer was concealed.

48

150.    By 2004, Bayer was increasingly dissatisfied with the highly influential and broadly accepted American College of Cardiology/American Heart Association (ACC/AHA) Guidelines for Coronary Artery Bypass Graft Surgery.  The Guidelines did not recommend routine Trasylol use for all patients.  Bayer sought an alternative professional organization's endorsement of Trasylol and encouraged the Society of Thoracic Surgeons to request a Bayer grant for guideline development.  Bayer KOLs were members of the drafting committee and conflicts of interest were not fully disclosed.  Bayer used these guidelines during the 2006 and 2007 FDA Advisory Committee meetings as proof of independent, evidence-based analysis and endorsement of Trasylol safety and efficacy, without mentioning Bayer's role in conceiving, influencing, and paying for them.

### 3.    Off-Label Trasylol Marketing for Cardiac Procedures

151.    In 1993, Bayer's Marketing Department commissioned an outside consultant to perform a Reimbursement Analysis for Trasylol.  Bayer provided that consultant with a broad list of surgical procedures, including non-CABG surgeries, where Bayer intended Trasylol use.  That consultant provided advice, which Bayer followed, on how to create opinion leader support and expand reimbursement for off-label use.

152.    Bayer's subsequent off-label promotional activities focused initially on expanding Trasylol to other heart-surgery patients, such as valve-surgery patients, CABG/valve patients, heart-transplant patients, and pediatric patients.

### a.    Trasylol Promotion for Valve and CABG/Valve Procedures

153.    Bayer promoted Trasylol with blanket statements that Trasylol had a "clean safety profile" with "no evidence of increased risk of renal dysfunction" and that "graft patency, MI, renal or hepatic dysfunction, and mortality were comparable to placebo."  Bayer knew, however, that Trasylol was riskier for valve-surgery patients than for CABG patients.  Bayer failed to

49

disclose that knowledge in Trasylol's label at the same time it was promoting off-label uses of Trasylol, thereby misbranding Trasylol and making it illegal in interstate commerce. 21 U.S.C. §§ 331, 352.

154.    By 2002, Bayer's market research suggested that in the U.S., Trasylol was administered in more than 50% of valve procedures and 65% of combined CABG/valve procedures.  Because Bayer intended that surgeons use Trasylol in those procedures, and knew that they would, its failure to amend the label accordingly violated FDA prohibitions on misbranding.  21 C.F.R. § 201.128.

155.    Bayer continued to promote Trasylol for valve-surgery even after the FDA issued a warning letter on January 23, 1997, disapproving of certain Bayer promotional materials.  The FDA found that Bayer's promotional materials discussed uses, including valve replacement, other than those for which Trasylol had demonstrated safety and efficacy.

156.    Bayer exploited colloquialisms with decision-makers in order to promote Trasylol for off-label cardiac procedures.  For example, Bayer used written marketing materials stating that Trasylol was approved for "CABG" procedures, knowing that decision-makers would assume Trasylol was safe and effective for open-heart surgeries, including off-label valve replacement and CABG/valve procedures.  Bayer's sales representatives and KOLs told prescribers and hospital administrators that Trasylol was appropriate for "cardiac surgery patients," "open heart patients," and patients at "high risk for bleeding."

**b.      Trasylol Promotion for Off-Pump Procedures**

157.    Starting about 2000, cardiac surgeons increasingly used "off-pump" or minimally invasive methods for cardiac surgery, which involves less bleeding than traditional open-heart surgery.  Bayer was concerned that Trasylol sales would decline as a result of this trend.

50

158.    Although Bayer acknowledged a lack of data regarding the safety and efficacy of Trasylol for use in off-pump CABG procedures and avoided sponsoring clinical trials in off-pump patients due to uncertain outcomes, Bayer promoted this off-label use.  Despite knowing that Trasylol use was unnecessary for off-pump patients, Bayer encouraged its use falsely claiming that Trasylol provided cardioprotection and neuroprotection and reduced strokes, thereby further misbranding Trasylol.

159.    Bayer contracted for a 2001 CME publication by "The Heart Surgery Forum," the official journal of the International Society for Minimally Invasive Cardiac Surgery, featuring off-pump cardiac surgery articles.  Bayer KOLs authored at least three articles that discussed Trasylol.  The publication featured a four-page color Trasylol advertisement and a Trasylol CD-ROM multimedia presentation.

160.    Bayer's 2004 Trasylol Strategic Marketing Review identified $8 million in Trasylol sales for off-pump CABG to meet sales goals.  The top strategy outlined in the 2004 Strategic Plan was "Drive physician demand for all CABG patients through communication of Trasylol Benefits" (emphasis added).

### c.    Trasylol Promotion for Pediatric Patients

161.    Trasylol was not approved for patients under 18, rendering all pediatric use off-label.  Moreover, children and teenagers rarely undergo CABG operations.  Bayer did not have data to demonstrate the safety and efficacy of Trasylol for any procedures in this patient population and acknowledged this fact on the Trasylol label.  Bayer nonetheless included pediatric hospitals on its sales representatives' target lists until at least 2003 and sales representatives were assigned quotas for these accounts. Prescribers from pediatric hospitals attended Cardiac Team Meetings.

51

4.        **Trasylol and Antiplatelets**

162.    Despite the lack of supporting data, Bayer promoted Trasylol as effective and ideal for patients on the antiplatelet drug Plavix (clopidogrel).  Antiplatelet drugs, such as Plavix and aspirin, help prevent blood clotting.  As a result, patients on these medications are prone to increased bleeding during surgery.  While aspirin clears the patient's system relatively quickly, Plavix has a long half-life and should be discontinued five days before surgery.  Armed with a wealth of data regarding Trasylol's safety and efficacy in patients taking aspirin, but with little data regarding its purported safety or efficacy in patients taking Plavix, Bayer marketing employed the term "antiplatelet" in its promotions, which implied similar proven effectiveness and safety with both aspirin and Plavix.  Bayer promoted Trasylol for use in conjunction with Plavix through presentations, specific promotional literature such as the "Antiplatelet Drug Use Slim Jim," and sales force messaging.  According to Trasylol's Medical Director, there was a scientific rationale for Trasylol's efficacy in conjunction with aspirin, but none for Plavix.

5.        **Off-Label Trasylol Marketing for Non-Cardiac Procedures**

a.        **Orthopedic-Surgery**

163.    In the mid-1990s, Bayer identified orthopedic-surgery as a potential Trasylol market and conducted preliminary orthopedic clinical studies.  The FDA expressed concerns that Trasylol might increase the incidence of deep-vein thrombosis, already an orthopedic-surgery risk.  Bayer decided not to pursue an orthopedic indication because it concluded there was no compelling reason to use Trasylol.

164.    Despite the results of its earlier orthopedic clinical studies, by about 2004, Bayer targeted orthopedic surgeries as the largest opportunity for Trasylol growth because there were many more orthopedic surgeries than CABG surgeries and substantially more orthopedic surgeons than cardiac surgeons.

165.    Relator conducted market research aimed at expanding Trasylol use into orthopedic-surgery.  The research revealed the following:  (1) little awareness or perceived need for Trasylol or for any other antifibrinolytics; (2) concerns about product safety; (3) blood loss in most cases was minimal and not a concern; and (4) patients donated blood prior to the operation in a substantial number of orthopedic surgeries.  Accordingly, Trasylol use in orthopedic-surgery was unreasonable and unnecessary.

166.    Bayer knew that the expansion of Trasylol use beyond cardiac surgery would increase patient re-exposure to aprotinin, such as patients undergoing heart surgery within a year of an orthopedic procedure.  Repeated exposure to Trasylol (or other products containing aprotinin) increased the risk for fatal allergic reactions.  Bayer knew that increased adverse events would accompany increased Trasylol use for orthopedic-surgery.  Before 2005, Bayer made little to no effort to inform cardiac surgeons that Trasylol was also being promoted for orthopedic use.

**i.      Bayer's Off-Label Promotion of Trasylol for Orthopedic-Surgery**

167.    With the approval under FDAMA to distribute articles on Trasylol use in orthopedic-surgery, Bayer expanded its effective off-label promotion for orthopedic use of Trasylol without FDA approval for that indication.  Upon information and belief, as part of those efforts, Bayer:

a.    Used an unnecessarily large number of clinical-trial investigators to expose the maximum number of orthopedic surgeons to Trasylol;

b.    Ensured that selected investigators were high potential prescribers or were influential;

c.    Used investigator meetings and associated kickbacks for Trasylol promotion;

53

d.    Fostered Trasylol use outside of clinical trials and encouraged physicians to publish those off-label case studies;

e.    Funded, influenced, and controlled the content of off-label CME programs featuring Trasylol KOLs;

f.    Identified investigators to conduct purported "investigator initiated" off-label trials; and

g.    Established Orthopedic Advisory Boards whose real purpose was to promote and increase Trasylol prescribing**.**

168.    In December 2003, Bayer contracted with Slack Inc., a CME provider, to publish presentations from a Trasylol Orthopedics Advisory Board meeting.  Bayer-compensated KOLs prepared those presentations.  The presentations contained false and misleading statements and became the basis for a June 2004 CME supplement to the journal <u>Orthopedics</u> entitled "Minimizing Perioperative Blood Loss in ORTHOPEDIC SURGERY," which promoted Trasylol use for orthopedic-surgery.

169.    In 2004, Bayer worked with Pharmatecture, LLC, a medical-education company, and its sister company American Health Consultants, to promote the off-label use of Trasylol in orthopedic-surgery through Advisory Boards and Continuing Medical Education programs. Despite the requirement that CME programs be independent and unbiased, Bayer's marketing personnel rewrote and edited the draft project proposal to suit Bayer's marketing objectives.  A project objective was "to galvanize 40 orthopedic-surgery thought leaders to develop and publish" an Orthopedic-surgery Clinical Consensus Report and guidelines encouraging the adoption of Trasylol in orthopedic surgical practice.  The report and guidelines were to be distributed to 20,000 orthopedic surgeons.  Upon information and belief, Pharmatecture and Bayer, not orthopedic surgeons, developed the guidelines, while the surgeons were paid honoraria to attend consultant meetings and approve the guidelines.

54

170.     Starting in late 2004 or early 2005, Bayer began funding an annual $30,000 grant to the Orthopedic Research and Education Foundation ("OREF").  Bayer provided the grant funding in exchange for the Foundation's support of Trasylol use in orthopedics.  Bayer was featured as an OREF sponsor.

171.     In 2004, reflecting the anticipated expansion of off-label orthopedic promotion, for 2005, Bayer budgeted an increase in educational grants from $490,000 to $890,000.

### ii.     Off-Label Marketing Results in Increased Adverse Events

172.     In July 2004, Relator and Bayer's Trasylol Medical Director, Puneet Mohan, M.D., discussed their concerns about patient safety in connection with off-label promotion for orthopedic procedures.  Both believed that Bayer was promoting Trasylol too aggressively for off-label uses and that Bayer was endangering patients.  Dr. Mohan told Relator that he had conveyed these concerns to Bayer senior management, who told him to keep quiet because Trasylol was funding his paycheck.

173.     After Bayer began off-label promotion of Trasylol for orthopedic-surgery, serious anaphylaxis and hypersensitivity reactions attributed to Trasylol increased substantially.

### b.     Liver Transplant Surgery

174.     In 2000, Bayer paid $10,000 to Dr. Robert J. Porte for presenting five symposia on off-label Trasylol use in liver transplants.  Bayer sales personnel identified locations for these programs and recruited attendees.

175.     In November 2004, Bayer sponsored Dr. Porte as a visiting professor at the University of Wisconsin Medical School to speak on off-label uses of Trasylol for liver transplants.  Bayer paid his travel expenses and an honorarium of $2,500 that was disguised as an unrestricted educational grant to the Medical School.

55

## 6.    Misbranding Trasylol by Promoting Unsubstantiated Outcomes

176.    Beginning in about 1998, Bayer misbranded Trasylol and promoted its off-label use by falsely claiming patient-health benefits.  These claims were unsubstantiated, misleading, and designed to promote unnecessary use of Trasylol and to increase use of the high-dose regimen.  These unsubstantiated health benefits were the foundation of Bayer's pharmacoeconomic programs to justify Trasylol's high cost.

177.    Bayer claimed that the high-dose regimen improved patient outcomes by reducing Systemic Inflammatory Response Syndrome ("SIRS").  In fact, in 1998, the FDA had admonished Bayer that its claim that Trasylol reduced inflammation and thus improved patient outcomes was unsubstantiated.  The FDA explained that "[t]he only claim is for decreased need for donor blood transfusion."

178.    Bayer claimed falsely that Trasylol reduced strokes, even though several studies suggested that this result was attributable to using fewer units of blood products, not from administering Trasylol.  Bayer's promotions frequently suggested that Trasylol provided cardio-protection and neuro-protection resulting in reduced strokes and heart attacks.  Relator documented that sales representatives were telling physicians that Trasylol reduced strokes.

179.    Dr. Sedrakyan, a Bayer KOL, prepared a deceptive 2004 study that Bayer used to justify its false claims.  Dr. Sedrakyan failed to disclose his Bayer ties.  At one point, he had a Bayer telephone number and email address.  Dr. Sedrakyan did not disclose that Jennifer Maurer, whom he credited with editorial assistance, was a Bayer employee.  Bayer remained silent about its participation.  Upon information and belief, when Bayer offered Dr. Sedrakyan's study to the FDA as evidence for its Trasylol claims, Bayer by omission allowed the FDA to believe that Dr. Sedrakyan's study was independent.

56

### 7.     Listing of Off-Label Uses in the Major Compendia

180.     Despite Bayer's efforts to fraudulently influence the medical acceptance of Trasylol for off-label uses, Bayer was unable to get any of the major compendia to support the off-label uses described above.

### a.     American Hospital Formulary Service Drug Information

181.     None of the entries for Trasylol (listed under "aprotinin") from 1999 through 2007 describe well-supported uses for Trasylol other than the FDA approved indication, on-pump CABG surgery.  However, all the entries note the increased risk for anaphylaxis in using Trasylol on patients undergoing initial CABG surgery because of the potential second exposure to the drug during repeat CABG surgery.  Other uses of Trasylol are only mentioned as either unproven or with reference to potential adverse effects.

182.     Each entry for Trasylol from 1999 through 2007 contains a "Pediatric Precaution" stating: "The manufacturer states that safety and efficacy of aprotinin in children younger than 18 years of age have not been established."

### b.     United States Pharmacopeia-Drug Information

183.     The entry for Trasylol (under aprotinin) from 1999 through 2000 lists only repeat CABG surgery and initial CABG surgery in cases of high risk of bleeding as "Accepted."  The 2001 and 2002 entries list only CABG surgery as "Accepted."  All other uses, including liver transplants, heart transplants, orthopedic surgery, and pediatric surgery, are listed as "Acceptance not established."  From 2003 onward the entry for aprotinin was not accessible in print.

184.     Pediatric use is also listed under "Precaution," with the statement that "[s]afety and efficacy have not been established."

### c.   DRUGDEX Drug Information System

185.   The DRUGDEX entry for aprotinin is attached as Exhibit G.  The entry was reviewed and approved by Bayer in 2000.  The entry recommends consideration of aprotinin in patients with a high risk of bleeding when undergoing on-pump CABG surgery, as well as some other cardiac surgeries, but states:  "The limited experience with the drug in liver transplantation and other types of surgery precludes recommendations at this time."  In addition, despite reviewing and commenting on the entry, among other issues, Bayer did not notify the publisher of DRUGDEX of the D'Ambra study that showed that Trasylol was ineffective for valve-surgery patients or the D91-007 and the TRA-B05 studies that showed an increase risk of heart attack for valve-surgery patients that received Trasylol.  See supra ¶¶ 135-37.  Bayer misled the publisher of DRUGDEX in order to obtain an entry for aprotinin that did not take account of these unfavorable studies, thus causing unreasonable and unnecessary uses of Trasylol in valve-surgery patients.

186.   The following unreasonable and unnecessary uses of aprotinin are specifically unsupported by the 2000 DRUGDEX entry:

      b.   Off-pump CABG surgery:  The 2000 DRUGDEX entry, like the FDA-approved Trasylol label, does not contemplate off-pump CABG surgery at all.  Instead, the "Dosing Information" section and the section on use in "Cardiac Surgery" explicitly refer to use of a "cardiopulmonary bypass pump."

      c.   Cardiac surgery involving pediatric patients:  The entry for "Cardiac Surgery" describes the documentation for use with pediatric patients as merely "fair," in contrast to the documentation for use with adult patients, which is described as "good."  In a discussion of the limited experimental studies on use in pediatric

58

patients, the entry notes that "[s]mall children undergoing cardiopulmonary bypass require relatively larger doses of aprotinin than adults to reduce blood loss," and concludes that "[t]he ultimate optimal dosage has yet to be defined." The entry further states that while "[h]igh-dose aprotinin reduced blood loss and the need for transfusions in children undergoing surgery for transposition of the great arteries (TGA) . . . in less complex surgery, aprotinin gave no benefit."

    d.   <u>Other surgeries involving pediatric patients:</u>  Entries for uses other than cardiac surgery do not refer to pediatric patients at all except to note that the FDA had not approved use in pediatric patients.

    e.   <u>Orthopedic surgery</u>:  The entry for "Orthopedic Surgery" states that the drug is "ineffective" for this use.  The entry notes small studies of aprotinin's use in orthopedic surgeries, but in summarizing the results of these studies, it offers only the tentative statement that aprotinin "<u>may</u> decrease blood loss and transfusion requirements during and after major orthopedic surgery."  Furthermore, the one potentially supportive study cited was limited to "major orthopedic surgery of the hip, femur or pelvis due to malignancy or infected hardware."  Thus, the entry says nothing more than that it is <u>possible</u> that aprotinin will reduce blood loss in a small subset of orthopedic surgeries.  The entry's bottom-line conclusion is that aprotinin is "<u>ineffective</u>" in orthopedic surgery.

    f.   <u>Use in patients taking Plavix (clopidogrel)</u>:  The 2000 DRUGDEX entry, like the FDA-approved label, does not contemplate the use of aprotinin with Plavix at all.

    **D.**    **<u>Bayer's Kickbacks and Off-Label Marketing of Trasylol</u>**

187.    Bayer routinely paid kickbacks to healthcare professionals illegally to induce them to prescribe Trasylol.  These incentives included the creation of sham consultant/Advisory

Board meetings, the use of unrestricted grants as rewards for increased prescribing, providing free textbooks, and conducting free, lavish, and biased CME programs.

### 1.    Cardiac Team Meetings

188.    Bayer's Trasylol marketing campaign relied heavily on Cardiac Team Meetings, which were fully paid "consultant" trips.  Attendees were cardiac surgeons, with their "cardiac team" of anesthesiologists, perfusionists, and occasionally, physician assistants and nurses.  All were termed "consultants" by Bayer.  Participants were reimbursed for expenses, including airfare, hotel, and meals, plus the payment of $500 as a "consulting" fee.  Bayer knew that it was illegal to pay physicians and hospital personnel as "consultants" when the meeting's purpose was to promote Trasylol use.

189.    Bayer used Cardiac Team Meetings to falsely and misleadingly promote Trasylol's efficacy and other benefits and to allay prescribers' concerns about Trasylol's safety and cost.  Cardiac Team Meetings included presentations promoting off-label Trasylol uses in cardiac surgery, off-pump surgery, pediatric surgery, transplant surgery and Deep Hypothermic Circulatory Arrest.  Bayer promoted Trasylol's alleged ability to provide cardio-protection and improve neurological outcomes, another form of off-label promotion.

### a.    Cardiac Team Meetings and Return on Investment Analysis

190.    After several Cardiac Team Meetings held in 1998 and 1999, Bayer's Marketing Department ordered "Return on Investment" ("ROI") analyses of those meetings.  These analyses were done for Trasylol Marketing Director Stanley Horton to justify to Bayer's senior management the expense and continued funding of those meetings.  Bayer's ROI analyses determined that sales of Trasylol increased at institutions whose prescribers had attended the meetings.  Bayer also conducted ROI analyses on institutions affiliated with the programs' speakers.

191.     The Bayer ROI analyses documented that the Cardiac Team Meetings were extremely effective in increasing Trasylol sales.  One analysis for 2000 showed a 50% increase in sales after the meetings, yielding a 300% return on investment.  A 2001 analysis showed a 50% increase in sales, yielding a 600% return on investment.  Bayer's information indicated that repeat attendance at Cardiac Team Meetings increased Trasylol usage.  In 2004, at Stanley Horton's direction, Bayer created deceptive internal documents about the Cardiac Team Meetings that falsely maintained that these meetings were legitimate and that "no financial return on investment is calculated."

192.     Each Cardiac Team Meeting was designed for an audience of approximately 100 participants, with the number of participants increasing over time.  These meetings were held generally during a weekend and included approximately five to six hours of "educational" or promotional presentations, plus time for questions.  Presentations varied in length, but were usually thirty minutes to an hour in length.  Speakers were paid a $3,000 honorarium, with $5,000 payments for moderators (2004 figures).  Audience participants were paid a $500 "consultant's honorarium . . . for your feedback and participation."  Bayer's meetings employed an Audience Response System ("ARS") to "collect data" and make it appear as though the meeting had a legitimate purpose beyond pure product promotion.

193.     Cardiac Team Meetings were expensive.  Bayer's total cost for holding such a meeting in New York City in 2003 was approximately $367,320.

194.     Bayer's Cardiac Team Meetings included:

a.     November 3-5, 2000:  Meeting at the Renaissance Mayflower Hotel in Washington, D.C., entitled Innovative Strategies to Improve Open Heart Surgery Outcomes, which was attended by over 56 medical professionals. This meeting was the subject of a formal ROI analysis demonstrating that Trasylol usage increased considerably at institutions represented by attending professionals.  The analysis showed that the $149,000 meeting

61

cost yielded increased Trasylol revenue that was six times cost, or about $894,000.

b.     April 20-22, 2001:  Meeting in San Francisco, entitled <u>Innovative Strategies to Improve Open Heart Surgery Outcomes</u>.  The meeting was attended by over 60 participants at institutions targeted by Bayer as "Grow Accounts."  In 2001, over 270 medical professionals from 101 institutions attended Cardiac Team Meetings.

c.     January 25-26, 2002:  Meeting at the Hyatt Regency Pier 66,  Ft. Lauderdale, FL, entitled <u>Innovative Strategies to Improve Open Heart Surgery Outcomes</u>.  Targeted to cardiothoracic surgeons and held within a few days of the Society of Thoracic Surgeons' annual meeting.  By this scheduling, Bayer effectively paid many doctors' travel costs to this annual conference.

d.     October 27-29, 2002:  Meeting at the Mayflower Hotel in Washington, D.C., entitled <u>Innovative Strategies to Improve Open Heart Surgery Outcomes</u>.  According to Bayer's December 2002 internal newsletter, "<u>PHARMAConnection</u>," the meeting was attended by "[m]ore than 130 medical professionals from hospitals across the country" with the "major objective of the three-day meeting" stated as "[b]uilding professional support for the use of the product [Trasylol]," thus emphasizing the meeting's promotional objectives.  Of the 130 "consultants," only 84 attended the presentations and responded to ARS questions.  During 2002, over 500 medical professionals from 120 institutions attended Cardiac Team Meetings, at a total cost to Bayer of $1,425,000.

e.     November 7-9, 2003:  Meeting in San Francisco, entitled <u>Innovative Strategies to Improve Open Heart Surgery Outcomes</u> was attended by over 110 professionals.

f.     In 2004, there were at least four Cardiac Team Meetings held, all entitled <u>Innovative Strategies to Improve Open Heart Surgery Outcomes</u>:  January 22-24 in San Antonio; June 25-27 at the Mayflower Hotel in Washington, D.C.; September 17-19 in San Diego; and November 5-7 in San Francisco. A fifth meeting was planned for December 10-12 in Boston.

**b.     <u>Disguise of the Meetings' Promotional Nature</u>**

195.    Bayer maintained that the Cardiac Team Meetings were designed to provide "valuable input" to Bayer and were conducted by Bayer's Scientific Affairs group.  Yet direction for these Cardiac Team Meetings came from the Director of Marketing for Trasylol, Stanley

Horton, and later from Val Pascale, who became Trasylol Product Manager in 2003.  Following

the 2000 marketing department's Return on Investment Analyses ("ROI"), when Mr. Horton and

other Bayer management personnel realized the substantial impact of these meetings on

increasing Trasylol sales, the objective of the meetings became almost exclusively promotional.

196.     To disguise the Cardiac Team Meetings as advisory in nature, Bayer posed

questions after each presentation and collected responses via keypads.  Bayer designed those

questions to reinforce the touted virtues of Trasylol, not to gather useful information.  Bayer did

not analyze the responses or render conclusions or recommendations based on the data collected.

The data was of marginal benefit and neither Bayer Product Management nor Scientific Affairs

reviewed the results.  Indeed, Bayer did not collect the data in a manner that would have been

useful for either scientific or market-research purposes.

197.     A market research vendor estimated that it would have cost only $92,000 to

complete a similar survey of 300 physicians and analyze the data collected.  Instead, in or about

2003, Bayer spent approximately $1,000,000 to conduct three Cardiac Team Meetings for a total

of approximately 300 physicians.

198.     Bayer's Marketing Department periodically adjusted the Cardiac Team Meetings

so they would appear to be legitimate advisory board meetings.  To justify honoraria, Bayer

collected data through the use of open-ended questions during some meetings.  However, there

was no need for this data.  During the November 16-17, 2002, Cardiac Team Meeting at the

Westin St. Francis Hotel in San Francisco, the participants were asked open-ended questions,

allegedly to benefit Bayer's research and development of the drug.  At that time, there were no

plans for any further development of the drug.  Moreover, no report of the responses was ever

completed or distributed to the product team or to Bayer management, nor was any summary requested.

### 2.   Improper Grants to Influence Prescribing Trasylol

199.   Bayer used grants as kickbacks to induce physicians to prescribe Trasylol.

#### a.   Dr. Peter Smith and Duke University Medical Center

200.   Dr. Peter Smith of Duke University Medical Center, Bayer's top KOL for Trasylol, requested $500,000 from Bayer to hold two meetings in 2005 for fellows in cardiothoracic surgery.  The grant was to sponsor meeting attendees and for overhead expenses, including payment for meeting organizers.  This request specified that 8.5% of the budget was for "institutional overhead."  The proposed meeting topics were expected to increase Trasylol use.  In 2002, Bayer granted Dr. Smith $75,000 for a similar meeting.

#### b.   United Way of Forsyth County, North Carolina

201.   Bayer disguised illegal incentives as payments to non-profit organizations.  For instance, Bayer approved a $13,000 charitable donation to the United Way of Forsyth County, North Carolina, requested on behalf of Wake Forest Baptist Medical Center where Dr. David Stump, a speaker for Trasylol and KOL, is an anesthesiology professor.  The grant request did not specify the contribution's purpose - a violation of Bayer compliance guidelines.

#### c.   Cardiovascular Surgical Clinic of Northwest Arkansas

202.   On information and belief, Bayer provided a $5,000 grant to the Cardiovascular Surgical Clinic of Northwest Arkansas to analyze data pertaining to practical and therapeutic changes to CABG surgery implemented in the clinic as a result of its staff members' attendance at a Cardiac Team Meeting.

#### d.     CABG-consult.com

203.    Bayer sponsored a website entitled www.CABG-consult.com through an "unrestricted educational grant."  The site featured publications concerning Trasylol off-label uses.  The website was designed for the specific purpose of promoting Trasylol.  Bayer provided or endorsed substantially all content.  Bayer also placed links to the website on its Trasylol website.  The *CABG-consult.com* website provided a "FreeCME" link enabling access to information on Bayer-sponsored CME programs.  These programs offered free textbooks and journals, free meals, and free CME credits for attending Trasylol-related presentations.  The *CABG-consult.com* website was discontinued when serious safety issues concerning Trasylol became widely known.

### 3.     Bayer's Funding of Off-Label Continuing Medical Education

204.    Through CME seminars taught by its paid KOLs, Bayer promoted off-label Trasylol use to "influencers, " persons who played a pivotal role in prescribing or using Trasylol, such as cardiac surgeons, anesthesiologists, and perfusionists.  Hospital administrators were targeted with messages promoting Trasylol's "cost-effectiveness."

205.    In 2004, Bayer contracted with American Health Consultants to promote Trasylol for cardiothoracic surgery in a CME series targeting clinicians and hospital administrators, entitled Coronary Artery Bypass Graft (CABG) Surgery:  A Year 2004 Update.  These sessions used pharmacoeconomic data, developed by KOL Dr. Peter Smith and Bayer, to justify Trasylol's high cost based on unsubstantiated claims of improved clinical outcomes such as reduction of heart attack and stroke.

206.    The CABG Surgery:  A Year 2004 Update CME program promoted off-label use of Trasylol with misleading information and paid kickbacks to encourage Trasylol use. Attendees each received a complimentary subscription to a hospital-administration or clinical

journal of their choice and a free textbook.  Annual journal subscriptions cost as much as $600 per year.

207.    In 2004, a Bayer-sponsored CME program entitled "Coronary Artery Bypass Graft (CABG) Surgery:  From Administration to Operation" targeted hospital administrators and pharmacy directors concerned about Trasylol's cost.  Ten regional programs were planned, including a September 11, 2004, program in Dearborn, Michigan.  Key Trasylol messages were: "Trasylol for Improved Quality of Care;" "Reduced Patient Risk;" "Improved Resource Utilization;" and "Reduced Institutional Costs."  Bayer sales force members recruited hospital administrators and other attendees.  Attendees were offered kickbacks similar to those provided in the CABG Surgery:  Update programs.

### 4.    Gifts and Other Kickbacks

208.    Bayer's Textbook Program was designed to increase Trasylol use by giving physicians a valuable textbook in exchange for looking at promotional material.  For the program, Bayer purchased thousands of copies of the cardiac surgery textbook, Advanced Therapy of Cardiac Surgery, written by Trasylol KOLs Kenneth Franco, M.D. and Edward Verrier, M.D. and valued at $135 each.

209.    Bayer asked physicians to review existing Trasylol marketing materials and complete a brief marketing survey in exchange for the free textbook.  Sales representatives hand delivered the books so they could personally influence prescribing.  While the purported purpose of the program was to obtain market research data, more than six months later, no data was submitted to Bayer.  In response to an inquiry from Relator, Bayer tracked down the data from the vendor.  Bayer's Trasylol product manager showed little interest and Bayer made no attempt to analyze the data.

66

210.    Bayer distributed those textbooks to 1,800 physicians, including cardiac surgeons and anesthesiologists who worked at federal facilities, such as:  Dr. T.E., at the VA in Milwaukee, Wisconsin; Dr. S.S. at the VA in Houston, Texas; Dr. C.W. at the VA in Cincinnati, Ohio; Dr. C.L in Buffalo, New York; Dr. P.M. at the VA in Ashville, North Carolina; Dr. M.C. at the VA in Roxbury, Massachusetts, and others.  The Textbook Program violated the $20 federal limit on the retail value of gifts to individual government employees.

211.    In addition to the Textbook Program, Bayer distributed textbooks valued at over $100 as premium items (gifts) to physicians and provided bound sets of journal volumes for medical residents with the intent of inducing the recipients to use Trasylol.

212.    Bayer marketing personnel, including Director Horton, funded entertainment expenses and provided items of value to KOLs.

### 5.    Key Opinion Leader Programs/ Peer-to-Peer Selling

213.    Bayer paid KOLs to present Trasylol information, including misleading safety information and off-label uses to physicians at expensive dinner meetings and other programs. Bayer provided grants to hospitals and physician groups to fund Bayer KOLs' Trasylol presentations featuring off-label promotion.

### 6.    Contract Discounts

214.    Bayer entered into a two-year contract with Premier Inc., a hospital group-purchasing organization.  The contract provided 20% discounts to hospitals that conducted more than 150 CABG procedures annually and had 100% "appropriate Trasylol utilization."  These discounts were not available to all hospitals.  The contract promoted off-label Trasylol use in combined CABG/valve procedures and in off-pump CABG surgery because the hospitals could not qualify for full discounts if Trasylol use was limited to on-pump FDA-approved CABG

procedures.  Trasylol discounts under the Premier contract totaled approximately $3 million annually.

### E.     Claims for Reimbursement of the Costs of Trasylol

#### 1.     The Costs of Bayer's Misconduct

215.     Bayer misrepresented Trasylol's safety, efficacy, and cost-benefit tradeoffs and deliberately omitted or downplayed Trasylol's dangers, especially with respect to off-label uses. These misrepresentations and omissions, both in the promotion of Trasylol and on its label, rendered Trasylol misbranded and therefore illegal for use in interstate commerce.  Government employees and healthcare providers would not have purchased or administered Trasylol had they known that Bayer was misrepresenting the safety and efficacy of Trasylol or that it was misbranded and therefore illegal in interstate commerce. Certainly, the United States itself would not have purchased Trasylol, reimbursed procedures in which it was used, or compensated States for Trasylol related payments if it had known that Trasylol was a misbranded drug and therefore illegal under the laws of the United States.

216.     Furthermore, decision makers relied upon those misrepresentations in prescribing, purchasing, and administering Trasylol, as well as in evaluating it for formulary placement. Those misrepresentations were material to their professional judgment when deciding the best course of treatment for a particular patient.  Because of Bayer's deception, providers were unable to make educated and independent risk/benefit decisions about Trasylol use and administered or prescribed Trasylol in situations in which it was unreasonable and unnecessary.

217.     As a result of Bayer's disinformation campaign and illegal promotional tactics, decision makers used Trasylol when it was unnecessary, or chose Trasylol over its cheaper competitors, thus typically adding well over $1,000 in costs to each procedure involving

Trasylol.  Furthermore, Trasylol increased hospital length of stay and cost of care for countless patients who suffered serious side effects.

218.    Trasylol was used in approximately one-third of all CABG procedures in the U.S., and that figure grew until 2006, when the Mangano study and Trasylol safety concerns came to light.  Bayer reported that Trasylol sales declined approximately 28% during 2007.  Marketing of the drug ceased in late 2007.

219.    In 2006, Bayer estimated U.S. patient exposure figures for Trasylol as follows: 78,000 patients in 1999; 101,000 patients in 2000; 131,000 patients in 2001; 145,000 patients in 2002; 169,000 patients in 2003; 189,000 patients in 2004; and 246,000 patients in 2005.

220.    As to government funded healthcare assistance programs, pharmaceutical industry statistics that Relator used while at Bayer showed that Medicare covered approximately 50% of CABG patients and Medicaid covered another 5%.  Applying those percentages to Trasylol use results in an estimate of approximately $610 million in Medicare patient Trasylol use ($244 million on-label and $366 million off-label) during the period from August 1999 through 2006.  Similarly, an estimated $62 million in Bayer's revenue from Trasylol was attributable to Medicaid patients ($25 million on-label and $37 million off-label).

221.    Approximately 60% of patients who received Trasylol from March 2005 to March 2006 underwent CABG surgery, including on and off-label use.

222.    Approximately 22% of the patients who received Trasylol from March 2005 to March 2006 underwent valve-surgery.

### 2.    Government Direct and Indirect Payments for Trasylol

223.     Numerous hospitals across the United States purchased Trasylol and administered it during surgery.  A substantial percentage of usage was reimbursed through

69

Medicare or paid for through the Medicaid program.  As an example, for the year ending October

30, 2003, the hospitals listed below purchased Trasylol in the following amounts:

| | |
|---|---|
| Cleveland Clinic Foundation, Ohio | $   200,394 |
| Emory Crawford Long Hospital, Georgia | $   723,306 |
| Florida Hospital, Orlando, Florida | $   514,502 |
| Indiana University Medical Center | $   223,349 |
| Huntsville Hospital, Alabama | $   317,788 |
| Jewish Hospital, Kentucky | $1,050,318 |
| JFK Medical Center, Florida | $   274,756 |
| Lee Memorial Hospital—Health Park Campus, Florida | $   392,792 |
| Medical Center of Central Georgia | $   778,764 |
| Methodist Hospital of Indiana Clarian | $   327,186 |
| North East Georgia Medical Center Main Campus | $   463,247 |
| Piedmont Hospital, Georgia | $   594,476 |
| Regional Med Ctr, Bayonet Point, Florida | $   678,473 |
| Sarasota Memorial Hospital, Florida | $   353,615 |
| St. Joseph's Hospital, Atlanta, Georgia | $   584,507 |
| St. Mary's Hospital, Rochester, Minnesota | $   500,925 |
| William Beaumont Hospital, Royal Oak, Michigan | $   114,973 |

224.    During the fiscal year ending October 30, 2003, Bayer estimated hospitals paid

$1,268 for 600ml of Trasylol.

### a.    <u>Medicare</u>

225.    Examples of Medicare claims for patients who received Trasylol are attached as

Exhibit B.

### b.    <u>Medicaid</u>

226.    Medicaid is the primary payor for approximately 5% of CABG admissions.

However, this percentage is higher for off-label procedures, particularly pediatric procedures and

other cardiac procedures.

227.    During the period from March 2005 to March 2006, approximately 9% of all

Trasylol patients in all U.S. non-governmental community hospitals received the drug during

pediatric heart surgery.  That figure does not include patients in pediatric hospitals.

228.    Medicaid and TRICARE are significant payors for many pediatric hospitals.

229.    By June 17, 2003, at least 33 pediatric hospitals were purchasing Trasylol and

Bayer had sales quotas based on 2002 sales of approximately $2 million or an average of

$60,000 per pediatric-hospital account.  However, Trasylol Marketing Director Stanley Horton

admitted on multiple occasions that Trasylol had no legitimate use in a pediatric setting.

**c.**      **Trasylol Purchases for Veterans Administration, Department of Defense, and Other Direct Purchasers**

230.    Federal agencies and federal health insurance programs, including the Veterans

Administration ("VA"), Department of Defense ("DoD"), TRICARE, CHAMPVA, and FEHBP,

purchased or paid for Trasylol.

**i.**      **Bayer's Misleading Promotion Affects Veterans Administration and Department of Defense Prescribers**

231.    In 1998, Trasylol Marketing Director Horton started an effort to expand Trasylol

use in VA and DoD hospitals.

232.    On August 11, 2000, Bayer KOL Peter K. Smith, M.D., gave a Bayer-sponsored

promotional program entitled "Cerebral Protection During Cardiac Bypass" at Ruth's Chris

Steak House in San Antonio, Texas.  In attendance were several doctors and perfusionists from

Brooke Army Medical Center.  Dr. Smith focused on off-label Trasylol uses and claimed falsely

that Trasylol had a "positive impact" on neurological outcomes and also reduced strokes and

heart attacks.  Dr. Smith recommended, "at the very least," using the high dose regimen for

anyone over age 60, as well as for repeat CABG surgery and valve surgery.

233.    On August 12, 2000, the day after Dr. Smith's presentation, attendee Dr. David

Cohen of the Brooke Army Medical Center used Trasylol for the first time in the off-label

procedure of valve surgery.

234.    On November 15, 2000, Dr. Smith presented a Bayer-sponsored promotional talk

on Trasylol for the "Cardiovascular Surgeons of San Diego County" at Donovan's Steak House

71

focusing on neuroprotection.  As a result, Bayer reported that the VA Hospital in San Diego went from using no Trasylol to using the high dose regimen of Trasylol on 100% of their CABG procedures.

235.    In 2003, cardiothoracic surgeons, anesthesiologists, and perfusionists from the Southern Arizona VA Medical Center, the Naval Medical Center in San Diego, and the Tripler Army Medical Center in Hawaii were invited to attend Cardiac Team Meetings under Bayer's marketing effort to "Grow and Protect" its Trasylol market.

236.    The Naval Medical Center in San Diego was listed on Bayer's "Protect" Trasylol market list.

### ii.    VA and Department of Defense Purchases of Trasylol

237.    In or about 1998 or 1999, Bayer entered into a government contract to provide Trasylol at a discount to DoD facilities.  Bayer also provided Trasylol to VA facilities through a government contract.  The federal government paid for healthcare treatment such as cardiac surgery for beneficiaries of DoD/VA and for other government beneficiaries who received such treatment at non-federal hospitals.

238.    In 1999, Bayer made sales of Trasylol to 33 Military Hospitals and VA Medical Centers in the amount of $790,990.

239.    In 2002, Bayer made Trasylol sales to government possession takers, such as VA/DoD, of $1,473,325 (net of chargebacks).

240.    For January to July 2003, Bayer reported $2,382,338 in Trasylol sales to federal healthcare facilities.

241.    During the 12 months ending October 30, 2003, the military facilities and VA Medical Centers listed below purchased Trasylol in the following amounts:

Ann Arbor VA Medical Center                              $  89,240

72

| | |
|---|---|
| Birmingham VA Medical Center | $ 64,359 |
| Edward Hines Jr. VA Hospital, Illinois | $ 23,506 |
| Eisenhower Army Medical Center | $ 64,731 |
| James A Haley Veterans Hospital | $122,855 |
| Ralph H. Johnson Veterans Affairs Medical Center | $150,789 |
| Richard L Roudebush VA Medical Center, Indianapolis | $ 62,564 |
| The Veterans Affairs Medical Center | $154,676 |
| The Veterans Affairs Medical Center | $158,889 |
| U.S.A.F. Medical Center | $ 31,402 |
| VA Medical Center, Atlanta, Georgia | $100,724 |
| William S. Middleton VA Hospital, Madison, Wisconsin | $ 19,619 |

## IX.    AVELOX

### A.    Overview of Avelox and Its Sales Volume, and Bayer's Kickback Schemes

242.    Avelox is Bayer's trade name for moxifloxacin hydrochloride, a synthetic broad-spectrum antibacterial agent classified as a fluoroquinolone.  Avelox is considered extremely powerful because the bactericidal action of the drug inhibits topoisomerase II (DNA gyrase) and topoisomerase IV required for bacterial DNA replication, transcription, repair, and recombination.

243.    Avelox is approved only for use in treating limited conditions caused by susceptible strains of particular bacteria.  Avelox and other antibiotics are not effective against viral infections, which constitute a substantial portion of respiratory illnesses.  The Avelox label directs that appropriate culture and susceptibility tests should be performed before treatment. The label warns that Avelox should be used only to treat or prevent infections that are proven or strongly suspected to be caused by susceptible bacteria.

244.    In November 2001, Bayer received the FDA's approval of Avelox IV (intravenous formulation) for indications similar to those for which Bayer had received approval of Avelox in tablet form.

73

245.   The recommended dose for Avelox is 400mg once daily over the course of 5-21 days, depending on the diagnosis.  Avelox is available in 400mg tablets and 400mg diluted in saline (250 ml bags) for intravenous administration.

246.   Avelox competes against other antibacterial drugs, primarily Levaquin (levofloxacin) and Tequin (gatifloxicin), as well as Augmentin (amoxicillin), Biaxin (clarithromycin), Cipro (ciprofloxacin), Floxin (ofloxacin), Rocephin (ceftriaxone), Zithromax (azithromycin), Factive (gemifloxacin mesylate) (launched April 2004), and Ketek (telithromycin) (launched July 2004).

247.   Bayer considered the initial sales volume of Avelox in 2000 a disappointment and thereafter expended considerable efforts to increase Avelox sales.  As a result of those efforts, Avelox became a very lucrative drug for Bayer.

248.   The reported Average Wholesale Price ("AWP") per 400mg tablet of Avelox was $7.51 in 2002, $7.79 in 2003, and $8.07 in 2004.  Each Avelox prescription averaged 8.8 tablets. Total Avelox prescriptions were 2.6 million in 2002, 3.2 million in 2003, and an estimated 3.7 million in 2004.  These figures do not include free samples, which exceeded 13 million tablets per year, the equivalent of another 1.5 million prescriptions annually, or about 30% of the total tablet volume in the market.

249.   Initially, Bayer marketed Avelox to physicians who treat patients with respiratory infections.  In order to change the prescribing behavior of these doctors, Bayer routinely paid kickbacks to physicians to influence them to prescribe Avelox.  These illegal incentives included the following:

   a.  Payments to physicians as "consultants" to attend promotional meetings;

   b.  Unrestricted grants as incentives and rewards for prescribing Avelox;

   c.  Payments to physicians to attend Bayer-influenced CME programs;

    d.  The provision of medical equipment, such as otoscopes, and textbooks as "prizes" or premiums to influence physicians to prescribe Avelox; and

    e.  Illegal gifts and entertainment.

These programs were financed primarily through Bayer's marketing budget for Avelox.

    250.    As a result of Bayer's kickback schemes and off-label marketing, gross Avelox sales grew from $194.9 million in 2002 to an estimated $273.1 million in 2004, and were projected to grow to $469.5 million by 2009.  Sales to Medicaid patients accounted for $25 million in 2003 and an estimated $33 million in 2004.  As a result of Bayer's campaign to promote Avelox for off-label uses, moreover, prescriptions for approved uses accounted for only 44% of sales, while prescriptions for off-label uses accounted for 56% of sales.

    **B.**    **Bayer's Kickback Schemes to Market Avelox**

    251.    Bayer's marketing department engaged in several programs that were designed to improperly benefit prescribing physicians in order to induce them to prescribe Avelox.  Bayer routinely conducted ROI analyses of those programs to determine if they had caused Avelox sales to increase and to refine its marketing tactics.

    **1.**    **Cash Honoraria Paid to Avelox Key Opinion Leaders**

    252.    Bayer recruited physicians to be advocates for Avelox in each medical specialty where Avelox had potential application.  Bayer trained KOLs and paid them honoraria ranging from $500 to $5,000 or more, and sometimes travel, lodging, and other expenses, to consult or speak at meetings, CME programs, and telesymposia to promote Avelox to prescribing physicians.

    253.    Bayer's Avelox promotional tactics were summarized in an "Avelox Tactics Brainstorming Workshop" presentation dated September 10, 2004.  The section entitled "Opinion Leader Development" listed Bayer's programs for training and deploying KOLs.  One

chart shows time periods, investments of hundreds of thousands of dollars per program, ROI analyses, and other assessments of the programs.

254.    According to Bayer's 2003 Avelox financial records, Bayer budgeted $2.7 million for "Speakers Alliance costs," including Pulmonary Advisory Network ("PAN") and Speaker Development Meetings.  Bayer's 2004 Avelox budget included $1 million for Speaker Development Meetings.  Bayer selected speakers who were willing to convey its Avelox messages, such as "Best in Class," superior speed of symptom resolution, and empiric use, *i.e.*, prior to culture and sensitivity testing.  Physicians who advocated conservative use of antibiotics were avoided or efforts were taken to "neutralize" or convert them.

255.    PAN was a Bayer KOL program.  Bayer paid thousands of dollars for 10 to 20 KOLs to attend PAN meetings, to assist with the development of marketing strategies for Avelox, and then to promote Avelox to other physicians.

256.    Bayer paid for Avelox KOLs to attend international symposia, such as the 2004 MOSAIC Study Symposia held in Monte Carlo, Monaco and Cancun, Mexico.

257.    Bayer's compliance policies prohibited payments to individuals affiliated with government facilities.  However, at least two Avelox KOLs who received payments were affiliated with government healthcare facilities:  Dr. Sanjay Sethi, affiliated with the VA Hospital in Buffalo, New York; and Dr. Antonio Anzueto, affiliated with the South Texas Veterans Healthcare System, Audie L. Murphy Veterans Hospital Division.

258.    Bayer's Marketing Department was the driving force behind these efforts.  In an e-mail from Avelox product manager Nancy Retzlaff to Avelox product manager Paul Bedard, dated March 8, 2004, Ms. Retzlaff urged that Bayer's Scientific Affairs Department should become "more involved with national KOL initiative . . . to manage the minutia [*sic*]."

### 2.      Honoraria Paid to Doctors as Avelox "Consultants" to Bayer

259.    Bayer Product Management routinely tried to hide promotional efforts under the guise of "market research" or "getting advice," including various instances where Bayer paid doctors a cash or gift honorarium "as a consultant to Bayer Corporation."  In the vast majority of cases, the information collected provided no incremental value.

### a.      Clinical Advisory Panels

260.    During various times, beginning in or about 2000, Bayer held Clinical Advisory Panel ("CAP") meetings to increase Avelox prescribing.  CAP meetings were promotional dinners for 12 to 15 high-volume prescribers.  Each sales area was expected to hold 10 to 15 of these dinners.  Hundreds of these Avelox dinners were held in upscale restaurants.  As of September 2002, Boron Lapore, a vendor who administered CAP meetings for Bayer, had a Bayer Purchase Order for $1.7 million for these Avelox dinners.  Some CAP meetings were moderated by paid Bayer speakers, while others were moderated by Bayer personnel.

261.    One CAP program was entitled "New Directions in Antibiotic Selection: AVELOX (moxifloxacin)."  To promote the New Directions panels, Bayer sent to invitees a Consulting Agreement and paid each physician $250 to attend the program.  Bayer funded these "consulting" meetings with funds from the Avelox marketing budget for the purported purpose of reviewing the latest information on Avelox and gaining personal and clinical feedback.  The actual purpose of these meetings was to increase and reward Avelox prescriptions.

### b.      Avelox Clinical Experience Study ("ACES 2000")

262.    In 2000, Bayer conducted the Avelox Clinical Experience Study ("ACES 2000"). The study was part of Bayer's commitment to the FDA to evaluate Avelox safety.  In conjunction with a contract-research organization, Bayer recruited and paid over 5,000 high-prescribing physicians to prescribe Avelox to three to six patients, track patient experience, and

then attend dinner meetings.  Patients were to receive Avelox for Acute Exacerbations of

Chronic Bronchitis, Sinusitis, or Community Acquired Pneumonia.  The purpose of the study

was to reward and encourage Avelox prescribing and to support Bayer's marketing claims for

Avelox's safety.  Bayer paid each participating physician an honorarium upon completion of the

trial.  Bayer designed the study as a marketing tool to increase the Avelox prescriptions by

physicians who, by the nature of their practice, wrote the most prescriptions.  To gather reliable

clinical information, however, significantly fewer physicians were needed.  Moreover, there was

no need to limit physicians to three to six patients each and there was no reason to limit the study

to only high prescribers.

### c.  <u>Managed Care Advisory Board</u>

263.    Bayer's product management requested a $10,000 payment to RJ Health Systems

for management fees in conjunction with a Managed Care Advisory Board held with

representatives from Harvard Pilgrim Healthcare.  At that time, Harvard Pilgrim Healthcare was

considering including, or recently had included, Avelox on its formulary.  Advisory Boards

typically involved Bayer paying members of the organization to attend a dinner with an Avelox

presentation designed to highlight the positive aspects of the product and to obtain feedback on

how to sell more Avelox and other Bayer products into the organization.

### d.  <u>Avelox Consultant Exchange Newsletter</u>

264.    In the summer of 2001, Bayer began sending a quarterly newsletter, <u>The Avelox</u>

<u>Consultant Exchange,</u> to physicians who had received honoraria as Bayer "consultants."  Bayer

described that newsletter as a "forum for the exchange of ideas around antibiotics, specifically

Avelox."  Each issue contained a short questionnaire, which Bayer asked the recipients to fill out

and mail back "to share your ideas and perspectives as they relate to the newsletter topics."  In

the next issue, Bayer summarized selected responses.  Those questionnaires were not scientific

78

or clinical, but focused instead on whether certain studies and information correlated with the physicians' experience and would likely influence their "prescribing habits."  The responses that Bayer collected were of negligible value.  In essence, the newsletter was a sham that Bayer used to justify paying physicians as Avelox consultants.

### e.      Avelox Velocity Challenge

265.      During various times, including 2002, Bayer encouraged physicians to participate in the "Avelox Velocity Challenge," another experience trial.  Bayer asked physicians to prescribe Avelox to bronchitis and sinusitis patients, track the patients' progress, and submit the results to Bayer.  Bayer however misled the physicians by failing to mention that Avelox is indicated for only some of these patients.  As an incentive to put patients on Avelox, physicians were invited to attend meetings where the stated purpose included "a review of the latest information on Avelox."  Bayer used funds from the Avelox marketing budget to pay a third party to organize these meetings and also used such funds to pay each attending physician $250 as a "consultant."  This "consulting fee" was a façade designed to disguise the purely promotional nature of these meetings, whose true purpose was to increase prescriptions of Avelox.

### f.      Avelox Advisory Board Meetings

266.      Bayer's 2004 proposed budget identified Advisory Board Meetings as marketing: "Specialty meetings to help build advocacy in Infectious Disease, Pulmonary Disease and Ear, Nose and Throat Specialties for Current and Future Business Needs."

267.      Bayer held other Avelox Advisory Board Meetings where Bayer provided dinner and paid consulting honoraria to high-prescribing physicians for listening to the latest information on Avelox.  In certain instances, Bayer paid the prescribing physicians who attended the meetings for their travel, hotel, meals, and other expenses.

**g.**   **Testing of New Detailing Approach**

268.   Upon information and belief, Bayer paid $100 cash honoraria to physicians ostensibly in exchange for their feedback on a new visual aid being developed by Bayer's Marketing Department for detailing Avelox to physicians.  The real purpose was to influence the prescribing behavior of the selected physicians, as reflected in "EXECUTIVE SUMMARY, Marketing DSM Tune-In Session" for August 4, 2000, which states:  "In this program, reps would chose [*sic*] five physicians . . . The message here is that the reps should probably start thinking about those five physicians that they've had a difficult time getting to use Avelox because we want it to be a nonuser targeted approach."

**h.**   **Roundtable Meetings**

269.   Bayer used Avelox "roundtable" promotional meetings such as Avelox Breakfast Roundtables.  Bayer paid physicians honoraria to attend these meetings.  Certain roundtable meetings had honoraria as high as $500 per participant.  As of September 2004, Bayer had completed 140 Breakfast Roundtable programs at an average cost of $575 per participant and $4,000 per program.  In 2004, Bayer conducted ROI analyses on these programs.

**i.**   **Signature Series Programs**

270.   Bayer paid prescribers $250 each to attend "Signature Series" case-discussion programs.  Bayer requested that each attendee bring a case to present at the program.  For these programs, Bayer selected KOLs as paid moderators to guide the discussion in ways that would showcase Avelox and promote its use.  Bayer considered these programs as promotional and KOL-development tactics that were part of its Avelox-marketing strategy.  Bayer paid moderators $1,000 or more per program.  Attendees also typically received dinner in an upscale restaurant as part of the program.

271.    In one version of the Signature Series program, each Bayer Scientific Affairs
Liaison was responsible for one program targeting Pharmacy and Therapeutics Committee
influencers in managed-care organizations or in hospitals where a competitor's drug was on the
formulary.  Bayer sales personnel identified targets for that program.  Bayer used that program to
obtain formulary approval and to encourage Avelox use in hospitals that had recently added
Avelox to their formularies.

272.    In the second half of 2002, Bayer reportedly conducted 60 Signature Series
programs.  Each of them cost Bayer $3,500 - $4,000 for five to eight attendees.

### 3.    Bayer Paid Honoraria for Attendance at Avelox Promotions

273.    Bayer paid honoraria to physicians in the form of "medically related items" in
exchange for the completion of a survey after viewing an electronic presentation, viewing an
internet-based interactive learning program, or listening to a telesymposium.  Those activities
were a façade for Bayer's compensation of physicians under the banner of "market research."
Their primary purpose was to influence doctors to prescribe Avelox.  These programs included:

a.    Telesymposia on the MOSAIC Study, published in the March 2004 issue
of *Chest*, for which physicians would "receive a valuable medical office
supply of their choice upon completion of this program and a market
research survey."  These included a telesymposium entitled "New
Evidence in the Antimicrobial Management of Acute Bacterial
Exacerbation of Chronic Bronchitis:  The MOSAIC Study" a one-hour
program offered in October-November 2003, January-February 2004, and
June 2004.

b.    Two interactive internet Learning Programs concerning the MOSAIC
study in late 2003 and early 2004, respectively, as evidenced by an
invitation to go to http://aveloxusa.medsite.com and enter invitation code
AVY7JNQ7 (2003) and to http://aveloxusa-2.medsite.com and enter the
invitation code AAVX3QAEM9, in order to view the program and
"receive a medically relevant item from Medsite Rewards" upon
completion of a survey to "help us assess the effectiveness of this
program."  This survey consisted of a few questions, the answers to which
Bayer reviewed only rarely.  But these programs were highly effective for
their purpose of increasing Bayer's sales of Avelox.  Bayer's ROI analyses

81

found market-share gains of between 1% and 4%, depending upon the physicians' specialty.  By September 2004, nearly 8,000 physicians had received compensation through these programs.  Bayer also noted high repeat-participation rates.

c.    An interactive internet Learning Program, as evidenced by a fax invitation to a Dr. Rizzo on August 2, 2005, stating:  "At the conclusion, you will have the opportunity to complete a short feedback survey and in return receive a clinical practice item through Medsite Rewards."

274.    Bayer funded promotional programs for providers and paid vendors to provide premiums to doctors as incentives to view electronic presentations or live promotions for Avelox.  Examples of Avelox educational/promotional programs that offered physicians Bayer-funded compensation for their participation included:

a.    2004 Telesymposia Series:  <u>Evidence-Based Antimicrobial Treatment of Acute Bacterial Exacerbation of Chronic Bronchitis, Including the Groundbreaking MOSAIC Study</u>, published in the March 2004 issue of *Chest*, offered at various times on June 23-24, 2004.  Promotional material for this telesymposium offered that "[p]hysicians completing this activity will receive a valuable medical office supply of their choice!" and also stated that it was "[p]rovided as an educational service by Bayer HealthCare Pharmaceuticals and [wa]s copyrighted to Bayer Pharmaceuticals Corporation."  Bayer caused biased presentation of the study results.  Those results were used to encourage unnecessary and inappropriate prescribing of Avelox for bronchitis because less than 50% of bronchitis cases are bacterial in origin.  Bayer made unsubstantiated claims based on those results.

b.    Thought Leader Telesymposia Series:  <u>Meet the Investigators/Experts: The Role of a New Antibiotic for the Treatment of Community-Acquired Respiratory Tract Infections</u>, scheduled for various dates from April 3 to May 31, 2000, July 12 to August 30, 2000, and October 10 to December 4, 2000, involving approximately 120 programs.  The promotional material noted that it was "[s]ponsored by Bayer Corporation, Pharmaceutical Division" and offered that "[u]pon completion of the program evaluation, each participant will receive a certificate valued at up to $100 towards the purchase of medically relevant items, such as textbooks or medical supplies."  The investigators/experts included Dr. Iannini, whom Bayer trained as a KOL.  Bayer paid honoraria to Dr. Iannini for his participation and for his endorsement of Avelox.

c.    Thought Leader Telesymposium:  <u>PK/PD Relationships for Differentiation of Fluoroquinolones in Primary Care</u>, scheduled for various dates from

December 27, 2000 - February 21, 2001.  Promotional material offered CME credit and noted that "[u]pon completion of the program evaluation, each participant will also receive a certificate valued at up to $50.00 towards the purchase of medically relevant items, such as textbooks or medical supplies."  Upon information and belief, Bayer used this seminar to promote Avelox for off-label uses and to promote unsubstantiated differences in efficacy as compared to other fluoroquinolones.

d.   Telesymposia Series:  <u>New Evidence in the Antimicrobial Management of Acute Bacterial Exacerbation of Chronic Bronchitis:  The MOSAIC Study</u>, offered on various dates in January and February 2001. Promotional materials offered that "[p]hysicians completing this activity will receive a valuable medical office supply of their choice!"  The material shows that the program was offered by Bayer HealthCare to promote Avelox and lists as faculty Bayer KOL Dr. Anzueto, to whom Bayer paid honoraria for his participation and for his endorsement of Avelox.

**4.    Other Kickbacks**

275.    Bayer misused "unrestricted educational grants" to induce healthcare providers to put Avelox on their formulary or to encourage its use, including off-label use.  In certain instances, Bayer used those grants to facilitate relationships with KOLs and further develop them as Avelox advocates who would present Bayer's messaging.  While these grants were purportedly "unrestricted," Bayer often provided them with the explicit understanding that they would fund specific efforts to increase Avelox use, and Bayer or its trained speakers frequently influenced their content.

276.    Bayer also provided physicians with gifts, lavish meals, spousal attendance at events, and other benefits to induce them to increase their prescribing of Avelox.  Bayer's employees were aware that those activities were illegal and used a variety of techniques to conceal them, such as failing to document them, falsifying expense reports, routing benefits through vendors who would bury the cost, and internal cost-shifting.

**C.**      **Bayer Funded and Sponsored Biased Continuing Medical Education and Other Programs with Kickbacks to Promote Avelox**

277.      Bayer used biased CME vendors, such as Gideon Bosker, M.D., and Thomson, to help promote Avelox.  Bayer had a long-standing relationship with Dr. Bosker and Thomson in connection with Cipro and then with Trasylol and Avelox.  As part of their CME contract with Bayer, Dr. Bosker and Thomson promised to spread the Avelox promotional messages via multiple platforms, referring to a "a multi-channel strategy -- which leverages every data set, resistance pattern changes, expert advocacy base and clinical trial that is currently driving the brand."  The program was called  "A Multi-Channel, High Impact, Expert Endorsed CME Educational Campaign" POWER Play (Print, Oratorial, Web and Electronic Educational Resources) involving clinical monographs, live symposia, internet platform (antibiotic.com), direct mail, clinical inserts and supplements, clinical textbooks, and consensus conferences.  The program was promoted as "[r]eturn on [i]nvestment proven" and incorporating "advocate and champion building," reflecting the biased content of the programs.

278.      Bayer paid Dr. Bosker and American Health Consultants to provide an extensive series of CME programs promoting Avelox entitled 2003 Infectious Disease Update:  Optimizing Antibiotic Management of Complicated and Uncomplicated Urinary Tract Infection and Respiratory Infections for the Primary Care and Hospital-Based Physicians.  One of many of these symposia was held November 22, 2003, at the Gaylord Opryland Resort and Convention Center.  The brochure for the program advertised "Free Textbook, Fine Dining and Free CME." Specifically, attendees were offered a free copy of the 2,100-page Textbook of Adult and Pediatric Emergency Medicine or the Textbook of Primary and Acute Care Medicine, along with a CD-ROM entitled "DrugCHOICE," to assist with antibiotic selection for common infections. Promotional material for the symposium noted that "[a]ttendance at the symposium is required to

84

receive your free textbook." Bayer sales representatives and Scientific Affairs Liaisons distributed invitations to these programs to physicians with high Avelox prescribing potential. Bayer paid for this program in the form of an unrestricted educational grant, even though the program's objective, as stated in a Thomson proposal to Bayer, was to promote Avelox. An updated symposium entitled 2004 Infectious Disease Update involved ten large regional programs, plus a website, with an average of 350 physicians attending per program. Bayer's 2004 budget for those programs was $2 million.

279.    In 2003 and 2004, Bayer sponsored a series of biased Avelox CME dinner programs, in conjunction with Bayer's vendor Pharmedica, called Anti-Infective Explorations. One program in the series was designed to increase Avelox use in treating acute sinusitis, a primarily viral infection. Also in 2003, Bayer sponsored 53 regional sinusitis CME dinner meetings in conjunction with Dr. Bosker and/or the Center for Healthcare Education -- another Thomson affiliate. Each dinner involved 10-15 physicians.

280.    Despite requirements that CME programs be independent of drug manufacturers, Bayer's Avelox District Sales Managers decided, in consultation with the CME vendor, on the speakers, dates, and venues. Bayer sales representatives were responsible for distributing the invitations and recruiting attendees. In the 2004 Tactical Plan, Bayer targeted five programs per sales area. In addition to a meal at an upscale restaurant, each participant received a $100 medically related gift, free antibiotic reference guides, and a CD-ROM program that the participant could use for additional CME credit. During the first half of 2004, 3,472 physicians attended various Anti-Infective Exploration Symposia on Sinusitis.

85

**D.**     **Bayer Paid Kaiser Permanente to Influence Physicians to Increase Prescriptions of Avelox**

281.     At certain times, Kaiser Permanente ("Kaiser"), a non-profit Health Maintenance Organization, listed Avelox as a "non-detailable" drug, precluding Bayer sales representatives from "detailing" Kaiser's staff physicians by providing literature and talking with them to influence their prescribing behavior in favor of Avelox.

282.     In 2003, Bayer paid $1,000 to Kaiser to fund an honorarium to a Kaiser-affiliated physician to present information on Avelox at an in-house meeting.  Bayer's Avelox financial records from 2003 show approximately $30,000 in payments to Kaiser entities.  These payments occurred during the same year that Bayer entered into an Addendum to its Corporate Integrity Agreement in settlement of allegations that Bayer paid $100,000 to Kaiser in connection with sales of Adalat and that Bayer failed to report Best Price information reflecting private label sales of Adalat and Cipro.

**E.**     **False Claims for Reimbursement and the Costs of Avelox**

283.     Bayer violated the FCA by knowingly causing healthcare providers and pharmacists to submit false claims to federal and state governments.  Those claims were the results of Bayer's illegal Avelox marketing and its payments of kickbacks.  Bayer's actions induced excessive payments on those claims from the federal and state governments, undermined physicians' and patients' freedom to choose appropriate drug therapies, and created the potential for patient harm.

284.     Medicaid paid a substantial number of Avelox prescriptions.  As of July 2004, Avelox had Medicaid coverage in 48 States.

285.    From the beginning of 2000 through 2006, the federal government's expenditures for federal participation in all States' Medicaid Programs for reimbursement for Avelox prescriptions totaled $55,251,375.

286.    Nationwide, from the beginning of 2000 through 2006, there were 2,203,950 prescriptions for Avelox reimbursed through the States' Medicaid Programs.

287.    In enrolling in State Medicaid Programs healthcare providers have to sign, affirm or certify that they will comply with all applicable state and federal law, including the anti-kickback statute.  Exhibit A contains numerous examples of such certification forms.

288.    From the beginning of 2000 through 2006, California, Delaware, Florida, Hawaii, Illinois, Louisiana, Nevada, New Mexico, Tennessee, Texas, the Commonwealths of Massachusetts, Virginia, and the District of Columbia, under their Medicaid Programs, reimbursed the States' portions of Medicaid for Avelox prescriptions in the following amounts, stated collectively:

| | |
|---|---|
| 2000 | $1,162,080 |
| 2001 | $3,337,859 |
| 2002 | $5,391,487 |
| 2003 | $7,999,440 |
| 2004 | $8,836,160 |
| 2005 | $2,935,533 |
| 2006 | $   180,230 |
| | $29,842,788 Total |

289.    Attached as Exhibit C is a summary of Medicaid reimbursements for Avelox in selected states during 2000-2006.  Exhibit C also contains a detailed summary of Medicaid reimbursement for Avelox showing the State, product code, package size, year and quarter, FDA product name and dosage, units reimbursed, number of prescriptions, and total reimbursement.

290.    Representative individual 2002-2004 Avelox IV Medicaid claims from Florida can be found in Exhibit D.  Almost all of these claims are from healthcare providers in the

greater Orlando area.  The DoD and the VA used Avelox and also reimbursed its cost.  Because

Avelox was not on the national DoD and VA formularies, it cost substantially more than

competing drugs.  During the second quarter of 2004, individual hospitals such as VA Houston,

VA Muskogee, Brooke Army Medical Center, and Wilford Hall (Air Force) accepted Avelox for

their respective formularies.

291.    For inpatient care, Medicare, Medicaid, and other government programs

reimbursed the cost of Avelox.  Medicare is the primary payor for Community Acquired

Pneumonia cases, which comprise the majority of Avelox IV use in hospitals.  Medicare covered

Avelox prescriptions for outpatients starting in 2006.

## X.    DEFENDANTS' UNLAWFUL RETALIATION AND OUTRAGEOUS MISCONDUCT

292.    In response to the concerns that Relator expressed about Baycol and later about

Trasylol, Bayer engaged in threats, harassment, discrimination, and other negative employment

actions with respect to Relator as described more particularly below.

### A.    Bayer's Outrageous Misconduct with Respect to Baycol

293.    In April 1998, Ms. Simpson began her employment at Bayer as the market-

research representative on the Baycol Cardiovascular Marketing team.  Baycol was a cholesterol-

reducing drug.

294.    Almost immediately, Ms. Simpson became aware of several colleagues' concern

about Baycol's safety, particularly when it was used in conjunction with gemfibrozil, another

cholesterol reducer.  Their concern was that the reported incidence of Baycol's association with

the potentially fatal condition rhabdomyolysis was higher than expected. [17]   As Ms. Simpson

learned of additional cases of rhabdomyolysis in Baycol patients, and that Baycol had a higher

reported incidence of association with that condition than similar drugs, she came to share that

concern.

295.    Over time, Ms. Simpson's concerns about Baycol increased.  On multiple

occasions, she expressed to Bayer managers her belief that their marketing practices were

jeopardizing patient safety.  Some of those managers told Ms. Simpson not to worry.  They

explained that if a patient contracted rhabdomyolysis, it "would not be a big deal" because the

patient would spend a couple of days in the hospital and then be fine, assuming that "it was

caught early."  Their explanations did not allay Ms. Simpson's concerns because she knew that

Bayer was not advising prescribers to be alert for warning signs of rhabdomyolysis.

296.    As the Baycol market researcher, and as an informal internal Bayer consultant on

Baycol, Ms. Simpson was heavily involved with many aspects of Baycol.  As the person with the

longest marketing-related tenure on Baycol in the U.S., she was among those most

knowledgeable concerning Bayer's promotion and marketing of Baycol.

297.    Ms. Simpson felt that Bayer's Baycol promotional practices were becoming

increasingly unethical and illegal in late 2000 and into 2001.

298.    In January 2001, Ms. Simpson's best friend and sister-in-law was diagnosed with

terminal cancer at age 39.  Several months later, while she was serving as the caregiver for her

friend and relative, she learned that a dozen Baycol patients had died from rhabdomyolysis.  She

---

[17]     That condition occurs when an injured muscle cell leaks myoglobin, a protein, into the
bloodstream.  Myoglobin can be directly toxic to muscle cells, and it can impair and clog the
kidney's filtration system.  The latter effects can lead to kidney failure and, potentially, death.

believed that those deaths were in part a result of Bayer having promoted Baycol unlawfully and having downplayed the risk of adverse events.

299.   In August 2001, as a result of 31 deaths associated with Baycol, Bayer withdrew it from the market.  Even before then, Bayer had become a defendant in multiple Baycol personal-injury lawsuits.

300.   Ms. Simpson believed that as an employee of Bayer, she had an obligation to assist Bayer's defense of those lawsuits despite her personal view that Bayer had promoted Baycol unlawfully.  She knew that her voluminous files contained documents that could damage Bayer's defense.  She also knew that her potential testimony about her knowledge of Bayer's promotional and marketing practices could be damaging to Bayer.

301.   In September 2001, Ms. Simpson was present during a conversation in which members of Bayer's senior management congratulated themselves on having made sure that they did not retain damaging Baycol documents.  They also discussed how they planned to make liberal use of the phrase "I don't recall" in their own anticipated depositions.

302.   During the discovery period in the Baycol multi-district litigation, members of Bayer's senior management made multiple comments to Ms. Simpson that suggested they were unhappy that she had kept voluminous files that contained damaging Baycol-related information.  One senior manager became upset and expressed anger to her when he learned, after Bayer supposedly had produced all responsive documents in discovery, that she had called attention to potentially responsive documents that he had ignored.

303.   After Bayer withdrew Baycol from the market, Ms. Simpson experienced overwhelming emotional stress as she tried to cope with the distress of having worked on a product that had caused avoidable patient deaths and harm while simultaneously assisting

90

Bayer's defense of thousands of Baycol lawsuits.  Furthermore, Ms. Simpson's ongoing

participation in the care of her relative personalized for her the consequences of the patient harm

caused by Baycol.

304.    Because of that stress, Ms. Simpson experienced negative repercussions to her

physical and mental health.  In addition, she had difficulty falling asleep, had frequent

nightmares, and would awake in the middle of the night and be unable to return to sleep.

305.    Baycol, and the deaths and injuries associated with it, dominated Ms. Simpson's

thoughts for years afterwards, and her emotional distress related to her employment at Bayer

continues to this day.

### B.      Bayer's Outrageous Misconduct and Retaliation with Respect to Trasylol

306.    After the withdrawal of Baycol in August 2001, Ms. Simpson was reassigned to

Trasylol in mid-2002.

307.    Unlike Baycol, which had a substantial market-research budget, Trasylol had no

market-research budget.  Promotional efforts were centered around Cardiac Team Meetings.  As

Ms. Simpson learned more about these meetings, she came to realize that they were a sham and

that she had been assigned to Trasylol to help Bayer make these promotional efforts look

legitimate.

308.    Ms. Simpson's reassignment to work on Trasylol exacerbated her emotional

distress when she realized that Bayer's management was still engaging in fraudulent and illegal

marketing practices that put patients at risk.  Ms. Simpson had assumed that those practices

would be discontinued after Bayer's Baycol experience.

309.    Ms. Simpson told her supervisor, Carol D'Eugenio, a Deputy Director in Bayer's

Strategic Analysis Department, that she would not participate in efforts to disguise the Cardiac

Team Meetings as valid market research.  Through this discussion, Simpson implicitly expressed

her belief that Bayer's description of those meetings as market research was a cover for improper and illegal kickbacks to prescribers for the ultimate purpose of increasing Trasylol sales.  Ms. D'Eugenio was fully supportive of Relator.

310.    Relator complained to Bill Allen, former Trasylol Product Manager, Randy Santiago of Scientific Affairs, and others that the Cardiac Team Meetings were being publicly presented as market research or advisory meetings but were, in fact, primarily promotional in nature.  Her complaints implied that those meetings were illegal.

311.    During the spring of 2003, Relator again discussed with Ms. D'Eugenio her concerns about the Cardiac Team Meetings.

312.    In June 2003, Relator applied for a project manager job for which she was fully qualified.  Her application was ignored.

313.    In July 2003, Ms. Simpson learned that she had not been invited to recent meetings of Bayer's New Products Evaluation Team.  Previously, she had attended that team's meetings on an informal basis and had performed successfully.  When she asked that team's leader, Bayer Vice President Nancy Bryan, why she had not been invited, Ms. Bryan replied that someone in higher management opposed her participation, and that she could no longer participate in that team's activities.

314.    Ms. Simpson questioned Ms. D'Eugenio as to why she was being marginalized.  Ms. D'Eugenio agreed with Ms. Simpson that she was being marginalized but stated that she did not know why.

315.    In mid-2003, Bayer increased its off-label promotion of Trasylol.  Ms. Simpson became concerned that Bayer was again jeopardizing patient safety.  At this time she started

exploring ways, including a potential False Claims Act action, to make Bayer change its

unethical and illegal behavior.

316.    Around this time, Bayer substantially increased the market-research budget for

Trasylol.

317.    In March 2004, at her request, Ms. Simpson met with Dean Slack, the Director of

the Strategic Analysis Department and Ms. D'Eugenio's direct supervisor, to again discuss her

concerns that the Cardiac Team Meetings were fraudulent, promotional in nature (including off-

label promotion), involved kickbacks, violated Bayer's Corporate Compliance policy, and were

illegal.  After this conversation, Mr. Slack reportedly spoke to David Reed, Bayer's in-house

attorney assigned to Trasylol.  Mr. Slack also reportedly discussed with Stanley Horton, Director

of Marketing for Trasylol, Relator's concerns about fraud and kickbacks related to the Cardiac

Team Meetings.

318.    After these discussions, Messrs. Slack and Horton apparently agreed upon some

changes to an internal Cardiac Team Meeting justification document to clarify the fact that these

meetings were not "market research."  Despite these efforts, Ms. Simpson does not believe that

there were any actual changes made to the meetings.  In April 2004, Ms. Simpson was excluded

from the business planning process for Trasylol, and two unqualified members of the department

were in a roster of participants in her place.

319.    Culminating in or about April 2004, as a result of complaints by Ms. Simpson and

others, several departments got together and created a policy to help reduce "non-compliant,"

*i.e.*, illegal, marketing efforts.  They prepared a document entitled:  "Policy on Not

Selling/Promoting Under the Guise of Research."  Despite agreement from the marketing

department, this policy was ignored.

320.     Shortly afterwards, Ms. Simpson ran across a new presentation by Stan Horton to Bayer's senior management, in which he again referred to the Cardiac Team Meetings as market research.

321.     In June 2004, Ms. Simpson was present at a Trasylol meeting in which a senior member of management effectively proposed concealing safety information, *i.e.*, conduct similar to what Bayer had done with Baycol, despite Bayer having paid out more than $1 billion in Baycol personal-injury settlements.  At the time, Bayer also was promoting Trasylol off-label, thus further jeopardizing patient safety.

322.     This further evidence of continuing practices that jeopardized patient safety caused her to endure substantial additional stress.  Ms. Simpson realized that her prior assumption, that Bayer would draw the proper lessons from its Baycol experience and change its practices accordingly, was proving incorrect.

323.     In June 2004, Ms. Simpson attended a Cardiac Team Meeting.  It confirmed her suspicions that her concerns had not been addressed and Bayer was still promoting off-label. Afterwards, she asked the Trasylol product manager what he had learned.  He laughed and said tongue-in-cheek that "just as [h]e suspected — nothing had changed," thus confirming that no useful information was expected to come from the meeting.

324.     In July 2004, Ms. Simpson learned that a less qualified colleague had been promoted into a newly created and unadvertised market-research job opening that would have been a promotion for her.  At the time, Ms. Simpson was the most qualified person for the position.  Ms. D'Eugenio told Ms. Simpson that she had objected to the promotion of Ms. Simpson's less-qualified colleague, and was told by Margaret Osora in Human Resources that they would have found a way to disqualify Ms. Simpson even if she had applied.

94

325.    During about 2004, Ms. Simpson and Mr. Horton had several interactions where Ms. Simpson communicated clearly that she would not support, condone, or otherwise enable any behavior that she believed to be fraudulent.  On at least two occasions, in response to these discussions, Mr. Horton referenced having his bonus tied to the financial success of his products and his desire to get the referenced bonuses.  He also stated that he thought that she had the same incentives.  These interactions included a meeting in August 2004, at Mr. Horton's request, during which he stated that he needed a market researcher who was going to be "supportive," and asked if she could be trusted to be "supportive."  She replied that she was willing to be "supportive," but was not willing to lie or to support his efforts to cover up what she considered to be fraudulent conduct.

326.    Approximately one month later, in September 2004, Ms. Simpson was notified indirectly that she was being terminated on the pretext of a workforce reduction implemented as part of a strategic alliance with Schering-Plough.  Ms. Simpson was terminated by Bayer effective January 1, 2005.

327.    Ms. Simpson's job function, however, was not eliminated.  Instead, she was replaced by another Bayer employee who was less qualified and had less experience in market research and the therapeutic area than Ms. Simpson, contrary to the policies contained in Bayer's Human Resources Employee Handbook.  Ms. D'Eugenio, Relator's supervisor, who had given her a good performance appraisal in August 2004 with no areas identified as needing improvement, stated that she felt Ms. Simpson's employment was being terminated because she had "stood up to Stan [Horton]."

328.    Before Ms. Simpson was formally terminated from Bayer, she told Ms. Osora in Bayer's Human Resources Department that her termination was illegal.

## XI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violation of 31 U.S.C. § 3729(a)(1) – Purchases  and Reimbursements by Federal Agencies – Trasylol was a Misbranded Drug

329.    Relator re-alleges and incorporates by reference all prior paragraphs.

330.    Bayer knowingly presented or caused to be presented false or fraudulent claims for payment for Trasylol purchased by federal agencies or paid for by federal agencies, including the VA and the DoD, or federal health insurance programs, including CHAMPVA, FEHBP and TRICARE, on or after August 5, 1999 in violation of 31 U.S.C. § 3729(a)(1).

331.    Under federal law, a drug is "misbranded" if its labeling or advertising is misleading.  21 U.S.C. §§ 321(n), 352.  If a manufacturer has notice that a drug is being used for off-label purposes and yet fails to provide adequate labeling for those additional uses, the manufacturer's conduct constitutes misbranding.  21 C.F.R. § 201.128.  It is illegal to introduce or deliver for introduction into interstate commerce a drug that is "misbranded."  21 U.S.C. § 331(a).  It is likewise illegal to "misbrand" a drug in interstate commerce, or receive or distribute a misbranded drug that has travelled in interstate commerce.  Id. 331(b) & (c).

332.    Federal agencies purchased or paid for Trasylol only on the condition that Bayer was in compliance with the FSS contract and any representations and warranties therein.

333.    Bayer misbranded Trasylol by marketing and selling the drug for off-label uses, including use in orthopedic surgery, valve surgery, off-pump surgery, and pediatric surgery, and yet failing to update the label to provide relevant safety and efficacy information for such intended uses as required.

334.    Bayer further misbranded Trasylol by misrepresenting the drug's safety and efficacy.  Bayer claimed that Trasylol improved outcomes and reduced the risks of myocardial

infarction (heart attack) and stroke even though Bayer knew that these claims were unsupported by data, and avoided conducting clinical trials that would yield adverse results.

335.    Trasylol therefore was prohibited from interstate commerce.  Bayer nevertheless profited from its sales of Trasylol to federal agencies, such as the DoD and VA, in violation of the representation Bayer made in its contract with the government.  By misrepresenting goods being sold to the government, and by misrepresenting compliance with a material contract condition, Bayer submitted false claims, and caused the submission of false claims, to the government.

336.    Trasylol was also ineligible for reimbursement for off-label uses under CHAMPVA and TRICARE because Trasylol was an unproven drug for such uses.  Bayer nevertheless profited from sales of Trasylol for such uses that the government reimbursed under CHAMPVA and TRICARE.

337.    Each claim for payment for Trasylol was false or fraudulent in implying that the drug was not misbranded, was permitted in interstate commerce, and was merchantable.  Each claim falsely, and at least impliedly, misrepresented that Trasylol was eligible for payment or reimbursement.

338.    Unaware of Bayer's misconduct, the United States paid for Trasylol.  If the United States had known that Trasylol was misbranded and prohibited from interstate commerce, it would not have paid for it.  Such false or fraudulent claims for payment for Trasylol, and (as a separate matter) use of Trasylol itself, resulted in damages to the United States in an amount to be determined.

## SECOND CAUSE OF ACTION
### Violation of 31 U.S.C. § 3729(a)(2) – Purchases  and Reimbursements by Federal Agencies – Trasylol was a Misbranded Drug

339.    Relator re-alleges and incorporates by reference all prior paragraphs.

340.    Bayer knowingly made, and caused to be made, false statements to get false or fraudulent claims paid for Trasylol purchased by federal agencies, including the VA and the DoD, or federal health insurance programs, including CHAMPVA, FEHBP and TRICARE, on or after August 5, 1999  in violation of 31 U.S.C. § 3729(a)(2).

341.    Bayer knowingly communicated and marketed Trasylol for use in procedures other than those approved by the FDA and outside of the FDAMA's limited exception to the dissemination of off-label marketing materials.  Bayer intentionally misrepresented the safety and efficacy of Trasylol, particularly for off-label uses such as off-pump surgery, orthopedic surgery and pediatric surgery, in numerous ways, including by failing to place appropriate warnings on the label or to include such warnings in its marketing, rendering such labeling and advertising misleading and fraudulent.

342.    Under federal law, a drug is "misbranded" if its labeling or advertising is misleading.  21 U.S.C. §§ 321(n), 352.  If a manufacturer has notice that a drug is being used for off-label purposes and yet fails to provide adequate labeling for those additional uses, the manufacturer's conduct constitutes misbranding.  21 C.F.R. § 201.128.  It is illegal to introduce or deliver for introduction into interstate commerce a drug that is "misbranded."  21 U.S.C. § 331(a).  It is likewise illegal to "misbrand" a drug in interstate commerce, or receive or distribute a misbranded drug that has travelled in interstate commerce.  Id. 331(b) & (c).

343.    Federal agencies purchased or paid for Trasylol on the condition that Bayer was in compliance with the FSS contract and any representations and warranties therein.

344.    Bayer misbranded Trasylol by marketing and selling the drug for off-label uses, including use in orthopedic surgery, valve surgery, off-pump surgery, and pediatric surgery, and yet failing to update the label to provide relevant safety and efficacy information for such intended uses as required.

345.    Bayer further misbranded Trasylol by misrepresenting the drug's safety and efficacy.  Bayer claimed that Trasylol improved outcomes and reduced the risks of myocardial infarction (heart attack) and stroke even though Bayer knew that these claims were unsupported by data, and avoided conducting clinical trials that would yield adverse results.

346.    Bayer's statements and omissions were material to the government's purchases of and payments for Trasylol, and were intended by Bayer to get the United States to make these purchases and payments.

347.    Trasylol therefore was prohibited from interstate commerce.  Bayer nevertheless profited from its sales of Trasylol to federal agencies, such as the DoD and VA, in violation of the representation Bayer made in its contract with the government.  By misrepresenting goods being sold to the government, and by misrepresenting compliance with a material contract condition, Bayer submitted false claims, and caused the submission of false claims, to the government.

348.    Trasylol was also ineligible for reimbursement for off-label uses under CHAMPVA and TRICARE because Trasylol was an unproven drug for such uses.  Bayer nevertheless profited from sales of Trasylol for such uses that the government reimbursed under CHAMPVA and TRICARE.

349.    Bayer's false and misleading statements and labels caused each claim for payment for Trasylol to be false or fraudulent in implying that the drug was not misbranded, was

99

permitted in interstate commerce, and was merchantable.  Each claim falsely, and at least

impliedly, misrepresented that Trasylol was eligible for payment or reimbursement.

350.     Unaware of Bayer's misconduct, the United States paid for Trasylol.  If the

United States had known that Trasylol was misbranded and prohibited from interstate commerce,

it would not have paid for it.  Such false or fraudulent claims for payment for Trasylol, and (as a

separate matter) use of Trasylol itself, resulted in damages to the United States in an amount to

be determined.

### THIRD CAUSE OF ACTION
### Violation of 31 U.S.C. § 3729(a)(1) – Medicaid Claims for Trasylol – Trasylol was a Misbranded Drug

351.     Relator re-alleges and incorporates by reference all prior paragraphs.

352.     Bayer knowingly caused to be presented false or fraudulent claims for Medicaid

reimbursement for Trasylol and inpatient care involving Trasylol on or after August 5, 1999 in

violation of 31 U.S.C. § 3729(a)(1).

353.     Under federal law, a drug is "misbranded" if its labeling or advertising is

misleading.  21 U.S.C. §§ 321(n), 352.  If a manufacturer has notice that a drug is being used for

off-label purposes and yet fails to provide adequate labeling for those additional uses, the

manufacturer's conduct constitutes misbranding.  21 C.F.R. § 201.128.  It is illegal to introduce

or deliver for introduction into interstate commerce a drug that is "misbranded."  21 U.S.C. §

331(a).  It is likewise illegal to "misbrand" a drug in interstate commerce, or receive or distribute

a misbranded drug under federal and state laws.  Id. 331(b) & (c); see supra ¶ 53 (listing state

statutes).

354.     Federal funds cannot be used in a manner, or for items, that are prohibited under

state laws.  2 C.F.R. § 225, Appx. A(C)(1)(c) (effective 2005 to 2013); Office of Mgmt. &

Budget, OMB Circular A-87, <u>Cost Principles for State, Local, and Indian Tribal Governments</u> (1997) (amended 2004).

355.    Bayer misbranded Trasylol by marketing and selling the drug for off-label uses, including use in orthopedic surgery, valve surgery, off-pump surgery, and pediatric surgery, and yet failing to update the label to provide relevant safety and efficacy information for such intended uses as required.

356.    Bayer further misbranded Trasylol by misrepresenting the drug's safety and efficacy.  Bayer claimed that Trasylol improved outcomes and reduced the risks of myocardial infarction (heart attack) and stroke even though Bayer knew that these claims were unsupported by data, and avoided conducting clinical trials that would yield adverse results.

357.    Trasylol therefore was prohibited from interstate commerce and prohibited from sale or distribution by state law.  Trasylol therefore, as a matter of law, was ineligible for Medicaid reimbursement.  Bayer nevertheless caused the submission of false claims involving Trasylol and profited from sales of Trasylol that were reimbursed through the Medicaid program.

358.    Each claim for payment involving Trasylol was false or fraudulent in implying that the drug was not misbranded and was permitted to be sold in interstate commerce and under state laws.  Each claim falsely, and at least impliedly, misrepresented that Trasylol was eligible for payment or reimbursement.

359.    Unaware of Bayer's misconduct, the United States partially compensated states for Medicaid payments for Trasylol and for inpatient care involving Trasylol.  If the United States had known that Trasylol was misbranded and prohibited from interstate commerce, it would not have made such reimbursements.  Such false or fraudulent claims for reimbursement

for Trasylol and for inpatient care involving Trasylol, and (as a separate matter) use of Trasylol

itself, resulted in damages to the United States in an amount to be determined.

## FOURTH CAUSE OF ACTION
### Violation of 31 U.S.C. § 3729(a)(2) – Medicaid Claims for Trasylol – Trasylol was a Misbranded Drug

360.    Relator re-alleges and incorporates by reference all prior paragraphs.

361.    Bayer knowingly made, and caused to be made, false statements to get false or

fraudulent claims paid by the United States for Medicaid reimbursement of Trasylol and

inpatient care involving Trasylol on or after August 5, 1999 in violation of 31 U.S.C. §

3729(a)(2).

362.    Bayer communicated and marketed Trasylol for uses other than those approved

by the FDA and outside of the FDAMA's limited exception to the dissemination of off-label

marketing materials, such as orthopedic surgery, valve surgery and pediatric surgery.  Bayer

intentionally misrepresented the safety and efficacy of Trasylol in numerous ways, including

failing to place appropriate warnings on the label or include such warnings in its marketing,

rendering such labels and advertising misleading and fraudulent.

363.    Under federal law, drug is "misbranded" if its labeling or advertising is

misleading.  21 U.S.C. §§ 321(n), 352.  If a manufacturer has notice that a drug is being used for

off-label purposes and yet fails to provide adequate labeling for those additional uses, the

manufacturer's conduct constitutes misbranding.  21 C.F.R. § 201.128.  It is illegal to introduce

or deliver for introduction into interstate commerce a drug that is "misbranded."  21 U.S.C. §

331(a).  It is likewise illegal to "misbrand" a drug in interstate commerce, or receive or distribute

102

a misbranded drug under federal and state laws.  Id. 331(b) & (c); see supra ¶ 53 (listing state statutes).

364.    Federal funds cannot be used in a manner, or for items, that are prohibited under state laws.  2 C.F.R. § 225, Appx. A(C)(1)(c) (effective 2005 to 2013); Office of Mgmt. & Budget, OMB Circular A-87, Cost Principles for State, Local, and Indian Tribal Governments (1997) (amended 2004).

365.    Bayer misbranded Trasylol by marketing and selling the drug for off-label uses, including use in orthopedic surgery, valve surgery, off-pump surgery, and pediatric surgery, and yet failing to update the label to provide relevant safety and efficacy information for such intended uses as required.

366.    Bayer further misbranded Trasylol by misrepresenting the drug's safety and efficacy.  Bayer claimed that Trasylol improved outcomes and reduced the risks of myocardial infarction (heart attack) and stroke even though Bayer knew that these claims were unsupported by data, and avoided conducting clinical trials that would yield adverse results.

367.    Bayer's statements and omissions were material to the government's Medicaid reimbursements for Trasylol, and were intended by Bayer to get the United States to make these reimbursements.

368.    Trasylol therefore was prohibited from interstate commerce and prohibited from sale or distribution by state law.  Trasylol therefore, as a matter of law, was ineligible for Medicaid reimbursement.  Bayer nevertheless caused the submission of false claims involving Trasylol and profited from sales of Trasylol that were reimbursed through the Medicaid program.

369.    Bayer's false and misleading statements and labels caused each claim for payment involving Trasylol to be false or fraudulent in implying that the drug was not misbranded and

103

was permitted to be sold in interstate commerce and under state laws.  Each claim falsely, and at least impliedly, misrepresented that Trasylol was eligible for payment or reimbursement.

370.    Unaware of Bayer's misconduct, the United States partially compensated states for Medicaid payments for Trasylol and inpatient care involving Trasylol.  If the United States had known that Trasylol was misbranded and prohibited from interstate commerce, it would not have made such reimbursements. Such false or fraudulent claims for reimbursement for Trasylol and for inpatient care involving Trasylol, and (as a separate matter) use of Trasylol itself, resulted in damages to the United States in an amount to be determined.

### FIFTH CAUSE OF ACTION
### Violation of 31 U.S.C. § 3729(a)(1) – Medicare Claims for Trasylol -- Trasylol was a Misbranded Drug

371.    Relator re-alleges and incorporates by reference all prior paragraphs.

372.    Bayer knowingly caused to be presented false or fraudulent claims for Medicare reimbursement for inpatient treatments involving Trasylol on or after August 5, 1999 in violation of 31 U.S.C. § 3729(a)(1).

373.    Under federal law, a drug is "misbranded" if its labeling or advertising is misleading.  21 U.S.C. §§ 321(n), 352.  If a manufacturer has notice that a drug is being used for off-label purposes and yet fails to provide adequate labeling for those additional uses, the manufacturer's conduct constitutes misbranding.  21 C.F.R. § 201.128.  It is illegal to introduce or deliver for introduction into interstate commerce a drug that is "misbranded."  21 U.S.C. § 331(a).  It is likewise illegal to "misbrand" a drug in interstate commerce, or receive or distribute a misbranded drug under federal and state laws.  Id. 331(b) & (c); see supra ¶ 53 (listing state statutes).

374.    Payments for claims under Medicare are conditioned on hospitals' compliance with Medicare conditions of participation, including compliance with "Federal laws related to the health and safety of patients" and the distribution of drugs "consistent with Federal and State law." 42 C.F.R. §§ 482.11, 482.25.

375.    Bayer misbranded Trasylol by marketing and selling the drug for off-label uses, including use in orthopedic surgery, valve surgery, off-pump surgery, and pediatric surgery, and yet failing to update the label to provide relevant safety and efficacy information for such intended uses as required.

376.    Bayer further misbranded Trasylol by misrepresenting the drug's safety and efficacy. Bayer claimed that Trasylol improved outcomes and reduced the risks of myocardial infarction (heart attack) and stroke even though Bayer knew that these claims were unsupported by data, and avoided conducting clinical trials that would yield adverse results.

377.    Trasylol therefore was prohibited from interstate commerce and prohibited from sale or distribution by state law. Nevertheless, hospitals submitted cost reports that included Trasylol as a covered charge and required certification that hospital services were provided in compliance with health care laws and regulations. Bayer, therefore, caused hospitals to falsely claim that Trasylol was covered by Medicare and to make false certifications of compliance with the law, and thereby profited from sales of Trasylol used for inpatient treatments that were reimbursed by Medicare.

378.    Each claim for reimbursement for inpatient treatments involving Trasylol was false or fraudulent in implying that the drug was not misbranded and permitted in interstate commerce, and therefore in violation of a condition of payment for Medicare. Each claim

105

falsely, and at least impliedly, misrepresented that Trasylol was eligible for payment or reimbursement.

379.    Unaware of Bayer's misconduct, the United States made Medicare reimbursements for inpatient treatments involving Trasylol.  If the United States had known that Bayer had willfully misrepresented Trasylol's safety and efficacy and that Trasylol was misbranded and prohibited from interstate commerce, it would not have made reimbursements for it.  Such false or fraudulent claims for reimbursement for Trasylol and related medical services, and (as a separate matter) use of Trasylol itself, resulted in damages to the United States in an amount to be determined.

## SIXTH CAUSE OF ACTION
### Violation of 31 U.S.C. § 3729(a)(2) – Medicare Claims for Trasylol – Trasylol was a Misbranded Drug

380.    Relator re-alleges and incorporates by reference all prior paragraphs.

381.    Bayer knowingly made, and caused to be made, false statements to get false or fraudulent claims paid for Medicare reimbursement of inpatient treatments involving Trasylol on or after August 5, 1999 in violation of 31 U.S.C. § 3729(a)(2).

382.    Bayer communicated and marketed Trasylol for uses other than those approved by the FDA and outside of the FDAMA's limited exception to the dissemination of off-label marketing materials, such as off-pump surgery, orthopedic surgery and valve surgery.  Bayer intentionally misrepresented the safety and efficacy of Trasylol in numerous ways, including failing to place appropriate warnings on the label or include such warnings in its marketing, rendering such labels and advertising misleading and fraudulent.

384.    Under federal law, a drug is "misbranded" if its labeling or advertising is misleading.  21 U.S.C. §§ 321(n), 352.  If a manufacturer has notice that a drug is being used for

106

off-label purposes and yet fails to provide adequate labeling for those additional uses, the manufacturer's conduct constitutes misbranding. 21 C.F.R. § 201.128. It is illegal to introduce or deliver for introduction into interstate commerce a drug that is "misbranded." 21 U.S.C. § 331(a). It is likewise illegal to "misbrand" a drug in interstate commerce, or receive or distribute a misbranded drug under federal and state laws. Id. 331(b) & (c); see supra ¶ 53 (listing state statutes).

385.    Payments for claims under Medicare are conditioned on hospitals' compliance with Medicare conditions of participation, including compliance with "Federal laws related to the health and safety of patients" and the distribution of drugs "consistent with Federal and State law." 42 C.F.R. §§ 482.11, 482.25.

386.    Bayer misbranded Trasylol by marketing and selling the drug for off-label uses, including use in orthopedic surgery, valve surgery, off-pump surgery and pediatric surgery and yet failing to update the label to provide relevant safety and efficacy information for such intended uses as required.

387.    Bayer further misbranded Trasylol by misrepresenting the drug's safety and efficacy. Bayer claimed that Trasylol improved outcomes and reduced the risks of myocardial infarction (heart attack) and stroke even though Bayer knew that these claims were unsupported by data, and avoided conducting clinical trials that would yield adverse results.

388.    Bayer's statements and omissions were material to the government's Medicare reimbursements for inpatient treatments involving Trasylol, and were intended by Bayer to get the United States to make these reimbursements.

389.    Trasylol therefore was prohibited from interstate commerce and prohibited from sale or distributions by state law. Nevertheless, hospitals submitted cost reports that included

Trasylol as a covered charge and required certification that hospital services were provided in compliance with health care laws and regulations.  Bayer, therefore, caused hospitals to falsely claim that Trasylol was covered by Medicare and to make false certifications of compliance with the law, and thereby profited from sales of Trasylol used for inpatient treatments that were reimbursed by Medicare.

390.    Each claim for reimbursement for inpatient treatments involving Trasylol was false or fraudulent in implying that the drug was not misbranded and was permitted in interstate commerce, and therefore in violation of a condition of payment for Medicare.  Each claim falsely, and at least impliedly, misrepresented that Trasylol was eligible for payment or reimbursement.

391.    Unaware of Bayer's misconduct, the United States made Medicare reimbursements for inpatient treatments involving Trasylol.  If the United States had known that Bayer had willfully misrepresented Trasylol's safety and efficacy and that Trasylol was misbranded and prohibited from interstate commerce, it would not have made such reimbursements.  Such false or fraudulent claims for reimbursement for Trasylol and related medical services, and (as a separate matter) use of Trasylol itself, resulted in damages to the United States in an amount to be determined.

### SEVENTH CAUSE OF ACTION
### Violation of 31 U.S.C. § 3729(a)(1) – Medicare Claims for Trasylol –Trasylol Use Was Not Reasonable or Necessary

392.    Relator re-alleges and incorporates by reference all prior paragraphs.

393.    Bayer knowingly caused to be presented false or fraudulent claims for Medicare reimbursement of inpatient treatments involving Trasylol on or after August 5, 1999, in violation of 31 U.S.C. § 3729(a)(1).

394.    Bayer communicated and marketed to Trasylol for uses other than those approved by the FDA and outside of the FDAMA's limited exception to the dissemination of off-label marketing materials, such as off-pump surgery, orthopedic surgery and valve surgery.  These uses lacked sufficient medical support, as reflected by the listings for Trasylol in the major drug compendia.  Bayer knew or had reason to know that Trasylol was a drug with dangerous side effects being used in situations unsupported by the data.  Bayer nevertheless encouraged off-label uses of Trasylol by physicians and hospitals.

395.    42 U.S.C. § 1395y(a)(1) excludes from Medicare Parts A and B payments for items or services that "are not reasonable or necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  As a drug with dangerous side effects being used in situations where its use was insufficiently supported by the medical evidence, Trasylol was not "reasonable or necessary for the diagnosis or treatment of illness" in such cases.  Treatments and services involving off-label usage of Trasylol therefore were not eligible for Medicare reimbursements.

396.    Accordingly, some or all claims that healthcare providers or physicians submitted for Medicare reimbursement of treatments involving Trasylol in off-label uses were false or fraudulent.  These claims falsely, and at least impliedly, misrepresented that Trasylol was eligible for reimbursement for such uses under Medicare.

397.    Unaware of Bayer's misconduct and the resulting submission of false claims, the United States made Medicare reimbursements for treatments involving Trasylol.  If the United States had known that Trasylol was not reasonable or necessary for some uses, it would not have made reimbursements for treatments involving those uses.  Such false or fraudulent claims for

reimbursement for Trasylol and related medical services, and (as a separate matter) use of Trasylol itself, resulted in damages to the United States in an amount to be determined.

### EIGHTH CAUSE OF ACTION
### Violation of 31 U.S.C. § 3729(a)(2) – Medicare Claims for Trasylol –Trasylol Use Was Not Reasonable or Necessary

398.    Relator re-alleges and incorporates by reference all prior paragraphs.

399.    Bayer knowingly made, and caused to be made, false statements to get false or fraudulent claims paid for Medicare reimbursement of inpatient treatments involving Trasylol on or after August 5, 1999, in violation of 31 U.S.C. § 3729(a)(2).

400.    Bayer communicated and marketed to Trasylol for uses other than those approved by the FDA and outside of the FDAMA's limited exception to the dissemination of off-label marketing materials, such as orthopedic surgery, off-pump surgery and valve surgery.  These uses lacked sufficient medical support, as reflected by the listings for Trasylol in the major drug compendia.  Bayer knew that Trasylol had dangerous side effects and that it had not been demonstrated safe and effective for these off-label uses.  Bayer nevertheless made numerous statements encouraging off-label uses of Trasylol by physicians and hospitals omitting warning that these uses of Trasylol had not been demonstrated to be safe and effective.  Bayer's statements and omissions were material to the government's Medicare reimbursements for inpatient treatments involving Trasylol, and were intended by Bayer to get the United States to pay these reimbursements.

401.    42 U.S.C. § 1395y(a)(1) excludes from Medicare Parts A and B payments for items or services that "are not reasonable or necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  As a drug with dangerous side effects being used in situations where its use was insufficiently supported by the medical

evidence, Trasylol was not "reasonable or necessary for the diagnosis or treatment of illness" in such cases. Treatments and services involving off-label usage of Trasylol therefore were not eligible for Medicare reimbursements.

402.    Accordingly, some or all claims that healthcare providers submitted for Medicare reimbursement of inpatient treatments involving Trasylol in off-label uses were false or fraudulent.  These claims falsely, and at least impliedly, misrepresented that Trasylol was eligible for reimbursement for such uses under Medicare.

403.    Unaware of Bayer's misconduct and the resulting submission of false claims, the United States made Medicare reimbursements for treatments involving Trasylol.  If the United States had known that Trasylol was not reasonable or necessary for some uses, it would not have made reimbursements for treatments involving those uses.  Such false or fraudulent claims for reimbursement for Trasylol and related medical services, and (as a separate matter) use of Trasylol itself, resulted in damages to the United States in an amount to be determined.

### NINTH CAUSE OF ACTION
### Violation of 31 U.S.C. § 3729(a)(1) -- Medicaid Claims for Trasylol – Anti-Kickback Statute Violations

404.    Relator re-alleges and incorporates by reference all prior paragraphs.

405.    Bayer violated the Anti-Kickback Statute, and as a consequence violated 31 U.S.C. § 3729(a)(1) by causing to be presented claims for Medicaid reimbursements for Trasylol and inpatient care involving Trasylol on or after August 5, 1999 that were false or fraudulent.

406.    The Anti-Kickback Statute makes it illegal to make or accept a payment to induce or reward a person for arranging for federally funded medical services.  42 U.S.C. § 1320a-7b(b).

407.    Compliance with the Anti-Kickback Statute is a condition of payment under federal healthcare programs.  In addition, many States require certification of compliance with

state and federal laws, including anti-kickback statutes, as a condition of healthcare provider's enrollment into the State's Medicaid program.  All claims for payment within the Medicaid program therefore imply that the items or services for which payment is claimed did not result from violations of the Anti-Kickback Statute, or any state anti-kickback statute.

408.    Bayer marketed Trasylol using an extensive array of kickback schemes (including sham Consultant/Advisory Board meetings, unrestricted grants as rewards for increased use, and free, but lavish, CME programs), to induce healthcare providers to use Trasylol, and especially to encourage the use of Trasylol off-label.  As a result, claims for payment for Trasylol and related medical services that were the product of those kickbacks were false in implying that the administration of Trasylol and related medical services did not result from violations of the Anti-Kickback Statute or state anti-kickback statutes.

409.    Unaware of Bayer's misconduct, the United States made Medicaid reimbursements for Trasylol, inpatient treatment involving Traylol, and related medical services to healthcare providers that were the result of kickbacks.  If the United States had known that Bayer used kickbacks to promote Trasylol, it would not have made Medicaid reimbursements to healthcare providers that were the result of such kickbacks. Such false or fraudulent claims for reimbursement for Trasylol and related medical services resulted in damages to the United States in an amount to be determined.

### TENTH CAUSE OF ACTION
### Violation of 31 U.S.C. § 3729(a)(1), (a)(2) & (a)(7) — Medicare Claims for Trasylol – Anti-Kickback Statute Violations

410.    Relator re-alleges and incorporates by reference all prior paragraphs.

411.    Bayer violated the Anti-Kickback Statute, and as a consequence violated 31 U.S.C. § 3729(a)(1) by causing to be presented claims for Medicare reimbursements for inpatient

112

treatments involving Trasylol on or after August 5, 1999 that were false or fraudulent; violated

31 U.S.C. § 3729(a)(2) by causing healthcare providers to submit false certifications of

compliance with the Anti-Kickback Statute to get claims paid on or after August 5, 1999; and

violated 31 U.S.C. § 3729(a)(7) by causing healthcare providers to submit false certifications of

compliance with the Anti-Kickback Statute on or after August 5, 1999 that concealed and

avoided their obligation to return reimbursements to the United States.

412.    The Anti-Kickback Statute makes it illegal to make or accept a payment to induce

or reward a person for arranging for federally funded medical services.  42 U.S.C. § 1320a-7b(b).

413.    Compliance with the Anti-Kickback Statute is a condition of payment under

federal healthcare programs.

414.    Healthcare providers who submitted claims for inpatient treatments involving

Trasylol certified on form CMS-855A or CMS-855I, or an equivalent form, their understanding

that "payment of a claim by Medicare is conditioned upon the claim and the underlying

transaction complying with" laws including the Anti-Kickback Statute.

415.    In addition, 42 C.F.R. § 413.24(f)(4)(iv) requires a certificate of compliance with

federal health care law with the filing of a cost report as a prerequisite to eligibility under the

Medicare program.  Healthcare providers submitted cost reports for reimbursement on form

CMS-2552 (previously HCFA-2552) certifying compliance with all health care services laws and

regulations.

416.    These certifications were false because Bayer marketed Trasylol using an

extensive array of kickback schemes (including sham Consultant/Advisory Board meetings,

unrestricted grants as rewards for increased use, and free, but lavish, CME programs) to induce

healthcare providers to use Trasylol, and especially to encourage the use of Trasylol off-label and in situations Bayer knew were unsafe and unsupported by the data.

417.    Unaware of Bayer's misconduct, the United States made Medicare reimbursements for inpatient treatments and related medical services involving Trasylol that were the result of kickbacks.

418.    If the United States had known that healthcare providers had falsely certified compliance with the Anti-Kickback Statute, it would not have made Medicare reimbursements to those healthcare providers.  In addition, false certifications of compliance with the Anti-Kickback Statute in cost reports avoided obligations to return funds obtained by Medicare reimbursements for inpatient treatments involving Trasylol.  Such false or fraudulent claims for reimbursement for inpatient treatments involving Trasylol and related medical services resulted in damages to the United States in an amount to be determined.

## ELEVENTH CAUSE OF ACTION
### Violation of 31 U.S.C. § 3729(a)(1) – Medicaid Claims for Avelox – Anti-Kickback Statute Violations

419.    Relator re-alleges and incorporates by reference all prior paragraphs.

420.    Bayer violated the Anti-Kickback Statute, and as a consequence violated 31 U.S.C. § 3729(a)(1) by causing to be presented claims for Medicaid reimbursements for Avelox on or after July 24, 2000 that were false or fraudulent.

421.    The Anti-Kickback Statute makes it illegal to make or accept a payment to induce or reward a person for arranging for federally funded medical services.  42 U.S.C. § 1320a-7b(b).

422.    Compliance with the Anti-Kickback Statute is a condition of payment under federal healthcare programs.  In addition, many States require certification of compliance with state and federal laws, including anti-kickback statutes, as a condition of healthcare provider's

114

enrollment into the State's Medicaid program.  All claims for payment within the Medicaid program therefore imply that the items or services for which payment is claimed did not result from violations of the Anti-Kickback Statute, or any state anti-kickback statutes.

423.    Bayer marketed Avelox using an extensive array of kickback schemes including sham Consultant/Advisory Board meetings, unrestricted grants as rewards for increased use, and free, but lavish, CME programs, to induce healthcare providers to use Avelox.  As a result, claims for payment for Avelox and related medical services that were the product of those kickbacks were false in implying that the Avelox and related medical services provided did not result from violations of the Anti-Kickback Statute or state anti-kickback statutes.

424.    Unaware of Bayer's misconduct, the United States partially compensated States for Medicaid payments for Avelox and inpatient services involving Avelox to healthcare providers that were the product of kickbacks.  If the United States had known that Bayer used kickbacks to promote Avelox, it would not have compensated a state Medicaid program for payments to healthcare providers that were the product of kickbacks.  Such false or fraudulent claims for reimbursement for Avelox and related medical services resulted in damages to the United States in an amount to be determined.

### TWELFTH CAUSE OF ACTION
### Violation of 31 U.S.C. § 3729(a)(1), (a)(2) & (a)(7) — Medicare Claims for Avelox– Anti-Kickback Statute Violations

425.    Relator re-alleges and incorporates by reference all prior paragraphs.

426.    Bayer violated the Anti-Kickback Statute, and as a consequence violated 31 U.S.C. § 3729(a)(1) by causing to be presented claims for Medicare reimbursements for Avelox on or after July 24, 2000 that were false or fraudulent; violated 31 U.S.C. § 3729(a)(2) by causing healthcare providers to submit false certifications of compliance with the Anti-Kickback

Statute on or after July 24, 2000 to get claims paid; and violated 31 U.S.C. § 3729(a)(7) by causing healthcare providers to submit false certifications of compliance with the Anti-Kickback Statute on or after July 24, 2000 that concealed and avoided their obligation to return reimbursements to the United States.

427.    The Anti-Kickback Statute makes it illegal to make or accept a payment to induce or reward a person for arranging for federally funded medical services.  42 U.S.C. § 1320a-7b(b).

428.    Compliance with the Anti-Kickback statute is a condition of payment under federal healthcare programs.

429.    Healthcare providers who submitted claims for Avelox or inpatient treatments involving Avelox certified on form CMS-855A or CMS-855I, or an equivalent form, their understanding that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with" laws including the Anti-Kickback Statute.

430.    In addition, 42 C.F.R. § 413.24(f)(4)(iv) requires a certificate of compliance with federal health care law with the filing of a cost report as a prerequisite to eligibility under the Medicare program.  Healthcare providers submitted cost reports for reimbursement on form CMS-2552 (previously HCFA-2552) certifying compliance with all health care services laws and regulations.

431.    These certifications were false because Bayer marketed Avelox using an extensive array of kickback schemes including honoraria paid to physicians known as "Key Opinion Leaders" (or "KOLs"), honoraria and "consulting fees" paid to physicians who attended meetings promoting Avelox, and gifts and lavish meals for physicians.

432.    Unaware of Bayer's misconduct, the United States made Medicare reimbursements for Avelox and inpatient services involving Avelox to healthcare providers who

116

submitted claims that were the product of kickbacks.  If the United States had known that healthcare providers had falsely certified compliance with the Anti-Kickback Statute, it would not have made Medicare reimbursements for claims that were the product of those kickbacks.  In addition, false certifications of compliance with the Anti-Kickback Statute in cost reports avoided obligations to return funds obtained by Medicare reimbursements for Avelox.  Such false or fraudulent claims for reimbursement for Avelox and related medical services resulted in damages to the United States in an amount to be determined.

**THIRTEENTH CAUSE OF ACTION**
**California False Claims Act**
**(Cal. Govt. Code §§ 12650 *et seq*.)**

433.    Relator re-alleges and incorporates by reference all prior paragraphs.

434.    This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Govt. Code §§ 12650 *et seq*.

435.    By virtue of the acts described above, Defendants "[k]nowingly present[ed] or cause[d] to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval," of claims for reimbursement of Trasylol and Avelox and related medical services in violation of Cal. Gov't Code § 12651(a)(1).

436.    By virtue of the acts described above, Defendants "knowingly ma[de], use[d], or cause[d] to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision," in violation of Cal. Gov't Code § 12651(a)(2).

437.    The State of California, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

438.    By reason of these payments, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

117

439.     Pursuant to Cal. Gov't Code § 12651(a), the State of California is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## FOURTEENTH CAUSE OF ACTION
### Delaware False Claims and Reporting Act
### (6 Del. Code §§ 1201 *et seq.*)

440.     Relator re-alleges and incorporates by reference all prior paragraphs.

441.     This is a claim for treble damages and civil penalties under the Delaware False Claims and Reporting Act, 6 Del C. §§ 1201 *et seq*.

442.     By virtue of the acts described above, Defendants "knowingly present[ed], or cause[d] to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval" of claims for reimbursement of Trasylol and Avelox and related medical services in violation of 6 Del. Code Ann. § 1201(a)(1).

443.     By virtue of the acts described above, Defendants "knowingly ma[de], use[d], or cause[d] to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved," in violation of 6 Del. Code Ann. § 1201(a)(2).

444.     The State of Delaware, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

445.     By reason of these payments, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

446.     Pursuant to 6 Del. Code Ann. § 1201(a), the State of Delaware is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## FIFTEENTH CAUSE OF ACTION
### Florida False Claims Act
### (Fla. Stat. §§ 68.081 *et seq.*)

447.    Relator re-alleges and incorporates by reference all prior paragraphs.

448.    This is a claim for treble damages and civil penalties under the Florida False

Claims Act, Fla. Stat. §§ 68.081 *et seq.*

449.    By virtue of the acts described above, Defendants "[k]nowingly present[ed] or

cause[d] to be presented to an officer or employee of an agency a false claim for payment or

approval" of claims for reimbursement of Trasylol and Avelox and related medical services in

violation of Fla. Stat. Ann. § 68.082(2)(a).

450.    By virtue of the acts described above, Defendants "[k]nowingly ma[de], use[d], or

cause[d] to be made or used a false record or statement to get a false or fraudulent claim paid or

approved by an agency,", in violation of Fla. Stat. Ann. § 68.082(2)(b).

451.    The State of Florida, unaware of the falsity or fraudulent nature of the claims

caused by Defendants, paid for claims that otherwise would not have been allowed.

452.    By reason of these payments, the State of Florida has been damaged, and

continues to be damaged, in a substantial amount to be determined at trial.

453.    Pursuant to Fla. Stat. Ann. § 68.082(2)(g), the State of Florida is entitled to three

times the amount of actual damages plus the maximum penalty of $10,000 for each and every

false or fraudulent claim, record or statement made, used, presented or caused to be made, used

or presented by the Defendants.

## SIXTEENTH CAUSE OF ACTION
### Georgia False Medicaid Claims Act
### (O.C.G.A. §§ 49-4-168 *et seq.*)

454.    Relator re-alleges and incorporates by reference all prior paragraphs.

119

455.    This is a claim for treble damages and civil penalties under the Georgia False

Medicaid Claims Act, O.C.G.A. §§ 49-4-168 *et seq*.

456.    By virtue of the submissions of non-reimbursable claims as described above,

Defendants knowingly caused to be presented to the Georgia Medicaid Program false or

fraudulent claims for the improper payment or approval of claims for reimbursement of Trasylol

and Avelox and related medical services and used false or fraudulent records to accomplish this

purpose.

457.    The Georgia Medicaid Program, unaware of the falsity or fraudulent nature of the

claims caused by Defendants, paid for claims that otherwise would not have been allowed.

458.    By reason of these payments, the Georgia Medicaid Program has been damaged,

and continues to be damaged, in a substantial amount to be determined at trial. Pursuant to Ga.

Code Ann. § 49-4-168.1(a), the State of Georgia is entitled to three times the amount of actual

damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim,

record or statement made, used, presented or caused to be made, used or presented by

Defendants.

**SEVENTEENTH CAUSE OF ACTION**
**Hawaii False Claims Act**
**(Haw. Rev. Stat. §§ 661-21 *et seq*.)**

459.    Relator re-alleges and incorporates by reference all prior paragraphs.

460.    This is a claim for treble damages and civil penalties under the Hawaii False

Claims Act, Haw. Rev. Stat. §§ 661-21 *et seq*.

461.    By virtue of the submissions of non-reimbursable claims as described above,

Defendants knowingly caused to be presented to an officer or employee of the State of Hawaii

false or fraudulent claims for the improper payment or approval and used false or fraudulent

records to accomplish this purpose. By virtue of the acts described above, Defendants

"[k]nowingly present[ed], or cause[d] to be presented, to an officer or employee of the State a false or fraudulent claim for payment or approval" of claims for reimbursement of Trasylol and Avelox and related medical services in violation of Haw. Rev. Stat. § 661-21(a)(1).

462.   By virtue of the acts described above, Defendants "[k]nowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State," in violation of Haw. Rev. Stat. § 661-21(a)(2).

463.   The State of Hawaii, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

464.   By reason of these payments, the State of Hawaii has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Pursuant to Haw. Rev. Stat. § 661-21(a)(8) the State of Hawaii is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by defendants.

### EIGHTEENTH CAUSE OF ACTION
### Illinois Whistleblower Reward and Protection Act
### (740 Ill. Comp. Stat. §§ 175/1 *et seq*.)

465.   Relator re-alleges and incorporates by reference all prior paragraphs.

466.   This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §§ 175/1 *et seq*.

467.   By virtue of the acts described above, Defendants "knowingly present[ed], or cause[d] to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval" of claims for reimbursement of Trasylol and Avelox and related medical services in violation of 740 Ill. Comp. Stat. § 175/3(a)(1).

121

468.     By virtue of the acts described above, Defendants "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State," in violation of 740 Ill. Comp. Stat. § 175/3(a)(2).

469.     The State of Illinois, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

470.     By reason of these payments, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Pursuant to 740 Ill. Comp. Stat. § 175/3(a)(7), the State of Illinois is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by defendants.

## NINETEENTH CAUSE OF ACTION
## Indiana False Claims and Whistleblower Protection Act
## (In. Code §§ 5-11-5.5 *et seq.*)

471.     Relator re-alleges and incorporates by reference all prior paragraphs.

472.     This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, In. Code §§ 5-11-5.5 *et seq*.

473.     By virtue of the submissions of non-reimbursable claims as described above, Defendants knowingly caused to be presented to the Indiana Medicaid Program false or fraudulent claims for the improper payment or approval of claims for reimbursement of Trasylol and Avelox and related medical services and used false or fraudulent records to accomplish this purpose.

474.     The Indiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

122

475.    By reason of these payments, the Indiana Medicaid Program has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

476.    Pursuant to Ind. Code § 5-11-5.5-2(b), the State of Indiana is entitled to three times the amount of actual damages plus at least $5,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**TWENTIETH CAUSE OF ACTION**
**Louisiana False Claims Act**
**(46 La. Rev. Stat. ch. 3 §§ 437.1 *et seq.*)**

477.    Relator re-alleges and incorporates by reference all prior paragraphs.

478.    This is a claim for treble damages and civil penalties under the Louisiana False Claims Act, 46 La. Rev. Stat. Ch. 3 §§ 437.1 *et seq*.

479.    By virtue of the acts described above, Defendants offered or paid remuneration, including but not limited to kickbacks, directly or indirectly, overtly or covertly, in cash or in kind, for a good, supply, or service for which payment may be made, in whole or in part, under the medical assistance programs.

480.    By virtue of the acts described above, Defendants "knowingly present[ed] or cause[d] to be presented a false or fraudulent claim" for reimbursement of Trasylol and Avelox and related medical services and used false or fraudulent records to accomplish this purpose in violation of 46 La. Rev. Stat. Ann. Ch. 3 § 438.3(A).

481.    By virtue of the acts described above, Defendants "knowingly engage[d] in misrepresentation to obtain, or attempt to obtain, payment from medical assistance programs funds" for reimbursement of Trasylol and Avelox and related medical services and used false or fraudulent records to accomplish this purpose in violation of 46 La. Rev. Stat. Ann. Ch. 3 § 438.3(B).

482.    By reason of these payments, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

483.    Pursuant to 46 La. Rev. Stat. Ann. c. 3 § 438.5 and § 438.6, the State of Louisiana is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by defendants.

**TWENTY-FIRST CAUSE OF ACTION**
**Massachusetts False Claims Act**
**(Mass. Gen. Laws ch. 12 §§ 5A *et seq.*)**

484.    Relator re-alleges and incorporates by reference all prior paragraphs.

485.    This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 §§ 5A *et seq.*

486.    By virtue of the acts described above, Defendants "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval" of claims for reimbursement of Trasylol and Avelox and related medical services  in violation of Mass. Gen. Laws ch. 12 § 5B(1).

487.    By virtue of the acts described above, Defendants "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof," in violation of Mass. Gen. Laws ch. 12 § 5B(2).

488.    The Massachusetts commonwealth government, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

489.    By reason of the Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

490.     Pursuant to Mass. Gen. Laws ch. 12 § 5B(9), the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by defendants.

<u>**TWENTY-SECOND CAUSE OF ACTION**</u>
<u>**Michigan Medicaid False Claim Act**</u>
<u>**(MCLS §§ 400.601 *et seq.*)**</u>

491.     Relator re-alleges and incorporates by reference all prior paragraphs.

492.     This is a claim for civil penalties under the Michigan Medicaid False Claims Act, MCLS §§ 400.601 *et seq.*

493.     By virtue of the submissions of non-reimbursable claims as described above, Defendants knowingly caused to be made to the Michigan Medicaid Program false statements or false representations of material fact in the application for Medicaid benefits and for use in determining rights to Medicaid benefits.  Defendants knowingly caused to be submitted to the State of Michigan false or fraudulent claims for the improper payment or approval of claims for reimbursement of Trasylol and Avelox and related medical services and used false or fraudulent records to accomplish this purpose

494.     The Michigan Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

495.     By reason of these payments, the Michigan Medicaid Program has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

496.     Pursuant to Mich. Comp. Laws § 400.612, the State of Michigan is entitled to a civil penalty equal to the full amount received by the person benefiting from the fraud plus triple the amount of damages suffered by the state as a result of the conduct by the person.

**TWENTY-THIRD CAUSE OF ACTION**
**Montana False Claims Act**
**(Mont. Code. §§ 17-8-401 *et seq.*)**

497.    Relator re-alleges and incorporates by reference all prior paragraphs.

498.    This is a claim for treble damages and civil penalties under the Montana False

Claims Act, Mont. Code §§ 17-8-401 *et seq*.

499.    By virtue of the submissions of non-reimbursable claims as described above,

Defendants knowingly caused to be presented to the Montana Medicaid Program false or

fraudulent claims for the improper payment or approval of claims for reimbursement of Trasylol

and Avelox and related medical services and used false or fraudulent records to accomplish this

purpose.

500.    The Montana Medicaid Program, unaware of the falsity or fraudulent nature of

the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

501.    By reason of these payments, the Montana Medicaid Program has been damaged,

and continues to be damaged, in a substantial amount to be determined at trial.

502.    Pursuant to Mont. Code Ann. § 17-8-403, the State of Montana is entitled to three

times the amount of actual damages plus the maximum penalty of $10,000 for each and every

false or fraudulent claim, record or statement made, used, presented or caused to be made, used

or presented by Defendants.

**TWENTY-FOURTH CAUSE OF ACTION**
**Nevada False Claims Act**
**(Nev. Rev. Stat. §§ 357.010 *et seq.*)**

503.    Relator re-alleges and incorporates by reference all prior paragraphs.

504.    This is a claim for treble damages and civil penalties under the Nevada False

Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*

505.     By virtue of the acts described above, Defendants "[k]nowingly present[ed] or cause[d] to be presented a false claim for payment or approval" of claims for reimbursement of Trasylol and Avelox and related medical services  in violation of Nev. Rev. Stat. Ann. § 357.040(1)(a).

506.     By virtue of the acts described above, Defendants "[k]nowingly ma[de] or use[d], or cause[d] to be made or used, a false record or statement to obtain payment or approval of a false claim," in violation of Nev. Rev. Stat. Ann. § 357.040(1)(b).

507.     The Nevada state government, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

508.     By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

509.     Pursuant to Nev. Rev. Stat. Ann. § 357.040(1), the State of Nevada is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by defendants.

### TWENTY-FIFTH CAUSE OF ACTION
### New Hampshire Medicaid Fraud and False Claims Law
### (N.H. Rev. Stat. Ann. §§ 167:61 *et seq.*)

510.     Relator re-alleges and incorporates by reference all prior paragraphs.

511.     This is a claim for treble damages and civil penalties under the New Hampshire Medicaid Fraud and False Claims Law, N.H. Rev. Stat. Ann. §§ 167:61, *et seq*.

512.     By virtue of the submissions of non-reimbursable claims as described above, Defendants knowingly caused to be presented to the New Hampshire Medicaid Program false or fraudulent claims for the improper payment or approval of claims for reimbursement of Trasylol

and Avelox and related medical services and used false or fraudulent records to accomplish this purpose.

513.     The New Hampshire Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

514.     By reason of these payments, the New Hampshire Medicaid Program has been damaged, and continues to be damaged, in excess of $5,000.

515.     Pursuant to § 167:61-b, the State of New Hampshire is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**TWENTY-SIXTH CAUSE OF ACTION**
**New Mexico Fraud Against Taxpayers Act**
**(N.M.S. §§ 44-9-1, *et seq.*)**

516.     Relator re-alleges and incorporates by reference all prior paragraphs.

517.     This is a claim for treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act, N.M.S. §§ 44-9-1, *et seq.*

518.     By virtue of the acts described above, the Defendants "present[ed], or cause[d] to be presented, to an employee, officer or agent of the state or to a contractor, grantee or other recipient of state funds a false or fraudulent claim for payment or approval" of claims for reimbursement of Trasylol and Avelox and related medical services  in violation of N.M. Stat. Ann. § 44-9-3(A)(1).

519.     By virtue of the acts described above, the Defendants "ma[de] or use[d], or cause[d] to be made or used, a false, misleading or fraudulent record or statement to obtain or

128

support the approval of or the payment on a false or fraudulent claim," in violation of N.M. Stat. Ann. § 44-9-3(A)(2).

520.    The New Mexico state government, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

521.    By reason of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

522.    Pursuant to N.M. Stat. Ann. § 44-9-3(C), the State of New Mexico is entitled to three times the amount of actual damages plus the maximum penalty which may be applicable for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the defendants.

**TWENTY-SEVENTH CAUSE OF ACTION**
**New York False Claims Act**
**(N.Y. Fin. Law §§ 187 *et seq*.)**

523.    Relator re-alleges and incorporates by reference all prior paragraphs.

524.    This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. Fin. Law §§ 187 *et seq*.

525.    By virtue of the acts described above, Defendants "knowingly present[ed], or cause[d] to be presented, to any employee, officer or agent of the state or a local government, a false or fraudulent claim for payment or approval" of claims for reimbursement of Trasylol and Avelox and related medical services  in violation of N.Y. Fin. Law § 189.1(a).

526.    By virtue of the acts described above, Defendants "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a local government," in violation of N.Y. Fin. Law § 189.1(b).

527.    The New York state government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants,

paid and continues to pay the claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

528.    By reason of the Defendants' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

529.    Pursuant to N.Y. Fin. Law § 189.1(g), the State of New York is entitled to three times the amount of actual damages plus the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWENTY-EIGHTH CAUSE OF ACTION
### Oklahoma Medicaid False Claims Act
### (Okla. Stat. Ann. §§ 5053 *et seq.*)

530.    Relator re-alleges and incorporates by reference all prior paragraphs.

531.    This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, Okla. Stat. Ann. §§ 5053 *et seq.*

532.    By virtue of the submissions of non-reimbursable claims as described above, Defendants knowingly caused to be presented to an officer or employee of the State of Oklahoma false or fraudulent claims for the improper payment or approval of claims for reimbursement of Trasylol and Avelox and related medical services and used false or fraudulent records to accomplish this purpose.

533.    The State of Oklahoma, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

534.    By reason of these payments, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

535.    Pursuant to 63 Okla. Stat. Ann. § 5053.1(B), the State of Oklahoma is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and

130

every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWENTY-NINTH CAUSE OF ACTION
### Rhode Island False Claims Act
### (R. I. St. §§ 9-1.1-1 *et seq.*)

536.    Relator re-alleges and incorporates by reference all prior paragraphs.

537.    This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act, R. I. St. §§ 9-1.1-1 *et seq.*

538.    By virtue of the submissions of non-reimbursable claims as described above, Defendants knowingly caused to be presented to an officer or employee of the state of Rhode Island false or fraudulent claims for the improper payment or approval of claims for reimbursement of Trasylol and Avelox and related medical services and used false or fraudulent records to accomplish this purpose.

539.    The State of Rhode Island, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

540.    By reason of these payments, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

541.    Pursuant to R.I. Gen. Laws § 9-1.1-3, the State of Rhode Island is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## THIRTIETH CAUSE OF ACTION
### Tennessee Medicaid False Claims Act
### (Tenn. Code §§ 71-5-181 *et seq.*)

542.    Relator re-alleges and incorporates by reference all prior paragraphs.

543.     This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code §§ 71-5-181 *et seq.*

544.     By virtue of the submissions of non-reimbursable claims as described above, Defendants knowingly caused to be presented to the State of Tennessee false or fraudulent claims for the improper payment or approval of claims for reimbursement of Trasylol and Avelox and related medical services and used false or fraudulent records to accomplish this purpose in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

545.     By virtue of the acts described above, Defendants "[m]a[de], used, or caus[ed] to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false," in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

546.     The State of Tennessee, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

547.     By reason of these payments, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

548.     Pursuant to Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by defendants.

### THIRTY-FIRST CAUSE OF ACTION
### Virginia Fraud Against Taxpayers Act
### (Va. Code Ann. §§ 8.01-216.1 *et seq.*)

549.     Relator re-alleges and incorporates by reference all prior paragraphs.

550.     This is a claim for treble damages and civil penalties under the Virginia Fraud against Taxpayers Act, Va. Code §§ 8.01-216.1 *et seq.*

551.    By virtue of the acts described above, Defendants "[k]nowingly present[ed], or cause[d] to be presented, to an officer or employee of the Commonwealth a false or fraudulent claim for payment or approval" of claims for reimbursement of Trasylol and Avelox and related medical services  in violation of Va. Code Ann. § 8.01-216.3(A)(1).

552.    By virtue of the acts described above, Defendants "[k]nowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth," in violation of Va. Code Ann. § 8.01-216.3(A)(2).

553.    The Virginia commonwealth government, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

554.     By reason of the Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

555.    Pursuant to Va. Code Ann. § 8.01-216.3(A), the Commonwealth of Virginia is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by defendants.

### THIRTY-SECOND CAUSE OF ACTION
#### Wisconsin False Claims Act
#### (Wis. Stat. Ann. §§ 20.931(1) *et seq.*)

556.    Relator re-alleges and incorporates by reference all prior paragraphs.

557.    This is a claim for treble damages and civil penalties under the Wisconsin False Claims Act, Wis. Stat. Ann. §§ 20.931(1) *et seq*.

558.    By virtue of the submissions of non-reimbursable claims as described above, Defendants knowingly caused to be presented to an officer, employee, or agent of the State of Wisconsin false or fraudulent claims for the improper payment or approval of claims for

133

reimbursement of Trasylol and Avelox and related medical services and used false or fraudulent records to accomplish this purpose.

559.    The State of Wisconsin, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

560.    By reason of these payments, the State of Wisconsin has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

561.    Pursuant to Wis. Stat. § 20.931(2), the State of Wisconsin is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**THIRTY-THIRD CAUSE OF ACTION**
**District of Columbia False Claims Act**
**(D.C. Code §§ 2-308.13 *et seq*.)**

562.    Relator re-alleges and incorporates by reference all prior paragraphs.

563.    This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code §§ 2-308.13 *et seq*.

564.    By virtue of the acts described above, Defendants "[k]nowingly present[ed], or cause[d] to be presented, to an officer or employee of the District a false claim for payment or approval" of claims for reimbursement of Trasylol and Avelox and related medical services  in violation of D.C. Code Ann. § 2-308.14(a)(1).

565.    By virtue of the acts described above, Defendants "[k]nowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to get a false claim paid or approved by the District," in violation of D.C. Code Ann. § 2-308.14(a)(2).

566.    The District of Columbia, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

134

567.     By reason of these payments, the District of Columbia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

568.     Pursuant to D.C. Code Ann. § 2-308.14(a), the District of Columbia is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by defendants.

## THIRTY-FOURTH CAUSE OF ACTION
### False Claims Act:  Retaliation Against Relator Simpson
### (31 U.S.C. § 3730(h))

569.     Plaintiff re-alleges and incorporates by reference all prior paragraphs.

570.     As more particularly set forth in the foregoing paragraphs by virtue of the acts alleged herein, the Defendants discharged, demoted, threatened, harassed, and/or discriminated against Plaintiff in the terms and conditions of her employment in violation of 31 U.S.C. § 3730(h) after Plaintiff had lawfully investigated and reported to her superiors what she believed to be fraudulent conduct or wrongdoing.  Plaintiff seeks compensatory damages, damages for emotional distress, and other appropriate statutory relief pursuant to this section.

## THIRTY-FIFTH CAUSE OF ACTION
### New York False Claims Act:  Retaliation Against Relator Simpson
### (N.Y. Fin. Law § 191)

571.     Plaintiff re-alleges and incorporates by reference all prior paragraphs.

572.     As more particularly set forth in the foregoing paragraphs,  by virtue of the acts alleged herein, the Defendants discharged, demoted, suspended, threatened, harassed, and discriminated against Plaintiff in the terms and conditions of her employment after Plaintiff lawfully reported and investigated what she believed to be fraudulent conduct or wrongdoing to her superiors, in violation of N.Y. Fin. Law § 191 in furtherance of an investigation or other

efforts to stop one or more violations of that statute.  Plaintiff seeks compensatory damages and damages for emotional distress and other appropriate statutory relief pursuant to this section.

## XII.   PRAYER FOR RELIEF

**WHEREFORE**, Relator, on behalf of the United States Government and the States, demands judgment against the above-named Defendants, ordering that:

**As to the Federal Claims:**

a.      Pursuant to 31 U.S.C. § 3729(a), Defendants pay:  an amount equal to three times the amount of damages that the United States Government has sustained as a result of Defendants' actions, which Relator currently estimates to be in the hundreds of millions of dollars; plus a civil penalty of not less than $5,500 and not more than $10,000 for each violation of 31 U.S.C. §§ 3729 *et seq.*, or such other penalty as the law may permit and/or require for each violation of other laws that governed Defendants' conduct.

b.      Relator be awarded a relator's share of the judgment to the maximum amount provided pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law;

c.      Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730(o) and any other applicable provision of the law; and

d.      Relator be awarded such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the False Claims Act for retaliatory discharge, including:

(1) two times the amount of back pay with appropriate interest including pre-and post-judgment interest;

(2) compensation for special damages, including damages for emotional distress, sustained by Relator in an amount to be determined at trial;

(3) litigation costs and reasonable attorney's fees; and

136

(4) such punitive damages as may be awarded under applicable law.

**As to the State Claims:**

e.      As provided by the following state and city laws, Relator and each named State

Plaintiff be awarded statutory damages in an amount equal to three times the amount of actual

damages sustained by each state and city as a result of Defendants' actions, as well as the

maximum statutory civil penalty for each violation by Defendants within each state and city;

Relator be awarded a relator's share of any judgment; Relator be awarded all costs and expenses

associated with each of the pendent state and city claims, plus attorneys' fees:

> Cal. Govt. Code §§ 12650 *et seq.*;
> 6 Del. C. §§ 1201 *et seq.*;
> Fla. Stat. Ann. §§ 68.081 *et seq.*;
> O.C.G.A. §§ 49-4-168 *et seq.*;
> Haw. Rev. Stat. §§ 661-21 *et seq.*;
> 740 Ill. Comp. Stat. §§ 175/1 *et seq.*;
> In. Code §§ 5-11-5.5 *et seq.*;
> 46 La. Rev. Stat. ch. 3 §§ 437.1 *et seq.*;
> Mass. Gen. Laws ch. 12 §§ 5A *et seq.*;
> MCLS §§ 400.601 *et seq.*
> Mont. Code §§ 17-8-401 *et seq.*;
> Nev. Rev. Stat. Ann. §§ 357.010 *et seq.*;
> N.H. Rev. Stat. Ann. §§ 167:61 *et seq.*;
> N.M.S.A. §§ 44-9-1 *et seq.*;
> N.Y. Fin. Law §§ 187 *et seq.*;
> Okla. Stat. Ann. §§ 5053 *et seq.*;
> R.I. St. §§ 9-1.1-1 *et seq.*;
> Tenn. Code Ann. §§ 71-5-181 *et seq.*;
> Va. Code. Ann. §§ 8.01-216.1 *et seq.*;
> Wis. Stat. Ann. §§ 20.931(1) *et seq.*; *and*
> D.C. Code Ann. §§ 2-308.13 *et seq.*

f.      Plaintiff be awarded such relief as is appropriate under the provisions of N.Y. Fin.

Law § 191 for retaliatory discharge, including:

> (1)    two times the amount of back pay with appropriate interest including pre-
>
>         and post-judgment interest;
>
> (2)    compensation for special damages, including damages for emotional

137

distress, sustained by Relator in an amount to be determined at trial;

(3)      litigation costs and reasonable attorney's fees; and

(4)      such punitive damages as may be awarded under applicable law.

g.      Plaintiff be awarded actual and punitive damages.

h.      Relator, the United States and the State and City Plaintiffs be awarded such other

and further relief as the Court may deem to be just and proper.

**JURY DEMAND**

Relator hereby demands a trial by jury as to all issues.

Dated: Radnor, PA
       April 14, 2015

KESSLER TOPAZ MELTZER
& CHECK LLP

By: /s/ David A. Bocian
David A. Bocian
KESSLER TOPAZ MELTZER & CHECK LLP
280 King of Prussia Road
Radnor, PA 19087
Tel. (484) 270-1418
Fax. (610) 667-7056
dbocian@ktmc.com

Counsel for Relator Simpson